# EXHIBIT 4

1           **UNITED STATES DISTRICT COURT**
            **SOUTHERN DISTRICT OF FLORIDA**
2                  **MIAMI DIVISION**

3           **CASE NUMBER 19-20979-CIV-MOORE**

4  **AXOS CLEARING, LLC,**

5              Plaintiff,                      **Courtroom 13-1**

6     vs.                                      **Miami, Florida**

7  **SCOTT RICHARD REYNOLDS, an individual,     April 4, 2019**
   **SRR FORTRESS CAPITAL, LLC, a**
8  **Florida limited liability company,**

9              Defendants.

10 ═══════════════════════════════════════════════════════════

            **PROCEEDINGS ON THE EMERGENCY MOTION TO DISSOLVE**
11           **THE WRITS OF GARNISHMENT AND ATTACHMENT**
             **BEFORE THE HONORABLE K. MICHAEL MOORE**
12            **CHIEF UNITED STATES DISTRICT JUDGE**

13 ═══════════════════════════════════════════════════════════

   **APPEARANCES:**
14 **FOR THE PLAINTIFF:**      **ANDRE J. CRONTHALL, ESQ.**
                             Sheppard Mullin Richter & Hampton, LLP
15                           333 South Hope Street
                             43rd Floor
16                           Los Angeles, California 90071
                                                 213-620-1780
17                                          Fax: 213-620-1398

18                           **CHRISTOPHER S. CARVER, ESQ.**
                             **TREVOR C. JONES, ESQ.**
19                           Akerman LLP
                             350 East Las Olas Boulevard
20                           Suite 1600
                             Fort Lauderdale, Florida 33301
21                                               305-982-5572
                                            Fax: 305-374-5095

22
   **FOR THE DEFENDANTS:**     **ADAM C. FORD, ESQ.**
23                           **MATTHEW A. FORD, ESQ.**
                             Ford O'Brien
24                           575 5th Avenue
                             New York, New York 10017
25                                               212-858-0040

1                                        **LORNE E. BERKELEY, ESQ.**
                                         **ALEXANDER L. WILDMAN, ESQ.**
2                                        Daniels Rodriguez Berkeley
                                         Daniels & Cruz, P.A.
3                                        4000 Ponce De Leon Boulevard
                                         Suite 800
4                                        Coral Gables, Florida 33146
                                                                        305-448-7988
5                                                                   Fax: 305-448-7978

6    **REPORTED STENOGRAPHICALLY**
     **BY:**                            **GILDA PASTOR-HERNANDEZ, RPR, FPR**
7                                        Official United States Court Reporter
                                         Wilkie D. Ferguson Jr. US Courthouse
8                                        400 North Miami Avenue - Suite 13-3
                                         Miami, Florida  33128    305.523.5118
9                                        gphofficialreporter@gmail.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# TABLE OF CONTENTS

Page

David D. Lopez ............................................. 6

    Direct Examination by Mr. Cronthall ..................... 6

    Cross-Examination by Mr. A. Ford ...................... 23

    Redirect Examination by Mr. Cronthall ................. 44

Eshel Bar-Adon ........................................... 48

    Direct Examination by Mr. Cronthall ................... 48

    Cross-Examination by Mr. A. Ford ...................... 68

    Redirect Examination by Mr. Cronthall ................. 90

David D. Lopez ........................................... 96

    Direct Examination by Mr. A. Ford ..................... 96

    Cross-Examination by Mr. Cronthall .................... 98

Scott R. Reynolds ....................................... 100

    Direct Examination by Mr. Cronthall .................. 100

    Cross-Examination by Mr. A. Ford ..................... 114

    Redirect Examination by Mr. Cronthall ................ 130

Scott Reynolds .......................................... 139

    Direct Examination by Mr. A. Ford .................... 139

    Cross-Examination by Mr. Cronthall ................... 139

Reporter's Certificate .................................. 164

1                            **EXHIBITS**

2    Exhibits                                    Received
                                          For ID/In Evidence

3
     Description                              Page      Line

4

5    Plaintiff's Exhibit Number 1 for ID ................ 49        17

6    Plaintiff's Exhibit Number 1 ...................... 53        14

7    Plaintiff's Exhibit Number 2 for ID ................ 54        13

8    Plaintiff's Exhibit Number 3 for ID ................ 61        2

9    Plaintiff's Exhibit Number 4 for ID ................ 61        17

10   Plaintiff's Exhibit Number 5 for ID ................ 62        3

11   Plaintiff's Exhibit Number 6 ...................... 64        9

12   Plaintiff's Exhibit Numbers 2, 3, 4 and 5 .......... 64       15

13   Plaintiff's Exhibit Number 7 for ID ................ 65        2

14   Plaintiff's Exhibit Number 7 ...................... 67        7

15   Plaintiff's Exhibit Number 8 for ID ................ 68        2

16   Plaintiff's Exhibit Number 8 ...................... 68       21

17   Plaintiff's Exhibit Number 9 ...................... 99       15

18   Defendants' Exhibit J  ........................... 126       22

19   Plaintiff's Exhibit Number 10 .................... 138       25

20

21

22

23

24

25

1            (The following proceedings were held at 10:55 a.m.)

2                    THE COURT:  Good morning, everyone.  Please be seated.

3                    MR. CRONTHALL:  Good morning, Your Honor.

4                    MR. A. FORD:  Good morning, Your Honor.

5                    THE COURTROOM DEPUTY:  Axos Clearing versus Scott

6     Richard Reynolds.

7                    Counsel, note your appearances, please.

8                    MR. CRONTHALL:  Good morning, Your Honor.  Andre

9     Cronthall, Sheppard Mullin Richter & Hampton, appearing pro hac

10    vice for plaintiff, Axos Clearing.

11                   MR. CARVER:  Christopher Carver, Akerman LLP, here for

12    plaintiff.

13                   MR. JONES:  Trevor Jones, Akerman LLP, here for

14    plaintiff as well.

15                   MR. A. FORD:  Good morning, Your Honor.  Adam Ford on

16    behalf of defendants appearing pro hac vice.

17                   MR. BERKELEY:  Good morning, Your Honor.  Lorne

18    Berkeley on behalf of defendants, local counsel.

19                   MR. M. FORD:  Matthew Ford on behalf of the defendants,

20    also appearing pro hac vice.

21                   MR. WILDMAN:  Alex Wildman on behalf of defendants,

22    Your Honor.

23                   THE COURT:  Okay.  Well, we set this down for a

24    hearing.  As I understand it, when an order such as this has

25    been entered, the defendant is entitled to a hearing, and the

Lopez - Direct

6

 1  plaintiff is required to put on evidence to justify the issue of

 2  the writ.  So that's what I intend on doing.

 3         Are you prepared to proceed?

 4         MR. CRONTHALL:  Yes, Your Honor, we're prepared to

 5  proceed.

 6         THE COURT:  Okay.  Call your first witness.

 7         MR. CRONTHALL:  Thank you very much, Your Honor.

 8         Axos Clearing would like to call David Lopez, please.

 9         DAVID D. LOPEZ, PLAINTIFF'S WITNESS, SWORN.

10         THE WITNESS:  I do.

11         THE COURTROOM DEPUTY:  Thank you.  Please be seated.

12  Speaking into the microphone, please state your full name for

13  the record and also spell it.

14         THE WITNESS:  Sure.  David Daniel Lopez, D-a-v-i-d

15  D-a-n-i-e-l L-o-p-e-z.

16         THE COURTROOM DEPUTY:  Thank you.

17                    DIRECT EXAMINATION

18  BY MR. CRONTHALL:

19  Q.  Good morning, Mr. Lopez.

20  A.  Good morning.

21  Q.  Mr. Lopez, last month, early March 2019, where were you

22  employed?

23  A.  Spartan Securities Group, Island Stock Transfer and

24  Transhare Corporation.

25  Q.  I'll be referring to that as Spartan, if that's okay with

1    you.

2    A.   Okay.

3    Q.   What was your position at Spartan?

4    A.   Corporate compliance officer.

5    Q.   Is Spartan still in business?

6    A.   They are.

7    Q.   Is Spartan currently operating its business?

8    A.   It is not, no.

9    Q.   What is your position at Spartan?

10   A.   I'm a compliance officer.

11   Q.   What are the general duties of a compliance officer at

12   Spartan?

13   A.   To help ensure and maintain our compliance with regulatory

14   requirements as a broker dealer.

15   Q.   Can you explain for the Court, generally, what is the nature

16   of the business of Spartan?

17            MR. A. FORD:  Objection, Your Honor.

18            THE COURT:  Overruled.

19            THE WITNESS:  Spartan Securities is a registered broker

20   dealer with the SEC and FINRA, and our primary functions are

21   market making and proprietary trading, as well as other

22   functions such as underwritings, private placements, things like

23   that.

24   BY MR. CRONTHALL:

25   Q.   What is proprietary trade?

 1  A.  It's where our traders trade capital on behalf of the firm,

 2  the firm's capital.

 3  Q.  Does that involve purchasing or selling securities with

 4  Spartan's own funds?

 5          MR. A. FORD:  Objection.  Your Honor --

 6          THE COURT:  Overruled.  You don't have to give me the

 7  nature of the objection.  Just say objection and I'll --

 8          MR. A. FORD:  Your Honor --

 9          THE COURT:  You don't have to give me any explanation.

10  Just say objection, and I'll rule on it.

11          MR. A. FORD:  Your Honor --

12          THE COURT:  Did you make an objection?

13          MR. A. FORD:  I did, Your Honor.

14          THE COURT:  I overrule the objection.  Okay?  No

15  speaking objections.

16          MR. BERKELEY:  Your Honor --

17          THE COURT:  Objection?

18          MR. BERKELEY:  No, Your Honor.  It's not an objection

19  to the line of questioning.  It's actually procedurally, we were

20  under the impression that we're here on a Motion to Dissolve the

21  Writ, not an evidentiary --

22          THE COURT:  Okay.  But yo were under a misapprehension.

23          Okay.  Go ahead.

24  BY MR. CRONTHALL:

25  Q.  Did you have the question in mind, Mr. Lopez?

Lopez - Direct

9

1  A.  If could you please re-ask it.

2  Q.  The question was whether or not proprietary trading involved

3  the use of Spartan's own funds to purchase or sell securities?

4  A.  That is correct.

5  Q.  Do you know Mr. Reynolds?

6  A.  I do, yes.

7  Q.  And how do you know him?

8  A.  He's been a trader at Spartan for a number of years.

9  Q.  Approximately how many years?

10  A.  Probably 14, 15 years potentially.

11  Q.  Is Spartan a subsidiary of any other entity?

12  A.  It is of our holding company, Connect X Capital Markets.

13  Q.  Does Mr. Reynolds, to your knowledge, have an interest in

14  that holding company or parent of Spartan?

15  A.  He is a partner as well, yes.

16  Q.  As of March 6th, 2019, did Spartan have a business

17  relationship with COR Clearing, then and now known as Axos

18  Clearing?

19  A.  It did, yes.  It was our clearing firm.

20  Q.  What is a clearing firm?

21  A.  Spartan is an introducing firm, and COR acted as our

22  clearing firm holding all monies and positions and settling

23  transactions on behalf of Spartan.

24  Q.  Does that have anything to do with COR, or in this case

25  Axos, making sure that transactions are funded?

Lopez - Direct

10

1   A.  For settlement purposes, yes.

2   Q.  And when COR or Axos would fund transactions for Spartan's

3   purchases or sales of shares, was Spartan under any obligation

4   to reimburse Axos for that?

5   A.  That is correct.  Spartan adds capital to an account that

6   allows us to cover the margin requirements necessary to take

7   either purchases or sales of securities held by the clearing

8   firm.

9   Q.  So if there is a number of transactions -- if there are a

10  number of transactions during the course of a trading day and

11  funds are needed to close out those transactions or clear those

12  transactions, if I understand you correctly, Axos would go ahead

13  and make sure that those transactions were funded so that they

14  could occur?

15  A.  That is correct.

16  Q.  Now, with respect to Mr. Reynolds, what services or tasks

17  did he perform on behalf of Spartan as of early March 2016 --

18  excuse me, 2019?

19  A.  Mr. Reynolds was a trader at Spartan Securities, had an

20  office of supervisory jurisdiction, OSJ, in Miami.

21  Q.  Did Mr. Reynolds have any limitations that he was working

22  under with respect to the trades that he could perform on behalf

23  of Spartan or its client?

24  A.  Limitations such as position limits?  As far as the number

25  of shares he could buy or sell?  Yes, there were limitations,

Lopez - Direct

11

 1  correct.

 2        MR. A. FORD:  Objection, Your Honor.

 3        THE COURT:  Overruled.

 4  BY MR. CRONTHALL:

 5  Q.  Specifically, with respect to limitations, did Mr. Reynolds

 6  have any limitations under regulations or rules of Spartan as to

 7  how much of a particular security Mr. Reynolds could purchase or

 8  sell in a particular day?

 9  A.  We did have position limits on our traders, that is correct.

10  Q.  Do you recall executing an affidavit concerning Mr. Reynolds

11  and his limitations and the events that occurred on March 6th

12  and March 7th, 2019?

13  A.  I do, yes.

14        MR. CRONTHALL:  That document is Document Number 31-1

15  in this matter, Your Honor.  May I, for convenience of the

16  witness, have a copy of it presented to the witness?

17        THE COURT:  All right.

18        MR. A. FORD:  Your Honor, we would ask that any

19  documents supporting these trading limits be produced.  We've

20  asked for them, and we've not received them from Mr. Lopez'

21  counsel.  We don't believe there were actually trading limits.

22  If these documents exist, I believe we have a right to them

23  before this client answers questions about them.

24        THE COURT:  You can cross-examine him on it.

25        MR. A. FORD:  Well, respectfully, Your Honor, we don't

Lopez - Direct

12

1   have the documents to cross-examine.

2          THE COURT:  So ask him.

3          MR. A. FORD:  Thank you, Your Honor.

4   BY MR. CRONTHALL:

5   Q.  Mr. Lopez, do you recognize the document I've given to you

6   to be an affidavit that you signed concerning the issues

7   surrounding Mr. Reynolds and the events of early March 2019?

8   A.  I do recognize it, yes.

9   Q.  If you could take a look at paragraph 7 of that affidavit,

10  does that set forth the limitations concerning Mr. Reynolds'

11  ability to trade and the limits on a given day?

12  A.  It does, the most recent limitations, yes.

13  Q.  And is it fair to say that the trading limit per day on any

14  given security was $500,000?

15  A.  Without additional approvals, that is correct.

16  Q.  So if Mr. Reynolds or another trader wanted to exceed

17  $500,000 worth of trades on a given day, they needed to get

18  prior authorization from someone else at Spartan?

19  A.  Correct.

20  Q.  Would that someone include yourself?

21  A.  It would include me as well, yes.

22  Q.  On March 6th, 2019, did Spartan, in fact, exceed the limits

23  on trading of an individual stock?

24  A.  That is correct.  In accordance to our procedures, it was a

25  position that was exceeded, yes.

1    Q.   Was that stock called Bio-Path?

2    A.   I believe that was the name.

3    Q.   Did Mr. Reynolds discuss with you the fact that the limits

4    of purchases on that day were exceeded with Bio-Path?

5    A.   We did have discussions about that, yes.

6    Q.   What did you discuss with Mr. Reynolds in that regard?

7    A.   We had a number of discussions about that particular

8    security.  Maybe you could be more, I guess, precise.  What kind

9    of discussions?

10   Q.   Certainly.

11        Did, for example, Mr. Reynolds approach you and ask for

12   permission to exceed the limits of trading for that stock that

13   day prior to the limits being exceeded?

14        MR. A. FORD:  Objection, Your Honor.

15        THE COURT:  Overruled.

16        THE WITNESS:  Not that I recall, no.

17   BY MR. CRONTHALL:

18   Q.   Did you have a discussion with Mr. Reynolds concerning the

19   exceeding of the trading limits for that stock that day?

20   A.   Yes.

21   Q.   What, specifically, did you discuss with Mr. Reynolds in

22   that regard?

23   A.   The capital requirements that we were exceeding, our ability

24   to maintain our net capital compliance with the position itself,

25   the amount of the position that was being taken, the loss that

Lopez - Direct

14

 1  was being incurred, realized and unrealized, both.

 2  Q.  So how far in excess of the $500,000 limit by Spartan were

 3  the trades that Mr. Reynolds was conducting exceeding that

 4  limit?

 5  A.  I'm not certain of the total amount, but it was in excess of

 6  the limitations.

 7  Q.  And do I understand your testimony just now to be that

 8  somehow, by exceeding those limits, that had some impact on

 9  whether or not Spartan met its minimum capital requirements?

10  A.  It did affect our ability to maintain our net capital

11  compliance, yes.

12  Q.  If you don't, at Spartan, maintain your minimum capital

13  requirements, what's the consequence of that to Spartan?

14          MR. A. FORD:  Objection, Your Honor.

15          THE COURT:  Overruled.

16          MR. A. FORD:  May I speak?

17          THE COURT:  You made your objection.  I overruled it.

18          MR. A. FORD:  Your Honor, we are here for the question

19  of whether the writ --

20          THE COURT:  Counsel, have a seat.

21          You may continue.

22  BY MR. CRONTHALL:

23  Q.  Do you have the question in mind, Mr. Lopez?

24  A.  If you could re-ask it again, please.  I'm sorry.

25  Q.  Certainly.

Lopez - Direct

15

1          You mentioned something about the exceeding of the

2    minimum -- excuse me, the maximum limits for trading on a day

3    for a given security having an impact on Spartan's minimum

4    capital requirements.

5          MR. A. FORD:  Objection.

6    BY MR. CRONTHALL:

7    Q.  My question is, what is the consequence when the minimum

8    capital requirements at Spartan are not met?

9          MR. A. FORD:  Objection.

10         THE COURT:  Overruled.

11         MR. A. FORD:  Your Honor, may I just note a standing

12   objection for every question so that I don't have say objection?

13         THE COURT:  We would all appreciate that.

14         MR. A. FORD:  Thank you.

15         THE WITNESS:  Spartan has to maintain capital

16   compliance under 15c3-1 in order to maintain enough capital to

17   continue operations as a broker dealer.  The positions in

18   aggregate, as well as our liabilities, all are accounted for

19   when it comes to that capital requirement.

20   BY MR. CRONTHALL:

21   Q.  And did, in fact, Spartan, at some point, have to cease

22   operations on March 6th or March 7th because of the exceeding of

23   those purchase limits?

24   A.  Due to our capital deficiency, we did have to cease

25   operations, yes.

Lopez - Direct

16

1   Q.  Did Mr. Reynolds, at any point in time on March 6th or March

2   7th, explain to you why he had exceeded the limits of Spartan's

3   -- the trading limits per a stock?

4   A.  We didn't discuss, that I recall, anything directly as to

5   why, no.

6   Q.  So you don't recall any explanation being given?

7   A.  Not one directly, no.

8   Q.  Did you discuss with Mr. Reynolds having him take some

9   action to rectify the situation or minimize or reduce the losses

10  that were occurring at Spartan on March 6th?

11  A.  We had discussions about the position and many different

12  discussions about the position and the capital requirements, the

13  position required.

14          Not so much discussions on how to minimize the loss

15  that had occurred, but definitely about the position size and

16  the requirements to try to mitigate the risks of that capital

17  requirement.

18  Q.  Did you ask Mr. Reynolds to take any steps in order to

19  address the problem?

20  A.  For that specific position -- the BPTH I believe was the

21  symbol -- we did, yes.

22  Q.  Was that on March 6th or on March 7th that you asked him to

23  do that?

24  A.  March 6th.

25  Q.  And did Mr. Reynolds take the action that you asked him to

Lopez - Direct

1   take in order to minimize or limit the loss?

2   A.   Again, it wasn't to minimize a specific loss.   We discussed

3   taking steps to reduce the exposure as well as potentially

4   address the capital requirements that were required as of that

5   day.

6   Q.   Did Mr. Reynolds take the steps that you discussed with him

7   in order to accomplish that?

8   A.   We discussed having to cover the position, meaning that we

9   had to go what we call flat, meaning that you end up where the

10  position either long or short, a particular position.   We did

11  discuss that, where we had to be flat that day.   The clearing

12  firm required that as well.

13         Also, we discussed the capital requirements that would

14  need to be covered for the loss or the requirements to have

15  taken the position on the 6th.

16  Q.   You mentioned bringing a position flat.   In this particular

17  case, Mr. Reynolds was selling a particular stock, Bio-Path

18  short; is that correct?

19  A.   Correct.

20  Q.   And so what would bringing the position flat entail?

21  A.   If you're short a position, you have to buy that same

22  quantity of shares back so that you're neither long or short the

23  position at the end of the day.   If you sold a hundred shares

24  short, you would have to buy a hundred shares to be flat, to

25  reconcile to zero.

Lopez - Direct

18

1  Q.  Did Mr. Reynolds end up doing that action in order to render

2  the position flat at Spartan that day?

3  A.  There was still a short position at the end of the day.

4  Q.  Did you investigate or take a look at -- strike that.

5       Let's take a look at your affidavit.  On the second

6  page, at paragraphs 10 and 11, you refer to the events occurring

7  on or about March 6th, 2019.

8       In paragraph 11 specifically, it says, "Mr. Reynolds

9       appears to have attempted to prevent Spartan from learning

10      that he had made these unauthorized trades by falsifying

11      transactions in the BRASS order management system to make it

12      look like he had not exceeded the limitations."

13      What do you mean by that, Mr. Lopez?

14 A.  I was referencing some terminal transactions that were

15 entered into our order management system in the morning time.

16 Those positions were purchases that made it appear as if the

17 position wasn't as short or as large of a short a position than

18 it truly was when compared to the street positions or the street

19 transactions.

20      So it appeared that those positions may have been --

21 those may have been entered in order to avoid us knowing or

22 potentially knowing the size of the position.

23 Q.  So based on the investigation that you did at that time, at

24 least according to paragraph 11, you concluded that Mr. Reynolds

25 was falsifying transactions in the code management system?

Lopez - Direct

19

 1  A.  I didn't conclude that, no.

 2         MR. BERKELEY:  Objection, Your Honor.

 3         THE COURT:  Overrule.

 4         THE WITNESS:  It just appeared that way to me.

 5  BY MR. CRONTHALL:

 6  Q.  Now, after Mr. Reynolds mentioned to you -- well, did

 7  Mr. Reynolds mention to you that he would, in fact, close out

 8  the position in Bio-Path?

 9  A.  Correct, on the 6th.

10  Q.  On the 6th.

11         Did he, in fact, close out Spartan's position in

12  Bio-Path as he said he would?

13  A.  No, there was still a short position remaining at the end of

14  the 6th, trading day of the 6th.

15  Q.  Did Mr. Reynolds give you any warning or notification that

16  the flattening or closing out was not going to occur?

17  A.  He did at some point in time.  It was after or about the

18  market close.

19  Q.  Was there still an opportunity, at that point, to do

20  anything to bring the position flat?

21  A.  It's unknown for certain that it could have been done or

22  not, but it closed the market, so it would be pure conjecture on

23  my part to say whether it could or could not be covered after

24  that.

25  Q.  Did, in fact, Spartan make efforts on March 7th to try and

Lopez - Direct

20

1  flatten out or clear out and stabilize the position it had

2  relative to Bio-Path?

3  A.  On the 7th, we did end up closing the position.

4  Q.  And was that effort successful in eliminating the loss?

5  A.  No.

6  Q.  What ended up being the ultimate loss to Spartan based on

7  these short trades conducted by Mr. Reynolds?

8  A.  At the close, when closing out the position on the 7th, the

9  net loss was about 16 and a half million dollars.

10 Q.  Did Mr. Reynolds make any promises to send funds to Axos

11 Clearing in order to rectify the financial loss with Axos?

12 A.  We did not discuss just him paying for the entire net loss.

13 We discussed, on the 6th and the 7th, the sending in funds of

14 about $2 million.

15 Q.  I'd like you to take a look at Exhibit A to your declaration

16 -- excuse me, your affidavit, which is again document 31-1 in

17 this matter, Page 8 of 12.

18       Do you recognize that page, sir?

19 A.  I do.

20 Q.  What does that page, which appears to be a photo of a phone

21 text message exchange, what does that appear to be to you?

22       MR. A. FORD:  Objection, Your Honor.  If we could get

23 the complete text message chain.  These text messages are cut

24 off, and we're insist on the full document under the

25 completeness rule.

Lopez - Direct

21

1          THE COURT:  Overruled.

2   BY MR. CRONTHALL:

3   Q.  You can answer.

4   A.  Could you ask the question again?  I'm sorry.

5   Q.  What is Exhibit A with the screenshot there?  What does that

6   reflect?

7   A.  A picture, a subset of texts, mostly of me and one of

8   Mr. Reynolds.

9   Q.  Which text is the one by Mr. Reynolds?

10  A.  The one in red.

11  Q.  The one that says, "Okay, will do"?

12  A.  Correct.

13  Q.  Prior to the "Okay, will do", what is it that you were

14  asking Mr. Reynolds to do in the other texts?

15  A.  Some of which was to close out the position and some of

16  which we discussed to send the funds before wire cutoff.

17  Q.  At one point, in the middle of the page, the largest text,

18      you say, "Please, please, please cover all of it and send

19      funds before wire cutoff or we are all over."

20          What did you mean by that?

21  A.  Because of our net cap deficiencies, I knew that the firm

22  would have to cease operations if we could not cover the net

23  capital.

24  Q.  And when you said "send funds", to whom were you asking him

25  to send funds?

1   A.   At this particular time, I'm not certain if we had discussed

2   sending the funds to Spartan directly or to COR Clearing.

3   Q.   At some point in time, though, did you ask Mr. Reynolds to

4   send funds to Axos Clearing?

5   A.   At some point in time, that is correct.

6   Q.   If you look at Exhibit B to your affidavit, do you recognize

7   that to be a communication to Mr. Reynolds regarding how to send

8   the money to Axos Clearing?

9   A.   That's correct.  That was an email sent by one of our

10  employees to Scott with the wiring instructions, which is to our

11  inventory account at COR Clearing.

12  Q.   Now, in that text message, Mr. Reynolds said, according to

13  your testimony, "Okay, will do."

14       In fact, did Mr. Reynolds do what you were asking him

15  to do?

16  A.   No, neither the position was covered nor were any funds

17  sent.

18  Q.   At the time of this loss on March 6th or March 7th, at some

19  point in time was this circumstance reported to any regulators?

20  A.   The capital deficiencies were reported to both the

21  Securities and Exchange Commission and FINRA, as required.

22  Q.   Did you -- strike that.

23       Did Spartan meet with the FBI at some point during that

24  time period?

25  A.   That is correct.  Some staff at Spartan did, yes.

Lopez - Cross

23

1   Q.   Was that on March 7th?

2   A.   I believe it was March 7th.

3   Q.   Now, were you aware of any accounts, security asset

4   accounts, that Mr. Reynolds had that had assets belonging to

5   him?

6   A.   Asset accounts?  I was aware of trading accounts, as

7   required for us to collect and for Mr. Reynolds to provide to

8   Spartan.  So yes, we were aware of some trading accounts.

9   Q.   Was one of those trading accounts or the account with TD

10  Ameritrade?

11  A.   One was, yes.

12  Q.   Why is it that you had to be aware of or Spartan was aware

13  of that account?

14  A.   It's a requirement and our procedures as well, internal

15  procedures, so that we can review the activity done by any

16  person or any associate of the firm.

17  Q.   Other than the TD Ameritrade account, have you been aware of

18  any other account related to Mr. Reynolds that has greater than

19  $2 million in it?

20  A.   Not that I'm aware of.

21          MR. CRONTHALL:  I have no further questions.

22          THE COURT:  Cross.

23                       CROSS-EXAMINATION

24  BY MR. A. FORD:

25  Q.   Good morning, Mr. Lopez.  I'm Adam Ford.  I represent

1    Defendant Scott Reynolds and SRR Fortress.

2    A.   Good morning.

3    Q.   Mr. Lopez, are you aware of any attempts by Mr. Reynolds to

4    abscond with any funds from his TD Ameritrade account?

5    A.   I'm not aware of that, no.

6    Q.   And Mr. Lopez, were you involved in the drafting or the

7    negotiation of a document that is entitled Settlement Agreement

8    that was between Mr. Reynolds and another party?

9    A.   No.

10   Q.   On the afternoon of March 7th, you recall taking part in a

11   telephone conference with Greg Garrabrants and Mr. Reynolds; is

12   that correct?

13   A.   I don't recall if it was the 7th, but I do recall being in a

14   conversation with both Mr. Reynolds and -- I'm sorry.  I didn't

15   know.  Greg is --

16   Q.   I believe I'm pronouncing it right, Garrabrants.

17   A.   Okay.  I'm not familiar with the last name either, so I

18   apologize.

19   Q.   An individual named Greg.

20   A.   Yes.

21   Q.   And what was Greg's position?

22   A.   I believe he was the president of Axos Bank.

23   Q.   I'm sorry.  You said you believe he was the president?

24   A.   President or CEO.

25   Q.   Of Axos Bank?

1    A.   I believe so.

2    Q.   And during that telephone conversation with -- I'll call him

3    Greg because that's what you referred to him as -- Greg and

4    Scott, do you recall discussing a possible global resolution to

5    the issue regarding the trades?

6    A.   We did have some discussion on that, yes.

7    Q.   And did you have an understanding -- strike that.

8         Did you also discuss the 8-K that Axos Financial had

9    filed earlier that day?

10   A.   I don't recall discussing the 8-K on the phone call, no.

11   Q.   You don't, okay.

12        Do you recall sending a document entitled Affidavit of

13   David Lopez to Reynolds, to Mr. Reynolds following that phone

14   call?

15   A.   I did not deliver any documents to Mr. Reynolds

16   individually, no.

17   Q.   Do you remember instructing your lawyer to send that

18   document to Mr. Reynolds?

19        MR. CRONTHALL:   Objection, calls for attorney/client

20   privilege communication.

21        THE COURT:   Overruled.

22        THE WITNESS:   I believe I did have some discussions

23   with our counsel about that, yes.

24   BY MR. A. FORD:

25   Q.   Do you recall drafting yourself the document that's entitled

Lopez - Cross

 1   Affidavit of David Lopez?

 2            MR. CRONTHALL:  Objection.

 3            THE COURT:  Overruled.

 4            THE WITNESS:  I was certainly a party to the draft,

 5   yes.

 6   BY MR. A. FORD:

 7   Q.  You were a party to the draft, okay.

 8            When you were drafting that document, were you

 9   intending to make truthful statements in that document?

10   A.  Yes.

11   Q.  You were, okay.

12            And I want to ask again whether you recall Greg stating

13   that he would retract the prior 8-K that was filed.  You

14   testified that you don't remember discussing that on the phone?

15   A.  Correct, I don't recall that.

16   Q.  Do you think if I showed you a copy of the affidavit that

17   you sent or that was sent to Mr. Reynolds, that would refresh

18   your recollection?

19   A.  Possibly, sure.

20            MR. A. FORD:  Your Honor, may I approach?

21            THE COURT:  All right.

22   BY MR. A. FORD:

23   Q.  Mr. Lopez, you can certainly read the whole thing, but I'm

24   just going to direct your attention to the last paragraph.

25            Can you read that paragraph into the record, please.

Lopez - Cross

27

1  A.  Sure.  "To date, to my knowledge, Axos has not released

2      Spartan Securities from liability for the loss suffered in

3      its trading account and it has not filed an 8-K with the

4      Securities and Exchange Commission retracting its prior

5      statements about the perpetration of fraud by the employee

6      of an Axos' client."

7  Q.  Do you recall drafting that statement?

8  A.  Correct.

9  Q.  And is that a truthful statement?

10 A.  It is.

11 Q.  And Mr. Lopez, you also state in here, to repeat what you

12     just read, "Axos has not released Spartan Securities from

13     liability from the loss."

14          Did you state that because you were, in fact, expecting

15 Spartan -- I'm sorry, you were expecting Axos to release Spartan

16 from liability?

17 A.  It was discussed in the phone call.

18 Q.  Was it agreed upon in the phone call?

19 A.  It was -- it seemed to me, in my recollection of the phone

20 call, that it was going to be done, yes.

21 Q.  Mr. Lopez, you testified earlier that there are trading

22 limits that Spartan Securities imposed on Mr. Reynolds; is that

23 correct?

24 A.  Correct.

25 Q.  Is there any documentation at Spartan that sets forth these

Lopez - Cross

28

1   trading limits?

2   A.   Yes.

3   Q.   And was this documentation ever given to Mr. Reynolds?

4   A.   Yes.

5   Q.   And do you have any documentation -- I'm sorry, did

6   Mr. Reynolds ever agree to these limits?

7   A.   They were imposed on Mr. Reynolds by us, and it was sent --

8   the most recent was sent via email.

9   Q.   Do you recall receiving an email back from Scott Reynolds

10  indicating that he would decline to abide by those trading

11  limits?

12  A.   By the most recent ones?

13  Q.   Any of them.

14  A.   We have written documentation that he's abide by our written

15  supervisor procedures, but I don't know if I received an email

16  from him confirming one way or the other.

17  Q.   Now, you had said that you understood the full position in

18  Bio-Path holding by Spartan Securities by the close of March

19  6th; is that correct?

20  A.   Could you repeat the question?  I apologize.

21  Q.   Sure.

22       On March 6th, by the close of the trading day, you were

23  aware of the full position that Spartan Securities was holding

24  in Bio-Path, in the stock Bio-Path; is that correct?

25  A.   By end of the trading day, that is correct, yes.

Lopez - Cross

29

1   Q.  By the end of the trading day.

2          And you could have closed out -- Spartan Securities

3   could have closed out its position in Bio-Path that day; isn't

4   that correct?

5          MR. CRONTHALL:  Objection.

6          THE COURT:  Overruled.

7          THE WITNESS:  At what point in time?

8   BY MR. A. FORD:

9   Q.  Well, at any point in time.

10  A.  That's subjective.  At the end of the trading day, I don't

11  know that we could have closed that position out.

12  Q.  Are you testifying that you don't know whether trades can be

13  placed in Spartan's proprietary trading account during hours the

14  market is closed?

15  A.  No, they certainly could.

16  Q.  So to be clear, Spartan Securities could place trades after

17  the markets closed?

18  A.  They can place trades in most cases, yes.

19  Q.  And therefore, it could have closed out the position at the

20  end of the day on March 6th; isn't that correct?

21  A.  That's impossible to say.  You don't know if there's going

22  to be enough securities available or enough participation to

23  close out a position.

24  Q.  Isn't it a fact that, on March 6th, you told Scott Reynolds

25  that you could not -- that Spartan should not close out the full

Lopez - Cross

30

1  position at the end of the day?

2  A.  Should not?

3  Q.  I'll strike that.

4        Isn't it a fact that, on March 6th, after the close of

5  trading, you told Mr. Reynolds, in no uncertain terms, that the

6  position should not be closed out?

7  A.  That is incorrect.

8  Q.  That's incorrect.

9        MR. A. FORD:  One second, Your Honor.

10  BY MR. A. FORD:

11  Q.  I'm going to come back to that position.

12  A.  Okay.

13  Q.  Now, also by the close of the 6th, you understood the

14  position that Spartan was holding in Bio-Path; is that correct?

15  A.  At the end of the trading day on the 6th, yes.

16  Q.  So certainly, by that time, there was -- well, strike that.

17        You cut off Mr. Reynolds' ability to place any trades

18  on behalf of Spartan at the end of March 6th; isn't that

19  correct?

20  A.  That is correct.

21  Q.  So when the trades in Bio-Path were placed on March 7th,

22  Mr. Reynolds had nothing to do with that; isn't that correct?

23  A.  That is correct.  He did not place any trades on that

24  position on the 7th.

25  Q.  And at the end of the 6th, isn't it a fact that the

1  proximate realized losses in Bio-Path were $2.2 million; is that

2  correct?

3  A.  I don't recall the exact number.

4  Q.  What do you recall being the approximate loss amount on

5  March 6th?

6  A.  There is both realized and unrealized losses at the end of

7  March 6th.  I don't recall what either were, but if I recall,

8  there was about 650,000 shares short at a closing price of $12

9  and some odd cents.  I believe our position was short about

10  $9.13, $9.14.  So whatever that -- and I'm sorry, I can't do the

11  math in my head -- whatever that number is plus the realized

12  loss, which I really don't recall what it was at that time,

13  would be our ultimate loss that day.

14  Q.  Now, who placed the trades in Bio-Path on behalf of Spartan

15  on March 7th?

16  A.  One of our traders named George Lindner.

17  Q.  Did you instruct -- George Lindner, did you say?

18  A.  Lindner, correct.

19  Q.  And did you instruct Mr. Lindner to place the trades?

20  A.  Both myself and under the direction of COR Clearing as well.

21  Q.  COR Clearing was directing the trades in Spartan at that

22  time?

23  A.  They informed us that we had to close out the position.

24  Q.  At what time did COR Clearing inform you that you had to

25  close out the position?

Lopez - Cross

32

1  A.  That was done on March 6th as well.  It started around 2:00,

2  1:00 on March 6th.

3  Q.  So at 2:00 on March 6th, COR Clearing instructed you to

4  close out the position; is that a fair statement?

5  A.  I think that's a fair statement.  They wanted the position

6  closed, yes.

7  Q.  And you didn't close out the position at 2:00 p.m. on March

8  6th, did you, Mr. Lopez?

9  A.  I instructed Scott Reynolds to close out the position.  He

10  did not, you're correct.

11  Q.  That was not my question, Mr. Lopez.

12        The question was, you did not close out the position at

13  2:00 p.m. on March 6th, did you?

14  A.  I was not the trader in charge of closing out the position,

15  so no, I did not.

16  Q.  You did not.

17        And by 3:00 p.m. on March 6th, having been told by COR

18  Clearing that you were required to close out the position in

19  Bio-Path, did you close out the position by 3:00 p.m.?

20  A.  I think we should define "you".  Do you mean Spartan?

21  Q.  I mean Spartan Securities.

22  A.  Okay.  Spartan Securities was told to close out the

23  position, yes.

24  Q.  And you were responsible for ensuring that you were in

25  compliance with COR's request on this front; is that correct?

Lopez - Cross

33

1   A.  I was the one that was in discussion with COR Clearing, yes.

2   Q.  So any losses that occurred in the Bio-Path securities after

3   2:00 p.m. on March 6th are directly attributable to you and

4   Spartan Securities; isn't that correct?

5             MR. CRONTHALL:  Objection.

6             THE COURT:  Overruled.

7             THE WITNESS:  I would disagree with that assessment.  I

8   was in discussion with COR Clearing, and I was then ordering

9   Mr. Reynolds to close out the position, who was acting on behalf

10  of Spartan, as I was.

11  BY MR. A. FORD:

12  Q.  You could have asked Mr. Lindner to close out the position

13  at 2:00 p.m. on March 6th; isn't that correct?

14  A.  It's possible, correct.

15  Q.  And you did not instruct Mr. Lindner, did you?

16  A.  That's correct.

17  Q.  And the reason why you did not is because you, Mr. Lopez,

18  did not want to close out the position on March 6th; isn't that

19  correct?

20  A.  That is incorrect.  I trusted my trader and friend, Scott

21  Reynolds, to do so.

22  Q.  But you have control -- strike that.

23             Mr. Lopez, can you remind me what your position is at

24  Spartan Securities?

25  A.  I'm a corporate compliance officer.

Lopez - Cross

34

1   Q.   Corporate compliance.  And is it fair to say that all

2   compliance functions fall or are under your purview?

3   A.   For the ones I'm in control of, yes.

4   Q.   And you're in control of trading, correct?

5   A.   That's correct.

6   Q.   And when you say you trusted your friend, Mr. Reynolds, to

7   close out the position, at what time did you realize -- strike

8   that.

9        You said you trusted your friend, Mr. Reynolds, to

10  close out the position, but you knew that Mr. Reynolds had not

11  closed out the position by 3:00 p.m. on March 6th; isn't that

12  correct?

13  A.   We knew that the position was not being closed out

14  throughout the day.  It had been closed.  The short position was

15  larger.  It was getting smaller as Mr. Reynolds was covering.

16       Then, at some point in time, about 3:15, 3:30, there

17  was an additional short position added to the position.  At

18  around 3:30, 3:45 is when I felt that it would be nearly

19  impossible to close out the position by 4:00.  We had

20  communications about that as well.

21  Q.   So you just testified that you did not believe you could

22  close out the position on March 6th.

23  A.   I felt like it would be very difficult to do.

24  Q.   And you felt that even though COR Clearing had instructed

25  you, the chief compliance officer, that the position had to be

Lopez - Cross

35

1  closed?

2  A.  They instructed us the position had to be closed, correct.

3  Q.  And you ignored that instruction?

4  A.  I did not ignore that instruction.  I ordered Mr. Reynolds

5  to close out the position.  He told me he would be able to, that

6  he was attempting to do it, would be able to do it, and I

7  shouldn't worry about it.  But at the end of the day, it was not

8  closed.

9  Q.  What is Mr. Lindner's position at Spartan Securities?

10  A.  He's a trader there as well.

11  Q.  And is Mr. Lindner qualified to place trades -- strike that.

12          Does Mr. Lindner place trades under Mr. Reynolds'

13  direction at Spartan?

14  A.  He could.

15  Q.  Is he responsible for trading in Spartan's proprietary

16  trading account?

17  A.  He is.

18  Q.  Okay.  And is he permitted to place trades in Spartan's

19  proprietary trading account without Mr. Reynolds' authorization?

20  A.  He could, yes.

21  Q.  And at what time did you give the instruction to Mr. Lindner

22  to close out the Bio-Path positions?

23  A.  Mr. Lindner did enter some purchase orders on the 6th, the

24  end of the day on the 6th, to assist Mr. Reynolds in trying to

25  cover that position; but on the 7th is when he was fully

Lopez - Cross

36

1    responsible, made fully responsible as a sole trader to do so.

2    Q.   And just for clarity, Mr. Reynolds had no responsibility for

3    trading at all on March 7th, correct?

4    A.   He placed no positions on the 7th, correct.

5    Q.   You had testified earlier that Mr. Reynolds had promised to

6    send $2 million to Spartan Securities on March 6th; is that

7    correct?

8    A.   He was going to send the money, yes.

9    Q.   And he was going to send that money to be used by Spartan

10   Securities for its net capital requirements; is that correct?

11   A.   In order to cover the loss or net capital requirement,

12   that's correct.

13   Q.   On March 6th, Mr. Reynolds never told you that he was going

14   to give Axos Clearing $2 million, did he?

15   A.   Just to make sure our phraseology is correct, we didn't

16   discuss Scott Reynolds paying COR Clearing.  We discussed the

17   monies going into the Spartan trading account at COR Clearing.

18   Q.   The $2 million that was being discussed by Mr. Reynolds that

19   was going to be provided was for the benefit of Spartan

20   Securities; is that correct?

21   A.   That's correct.

22   Q.   Mr. Reynolds, in fact, never agreed with you to give $2

23   million for the benefit of Axos Clearing; isn't that correct?

24   A.   We never discussed him giving any funds to just solely

25   benefit Axos Clearing.

Lopez - Cross

37

1   Q.   So if someone were to submit an affidavit to this Court

2   claiming that you told them that Mr. Reynolds was going to give

3   Axos Clearing $2 million on March 6th, that would be false; is

4   that correct?

5   A.   No, because the monies would have been wired to --

6   potentially would have been wired to Axos Clearing.

7   Q.   No, I'll rephrase that.

8          If someone had said that Scott Reynolds was going to

9   give $2 million for the benefit of Axos Clearing, that would be

10  false, correct?

11  A.   Not necessarily because the loss incurred would have been at

12  Axos; so therefore, directly or indirectly, the money would have

13  gone to the benefit of COR.

14  Q.   But that would not then have satisfied, that would not have

15  satisfied your net capital requirements then; would it have?

16  A.   On the 6th it may have.

17  Q.   Now, you had testified earlier that, as part of

18  Mr. Reynolds' employment, he was required to provide you with

19  his personal trading accounts; is that correct?

20  A.   That's correct.

21  Q.   In fact, he would provide you, or rather, the trading

22  account holders would provide you with monthly account

23  statements of his activity; is that correct?

24  A.   That's correct.

25  Q.   Now, these accounts were Mr. Reynolds' personal accounts; is

1  that correct?

2  A.  Personally managed by Mr. Reynolds, yes.

3  Q.  Personally managed, but they had no relation to Spartan

4  Securities whatsoever?

5  A.  No.

6  Q.  You shared Mr. Reynolds' personal financial information with

7  COR Clearing on March 6th; is that a fact?

8  A.  They did request copies of statements, yes, that were in our

9  possession.

10 Q.  And as compliance officer, did you feel that you were --

11 strike that.

12         As compliance officer, did you understand whether it

13 was improper to provide Mr. Reynolds' personal trading account

14 statements to third parties?

15 A.  It was my understanding, in accordance with our clearing

16 arrangement, that I'm to provide anything in my possession to

17 COR Clearing for purposes of reviews.

18 Q.  I'm sorry, could you repeat that?

19 A.  It's my understanding that the clearing arrangement allows

20 for COR Clearing to request documentation for any reviews that

21 they're undertaking in my possession.

22         MR. A. FORD:  Your Honor, if I may have a moment.

23 BY MR. A. FORD:

24 Q.  Mr. Lopez, do you have any understanding of the corporate

25 structure between COR Clearing and Axos Clearing?

Lopez - Cross

39

1    A.   I do not, no.

2    Q.   Do you know whether they are separate corporate entities?

3    A.   I don't know either way for sure, no.

4    Q.   Spartan's agreement, clearing agreement, is solely with COR

5    Clearing; isn't that correct?

6    A.   That's correct.

7    Q.   There exists no agreement between Spartan and Axos Clearing;

8    is that correct?

9    A.   I believe -- well, it depends on the structure.  I don't

10   know if Axos Clearing and COR Clearing are the same entity or

11   not.

12   Q.   But you're not aware of an agreement that is between Spartan

13   and Axos Clearing?

14   A.   Well, we do have one now, yes, because I believe there was a

15   name change between COR Clearing and Axos Clearing.

16   Q.   So do you know when that agreement is from?

17   A.   Not certain, but I believe it was March 1st, if I'm not

18   mistaken.  The clearing agreement would have been well before

19   that.  2013, I would say.

20   Q.   Thank you.

21          How many conversations -- well, on March 6th, do you

22   recall how many conversations you had with Ethan McComb?

23   A.   Ethan McComb, I don't recall.

24   Q.   Is it true that you didn't have any conversations with Ethan

25   McComb on March 6th?

Lopez - Cross

40

1    A.   That, I don't know.  I spoke to a few people at the clearing

2    firm, and I'm not sure if he was one of them or not.

3    Q.   Do you recall the names of everyone you spoke to at the

4    clearing firm?

5    A.   No.

6    Q.   Do you remember the names of anyone that you spoke with at

7    the clearing firm.

8    A.   I certainly have documentation.  I don't recall exactly.  I

9    know one for sure was Janet.  I believe there was another Chris,

10   if I'm not mistaken.  It was a few different people.

11   Q.   Did you speak with Greg Garrabrants on March 6th?

12   A.   I don't recall if I did on March 6th or not.

13   Q.   Mr. Lopez, did you ever tell anyone from Axos Clearing that

14   Scott Reynolds intended to pledge -- this is on March 6th -- to

15   pledge all of his cash and securities in the TD Ameritrade

16   account to Axos Clearing?

17   A.   No.

18   Q.   On March 6th, did you represent to anyone from Axos Clearing

19   that Reynolds would execute an agreement to memorialize this

20   asset pledge and guarantee in writing?

21   A.   No.

22   Q.   And do you recall communicating to Axos Clearing, on March

23   6th, the request directly from Reynolds to keep Spartan's

24   trading position open to address the deficit, even though at

25   that time it was over $14 million?

Lopez - Cross

41

1  A.  Could you rephrase the question, please?  I'm sorry, I don't

2  quite understand.

3  Q.  It was a little mangled.  I agree.

4       On March 6th, you never told anyone from Axos that the

5  account needed to be kept open even though the losses were over

6  $14 million at that time, did you?

7  A.  What do you mean by account?

8  Q.  The proprietary trading account.

9       I can take a step back.

10 A.  Okay.

11 Q.  Spartan has a proprietary trading account, correct?

12 A.  A few of them, yes.

13 Q.  And does it have just one with Axos Clearing, COR Clearing?

14 A.  We have one account that we maintain our capital for margin

15 purposes, and then we have a number of proprietary accounts

16 where the trading actually occurs.

17 Q.  So the net capital account at Axos is a different account

18 than the trading accounts; is that correct?

19 A.  Technically correct, yes.

20 Q.  But are there two different account numbers?

21 A.  Yes.

22 Q.  So there are, in fact, two different accounts?

23 A.  There are a number of different accounts maintained for

24 different purposes, yes.

25 Q.  And to go back to the question about the $2 million payment,

Lopez - Cross

1    if Mr. Reynolds was agreeing to send $2 million for the net

2    capital requirement, that would go to the net capital account;

3    isn't that correct?

4    A.  It's called a valuation account where the capital is

5    maintained for the purposes of covering the margin requirements

6    based on the positions in the proprietary accounts.  So the wire

7    would have gone to that valuation account.

8    Q.  But those funds would not have gone directly to Axos

9    Clearing to cover losses; would it have?

10   A.  It would not have.  That account that maintains those funds,

11   the clearing firm has access to that account to pull the margin

12   requirement or losses from.

13   Q.  Okay.  Now, on March 7th, early in the morning, do you

14   recall having any telephone conference with anyone from Axos

15   Clearing?

16   A.  Not specifically.  I talked to Axos or COR, whichever,

17   frequently that day.

18   Q.  And did you ever disclose to Axos Clearing that Scott

19   Reynolds acknowledged responsibility for the losses?

20   A.  That he acknowledged responsibility?  Not that I recall.

21   Q.  In fact, Mr. Reynolds never acknowledged responsibility for

22   the trading losses, did he, to you?

23   A.  We had number of discussions where he certainly was aware

24   the position went against him.  So if that's acknowledging the

25   losses, we incurred those, I guess that's subjective to

Lopez - Cross

43

1    determine.

2    Q.   Mr. Lopez, let me rephrase.

3    A.   Okay.

4    Q.   Did Mr. Reynolds ever say to you, "I acknowledge

5    responsibility for these trading losses"?

6    A.   He never said those terms, no.

7    Q.   And therefore, he also never said that he acknowledged his

8    responsibility for the unauthorized trading -- for unauthorized

9    trading, did he?

10   A.   No, we never discussed the unauthorized aspect of the

11   trading.

12   Q.   And he never represented to you that he acknowledged

13   responsibility that the unauthorized trading resulted in short

14   sale trading losses, did he?

15   A.   We never discussed the unauthorized aspect of the trading.

16   Q.   Okay.  And you never communicated this to anyone at Axos

17   Financial, did you?

18   A.   I don't recall having conversation about this with Axos.

19   Q.   So if someone submitted an affidavit to this Court that

20        said, "Early on March 7th, 2019, through various

21        communications involving some combination of myself" -- that

22        would be Ethan McComb -- "Axos Clearing Management, Spartan

23        Management, (and particularly David Lopez), and Reynolds,

24        Reynolds acknowledged his responsibility for the

25        unauthorized trading and the short sale trading losses and

Lopez - Redirect

44

1          the injury he caused to Axos Clearing."

2              You never said that, correct?

3   A.  I don't recall having any conversations like that.

4   Q.  And Reynolds never told you that he was agreeing not to

5   transfer any assets from the TD Ameritrade account to any third

6   party; is that correct?

7   A.  That he did not tell me he was not doing that?  I'm sorry,

8   could you phrase that again?

9   Q.  Yeah.  Reynolds never told you that he was agreeing that he

10  would not transfer any assets from the TD Ameritrade account to

11  a third party, correct?

12  A.  I don't recall us talking about transferring of funds to a

13  third party, no.

14  Q.  And Mr. Lopez, just to confirm, you're not aware of any

15  actions by Mr. Reynolds to attempt to abscond with any money

16  outside of this state, correct?

17  A.  I'm not aware of that, no.

18          MR. A. FORD:  No further questions, Your Honor.

19          THE COURT:  Redirect.

20                    REDIRECT EXAMINATION

21  BY MR. CRONTHALL:

22  Q.  Mr. Lopez, you were asked about a draft affidavit identified

23  as Document 24-14 in this matter.

24          Do you have that document in front of you still?

25  A.  I do.  Actually, Affidavit of David Lopez, that one?

Lopez - Redirect

45

1   Q.   The unsigned one.

2   A.   No, I don't believe I do.

3        MR. CRONTHALL:   May I approach, Your Honor?

4        THE COURT:   All right.

5   BY MR. CRONTHALL:

6   Q.   Mr. Lopez, do you remember counsel asking you about this

7   unsigned affidavit just a few minutes ago?

8   A.   I do, yes.

9   Q.   You never did sign that document, did you?

10  A.   Not that I recall.

11  Q.   After that document was prepared, there were further

12  discussions that you understand occurred between Mr. Reynolds

13  and Axos that you weren't a party to; is that correct?

14  A.   I'm not aware of any conversations beyond the one I had on

15  the phone with both Greg and Scott.

16  Q.   You mentioned Mr. Lindner was tasked with making trades to

17  try and close out the Bio-Path position on March 7th.  Do you

18  recall that?

19  A.   I do, yes.

20  Q.   Now, do you know whether or not Mr. Lindner made efforts, as

21  best he could, to close out that position on the 7th?

22  A.   Yes.

23  Q.   Did he do anything, to your knowledge, to exacerbate the

24  situation; i.e. did he take further short positions as you

25  mentioned and testified Mr. Reynolds had the day before?

Lopez - Redirect

46

1    A.   We were not able to open up any new positions after the 6th,
2    so it was just strictly for covering.
3    Q.   Is it fair to say that Mr. Lindner, despite his efforts, was
4    unable to rectify the problems caused by Mr. Reynolds' trading
5    the previous day?
6    A.   Mr. Lindner closed out the position as best he could.
7    Q.   So is it fair to say that the damage was already done by
8    virtue of the trading the prior day?
9    A.   There was already a financial damage to our net capital
10   position as of the 6th.  So his efforts on the 7th would not
11   have changed what happened on the 6th.
12   Q.   In other words, are you aware of anything that Mr. Lindner
13   could have done differently to rectify the problem caused by
14   Mr. Reynolds' trades the prior day?
15   A.   Yeah, not that I'm aware of.
16   Q.   You mentioned -- and I just want to confirm this -- on
17   examination by counsel just now, that even after you discussed
18   with Mr. Reynolds closing out the position with Bio-Path on
19   March 6th, he added to the short position that afternoon; did I
20   hear you correctly?
21   A.   There were buys and sales done throughout the day, shorts
22   buys to cover throughout the day.  At the end part of the
23   trading day on the 6th, there were additional short positions
24   adding to what was covered previously.
25          So as an example, just to give you a good example,

1   let's say we were short a thousand shares.  There would be a

2   covered 800 shares and then an additional short of another 50

3   shares would mean a position was increased from 800 to 850, but

4   in aggregate, the position was still lower than at its worst

5   level throughout the day.

6   Q.   Did Scott Reynolds engage in unauthorized trading of

7   Bio-Path shares?

8   A.   It was beyond the limitations.

9   Q.   And did Mr. Reynolds' unauthorized trading or trading above

10   the limitations result in the 16 and a half million dollar loss

11   that you testified about on direct exam?

12   A.   The total position, in its entirety, resulted in a loss of

13   16 and a half million dollars or so.

14   Q.   And whether or not Mr. Reynolds paid or wired $2 million to

15   Spartan's capital account or one of its accounts or directly to

16   Axos Clearing, I believe you testified those funds would have

17   been accessible to or for the benefit of Axos Clearing

18   ultimately anyway; is that a fair statement?

19   A.   That's correct, sir.

20          MR. CRONTHALL:  No further questions.

21          THE COURT:  Thank you.  You may step down.

22          (Witness excused).

23          THE COURT:  Call your next witness.

24          MR. A. FORD:  Your Honor, may I have a brief recross?

25          THE COURT:  That's it.

1               Call your next witness.

2               MR. CRONTHALL:  I'd like to call Mr. Eshel Bar-Adon.

3               MR. A. FORD:  Your Honor, if we could request --

4               THE COURT:  Watch your step coming up there.

5               MR. A. FORD:  If we could request that Mr. Lopez not

6    leave because we will recall him.

7               THE COURT:  Okay.

8               MR. A. FORD:  Thank you, Your Honor.

9               THE COURT:  Raise your right hand, please.

10              ESHEL BAR-ADON, PLAINTIFF'S WITNESS, SWORN.

11              THE WITNESS:  I do.

12              THE COURTROOM DEPUTY:  Thank you.  Please be seated.

13              Please speak into the microphone and state and spell

14   your name for the record.

15              THE WITNESS:  Eshel Bar-Adon, E-s-h-e-l; last name is

16   B-a-r, hyphen, A-d-o-n.

17                          DIRECT EXAMINATION

18   BY MR. CRONTHALL:

19   Q.  Good afternoon, Mr. Bar-Adon.

20              Whom are you employed with?

21   A.  Axos Financial and Axos Bank.

22   Q.  What is your position at Axos?

23   A.  I'm the executive vice president and chief legal officer.

24   Q.  Are you familiar with Axos Clearing?

25   A.  Yes.

Bar-Adon - Direct

49

1   Q.  What is Axos Clearing?

2   A.  It's a securities clearing company that Axos acquired

3   through merger, reverse triangular merger, in January.

4   Q.  Is there any relationship between Axos Financial and Axos

5   Clearing?

6   A.  Yeah, Axos Financial is the ultimate parent of Axos

7   Clearing.

8   Q.  Are you familiar with COR Clearing, LLC?

9   A.  Yes.

10  Q.  Is there any connection between COR Clearing, LLC and Axos

11  Clearing, LLC?

12  A.  Yes, same company.

13          MR. CRONTHALL:  And I'd like to have marked as an

14  exhibit -- does Your Honor prefer numerical or alpha?

15          THE COURT:  Whatever you want.

16          MR. CRONTHALL:  All right.  Let's call this Exhibit 1.

17      (Plaintiff's Exhibit Number 1 for ID was marked.)

18  BY MR. CRONTHALL:

19  Q.  Mr. Bar-Adon, do you recognize Exhibit 1, which appears to

20  be an official document from the state of Delaware?

21  A.  Yes.

22  Q.  What is that document?

23  A.  It's an acknowledgment of the name change of COR Clearing to

24  Axos Clearing.

25  Q.  What was the name -- excuse me, the date of that name

1  change, if you can tell from the second page of the exhibit?

2  A.  It was accepted the 1st of March, 2019.

3  Q.  Is that consistent with your understanding that COR Clearing

4  is the same as Axos Clearing?

5  A.  Yes.

6  Q.  So is it true then that, as of March 1st, 2019, there was a

7  name change that changed the name of COR Clearing to Axos

8  Clearing?

9  A.  Yes.

10 Q.  So to your understanding and knowledge then, did the rights

11 and obligations of COR Clearing become the rights and

12 obligations of Axos Clearing as of March 1st?

13 A.  Yes, same company.

14 Q.  Has that changed at all since March 1st, 2019?

15 A.  No.

16 Q.  As of March 1st, 2019, what was the relationship between

17 Axos Clearing and Spartan?

18 A.  Axos Clearing had a disclosed clearing agreement with

19 Spartan.

20 Q.  Did Axos incur a loss in March 2019 involving Spartan?

21 A.  Yes.

22 Q.  And can you briefly describe what that loss is.

23 A.  Axos had to advance 16.6, approximately, million dollars in

24 order to cover Spartan's trades because Spartan was unable to do

25 so.

1  Q.  By virtue of its contractual relationship with Spartan, was

2  Axos, to your understanding, entitled to recover those sums that

3  were advanced from Spartan?

4  A.  Yes, absolutely.

5  Q.  Has Axos been reimbursed any part of those funds as of

6  today?

7  A.  No.

8  Q.  Were you involved in attempting to mitigate that 16.5 or 6

9  million dollar loss by obtaining reimbursement from Spartan or

10  its principals?

11  A.  Yes.

12  Q.  Without disclosing any attorney/client communications you

13  may have had as general counsel of Axos, were you a party to any

14  communications with Spartan on or about March 7th or 8th, 2019

15  to try and resolve the matter?

16  A.  Yes.

17  Q.  Were you made aware of any investigation by the FBI and

18  FINRA of the trading losses involving Mr. Reynolds and Spartan?

19  A.  Yes.

20  Q.  What was your understanding in that regard?

21  A.  My understanding was that Spartan had reported it to the FBI

22  and had met with the FBI and had also reported it to FINRA and

23  the SEC, as they're required to do.

24        I believe that the SEC reached out to Axos Clearing and

25  spoke with one of our people there, and I believe that there

1  have been some subsequent communications as well.

2  Q.  Did you have any discussions with Mr. Lopez concerning the

3  cause of the losses that occurred on March 6th and March 7th?

4  A.  Yes.

5  Q.  And what was discussed in that regard?

6  A.  I had a brief conversation with Mr. Lopez in which he told

7  me that Mr. Reynolds was responsible for the losses.  We talked

8  about the position, the recklessness of the position.

9        In fact, Mr. Lopez was extremely disappointed that

10  Mr. Reynolds would have exposed his partners and friends, you

11  know, to this situation through his reckless trading.

12  Q.  At some point, was Axos made aware that Mr. Reynolds had a

13  trading account at TD Ameritrade?

14  A.  Yes.

15  Q.  From whom did Axos receive that information?

16  A.  I believe from Mr. Lopez.

17  Q.  Did Axos ever become aware of any other accounts that

18  Mr. Reynolds had access to that were in an amount in excess of

19  $2 million?

20  A.  We did not, no.

21  Q.  Was someone at Axos Clearing tasked with communicating with

22  TD Ameritrade about that account that Mr. Reynolds had there?

23  A.  Yes.

24  Q.  Who was tasked with that responsibility?

25  A.  Ethan McComb.

Bar-Adon - Direct

53

1  Q.  Were you in regular communication with Mr. McComb concerning

2  those efforts to deal with TD Ameritrade and that account?

3  A.  Either Greg Garrabrants or I spoke to Ethan.

4  Q.  Have you seen and read the declaration, the supplemental

5  affidavit, I should say, of Ethan McComb, which is in this

6  matter as Document Number 31-2, entered on the docket April 2nd,

7  2019?

8  A.  Yes.

9  Q.  For convenience, I'll hand the witness a copy of the

10  document.

11       MR. CRONTHALL:  Your Honor, may I move Exhibit 1 into

12  evidence?

13       THE COURT:  Over objection it will be admitted.

14     (Plaintiff's Exhibit Number 1 was received in evidence.)

15       MR. CRONTHALL:  To the extent that I need to identify

16  and move the documents that have already been filed with the

17  Court in as exhibits, I will do that as well, Your Honor.

18       THE COURT:  All right.

19  BY MR. CRONTHALL:

20  Q.  Is there anything in the affidavits, the information in the

21  affidavit of Mr. McComb that gave you concern about Mr. Reynolds

22  and specifically whether he would try to make funds in the TD

23  Ameritrade account more difficult to attach or garnish?

24       MR. A. FORD:  Objection, Your Honor.

25       THE COURT:  Overruled.

Bar-Adon - Direct

54

1          THE WITNESS:  Yes, yes.  I understood that Mr. Reynolds

2   had made several attempts to remove funds from the TD Ameritrade

3   account.  I also know that none of the money that was supposed

4   to be sent to Axos was actually sent.

5   BY MR. CRONTHALL:

6   Q.  Were you aware of a Settlement Agreement that was entered

7   into between Mr. Reynolds and Axos?

8   A.  Yes.

9          MR. CRONTHALL:  We ask to be marked as Exhibit 2 that

10  Settlement Agreement.  It is also Exhibit A to the Complaint,

11  which is within Document 1 filed with the Court.

12         THE COURT:  All right.

13     (Plaintiff's Exhibit Number 2 for ID was marked.)

14  BY MR. CRONTHALL:

15  Q.  Mr. Bar-Adon, is Exhibit 2 a Settlement Agreement that was

16  entered into between Axos and Mr. Reynolds?

17  A.  Yes, it is.

18  Q.  Does your signature appear on that agreement?

19  A.  Yes, it does.

20  Q.  When was this Settlement Agreement entered into?

21  A.  On the 8th of March.

22  Q.  Now, let's just briefly review the agreement.  It appears to

23  be a seven-page long -- or sorry, six-page long document.

24         Do you understand that under this agreement, there was

25  any payment obligation from Mr. Reynolds to Axos?

Bar-Adon - Direct

55

1   A.  Yes, Mr. Reynolds agreed to pay 7 and a half million dollars

2   the following Monday, I believe, and if in the event that he

3   didn't or wasn't able to liquidate positions that he needed to

4   liquidate, that he would give Axos a lien on the entire account

5   until that was paid, as well as giving Axos a mortgage against

6   his home under construction, I believe, in the amount of $3

7   million with a ten-year -- a note of a ten-year term at 5

8   percent interest.

9   Q.  Now, let's take a look at the recitals on the first page of

10  the exhibit, specifically Recital Number 3, which refers to an

11  agreement to transfer, in settlement, $7.5 million from that

12  certain pledged account, TD Ameritrade, and then there's an

13  account number there.

14          What was that?

15  A.  Excuse me.  Please ask the question again.

16  Q.  Yes.  Is the account that's referenced in the recitals, in

17  the third recital, is that the TD Ameritrade account that we've

18  been talking about in this matter?

19  A.  Yes, it is.  Yes, it is.

20  Q.  Okay.  And that's referred to as a pledged account?

21  A.  Yes.

22  Q.  So was it a part of this agreement that that TD Ameritrade

23  account that Mr. Reynolds had was being pledged for the purpose

24  of satisfying his obligations under the agreement?

25  A.  Yes.

Bar-Adon - Direct

56

```
 1  Q.  You mentioned granting a security interest in a real
 2  property.
 3         Is that set forth in paragraph 4 of the Settlement
 4  Agreement on Page 2?
 5  A.  Yes.
 6  Q.  Then there is a release provision.
 7         Did Axos provide consideration to Mr. Reynolds in
 8  exchange for his agreement to pay the $7.5 million, pledged the
 9  TD Ameritrade account and provide a $3 million lien or mortgage
10  on his real property?
11  A.  Yes.
12  Q.  And what was that consideration provided for in the
13  agreement?
14  A.  Well, the release was -- it put Axos in a situation where --
15  in which it, first of all, could not collect from Mr. Reynolds
16  directly, other than the amount that was agreed to here.  We
17  couldn't go any further or any deeper on that.
18         It put us in a position where it would make it very
19  difficult for us to execute on certain insurance policies or
20  bonds because we essentially are waiving their right of
21  subrogation on it against him.
22         It prevents us from going after him should we, you
23  know, have otherwise had a theory in tort that would have
24  resulted in punitive damages or other consequential types of
25  damages that were incurred by us.  So the release was very
```

1  valuable to him.

2  Q.  So Axos was damaged to the amount of approximately 16 and a

3  half million dollars, but the total consideration flowing from

4  Mr. Reynolds to Axos here was far less than that?

5  A.  Yes.

6  Q.  Was that a part of the consideration, the sort of a discount

7  on his liability?

8  A.  Yes, yes, in order to get immediate payment.

9  Q.  Now, there's a few of the provisions I assume you typically

10  see in Settlement Agreements that are in this agreement such as

11  what's called an integration clause; is that correct?

12  A.  Yes.

13  Q.  I believe that's on Page --

14  A.  5.

15  Q.  -- 5 of the agreement, 6 of the Document 1-2, at paragraph

16  16.

17      Do you see that?

18  A.  Yes.

19  Q.  Can you read that particular clause?  It's very short.

20  A.  Sure.  "This agreement contains the full, final, and entire

21      agreement between the parties hereto with respect to the

22      matters addressed herein and supersedes all prior

23      negotiations and proposed agreements, whether written or

24      oral."

25  Q.  Did you understand that there had been prior discussions,

```
 1  both with Mr. Reynolds and perhaps even with Spartan, concerning

 2  a resolution prior to the time the agreement was signed?

 3  A.  Yes.

 4  Q.  So you, by having this integration clause in there, wanted

 5  to supersede all of those prior discussions and have this

 6  agreement be the final agreement?

 7  A.  Yes.

 8  Q.  Do you have any understanding as to whether or not

 9  Mr. Reynolds was represented by counsel or had the opportunity

10  to have counsel review with him and counsel him concerning the

11  Settlement Agreement prior to it being signed?

12  A.  Yes, the agreement provides that both parties acknowledge

13  that they have had the opportunity for advice of counsel, and

14  Mr. Reynolds' counsel -- and Mr. Reynolds confirmed by email

15  that he was represented by counsel, and his counsel confirmed by

16  email that he reviewed the agreement, discussed it, and advised

17  Mr. Reynolds with respect to the agreement.

18          MR. A. FORD:  Objection, Your Honor.  Misrepresents the

19  document.

20          THE COURT:  Overruled.

21  BY  MR. CRONTHALL:

22  Q.  Do you have any other reasons that you were concerned that

23  if the writs that were granted earlier in this matter in favor

24  of Axos were dissolved and didn't remain in place that

25  Mr. Reynolds may not be able to satisfy his debt to Axos?
```

A.   Yes.  Basically, this account had, you know, a significant

sum of assets in it, both cash and securities.  Mr. Reynolds had

demonstrated by his conduct, with respect to the Bio-Path stock,

a recklessness that would have, you know, or did concern me that

if he were able to get his hands on the cash there and continue

trading that he could end up losing the entire amount.  There

would not be anything left.

          This was precipitated by Mr. Reynolds' statements that

he wanted Axos to stake him, to the effect of staking him so

that he could continue trading and pay us back over time.  You

know, at that time, I think that the specter of his continuation

of trading was not something that we wanted to even think about.

          He seemed to have a continuing disregard for rules,

whether it be the disclosure requirement of his accounts, he was

previously fined for failing to disclose his accounts, fined by

FINRA --

          MR. A. FORD:  Objection, Your Honor.

          THE COURT:  Overruled.

          THE WITNESS:  -- for failing to disclose his accounts

to Spartan, and he entered into a Settlement Agreement with

FINRA in that regard.

          You know, based on what, you know, we knew at the time,

he had violated trading limits that had been imposed by his

company on him.  You know, that kind of misconduct and

continuing disregard for the rules is what precipitated,

1  ultimately, this loss, and finally, there seemed to be a

2  tremendous amount of information about Bio-Path, which he seemed

3  to ignore at the time that, you know, would have made this

4  particular trade especially unwise.

5  BY MR. CRONTHALL:

6  Q.  What are you referring to with respect to information about

7  Bio-Path that would have or should have influenced Mr. Reynolds

8  in the positions that he was taking on March 6th and March 7th?

9          MR. A. FORD:  Objection, Your Honor.  This is expert

10 testimony.

11         THE COURT:  Overruled.

12         THE WITNESS:  Bio-Path, the morning of the 6th, before

13 the market opened, Bio-Path had issued a press release regarding

14 the positive results that had been received from its -- I

15 believe its Phase 2 trials.

16         Prior to that, on March 1st, they issued a press

17 release that they would be reporting or presenting at a

18 conference that indicated that they had something to present.

19 They had been able to raise a certain amount of capital prior to

20 that time in the early part of the year, which again indicated

21 that something positive was happening at Bio-Path.

22         Finally, their stock had risen quite a bit that very

23 morning.  I believe 54 percent, if I remember correctly.

24 BY MR. CRONTHALL:

25 Q.  I would like to show you a document that we'll have marked

1    as Exhibit 3, I believe.

2        (Plaintiff's Exhibit Number 3 for ID was marked.)

3    BY MR. CRONTHALL:

4    Q.  Mr. Bar-Adon, I've handed you Exhibit 3, which is a

5    publication making an announcement on March 6th, 2019 about

6    Bio-Path.

7    A.  Yes.

8    Q.  Is this what you were referring to?

9    A.  Yes.

10   Q.  Was this the first announcement, to your knowledge, about

11   the clinical update that's mentioned here in the title of the

12   article?

13   A.  Yes, I believe it was.  It may not have been, but I believe

14   it was.

15   Q.  Let me show you a press release which we'll have marked as

16   Exhibit 4.

17       (Plaintiff's Exhibit Number 4 for ID was marked.)

18   BY MR. CRONTHALL:

19   Q.  Do you recognize Exhibit 4 to be a press release by Bio-Path

20   about an announcement concerning a clinical update regarding one

21   of its leukemia drugs?

22   A.  Yes, I believe that this is the press release that's

23   referenced in the Seeking Alpha notation that came out 8:00 a.m.

24   on March 6th, you know, incorporating basically all of this

25   information.

1          MR. CRONTHALL:  Let's mark as Exhibit 5 another one,

2    last document about this.

3        (Plaintiff's Exhibit Number 5 for ID marked.)

4    BY MR. CRONTHALL:

5    Q.  This is a document dated March 6th at 8:40 a.m. Eastern

6         Time.  "Bio-Path up 54 percent premarket on positive

7         prexigebersen data."

8              Do you see that?

9              MR. A. FORD:  Your Honor, can you note my standing

10   objection to this entire line?

11             THE COURT:  I will.

12             THE WITNESS:  Yes.

13   BY MR. CRONTHALL:

14   Q.  Mr. Bar-Adon, is that document of any significance to you

15   with respect to Axos' concern that if the Writs of Attachment

16   and Garnishment are dissolved that there could be a problem in

17   collecting or executing on any judgment in this matter?

18   A.  Yes, it bears on it because it, again, suggests a certain

19   amount of recklessness in pursuing trades, and you know, seeing

20   the money gambled away when we have a claim of this size is not

21   something that we would have wanted to see.

22   Q.  You mentioned earlier that you received information from

23   Mr. McComb regarding activity at TD Ameritrade --

24   A.  Yes.

25   Q.  -- whereby Mr. Reynolds was attempting to withdraw or

 1  transfer funds from that account at about the time that the

 2  Settlement Agreement was entered into.

 3          Do you recall that testimony?

 4  A.  Yes.

 5  Q.  Is that discussed in some detail in the affidavit of

 6  Mr. McComb and the emails attached thereto --

 7  A.  I believe so.

 8  Q.  -- as Exhibit B?

 9  A.  I believe so.

10  Q.  If you look at Exhibit B, I believe you have that affidavit

11  there in front of you of Mr. McComb, correct --

12  A.  Yes.  Just a minute, yes.

13  Q.  -- you'll see a series of emails involving Axos and TD

14  Ameritrade going back to Friday, March 8th.

15  A.  Yes.

16          MR. A. FORD:  I'm sorry, Your Honor, what are we

17  looking at now?

18          THE COURT:  Exhibit B.

19          MR. CRONTHALL:  This is the affidavit of Mr. McComb.

20          MR. A. FORD:  This is the first affidavit?

21          MR. CRONTHALL:  Correct.

22          MR. A. FORD:  Okay.

23          MR. CRONTHALL:  But I believe Mr. Bar-Adon has the

24  supplemental affidavit in front of him; is that correct?

25          THE WITNESS:  Yes.

1       MR. CRONTHALL:  We hereby move into evidence, as

2  Exhibit 6, the supplemental affidavit of Mr. McComb.

3       MR. A. FORD:  Your Honor, we object to both affidavits

4  of Mr. McComb.  We would request an opportunity to cross-examine

5  him.  We believe we've demonstrated misstatements in both

6  affidavits.  So we object strongly and request an opportunity to

7  cross-examine him.

8       THE COURT:  Overruled.  It will be admitted.

9     (Plaintiff's Exhibit Number 6 was received in evidence.)

10      MR. CRONTHALL:  We hereby move into evidence Exhibits

11 2, 3, 4, and 5, which concern the Bio-Path announcements.

12      THE COURT:  Admitted.

13      MR. A. FORD:  Just note our objection, Your Honor.

14      THE COURT:  All right.

15    (Plaintiff's Exhibit Numbers 2, 3, 4 and 5 were received in

16 evidence.)

17 BY MR. CRONTHALL:

18 Q.  As part of the discussions that were occurring between Axos

19 and Mr. Reynolds in the March 7, March 8 time frame, at some

20 point in time, did Mr. Reynolds provide an executed request to

21 transfer the $7.5 million from the TD Ameritrade account to

22 Axos?

23 A.  Yes.

24 Q.  I'd like to show you the Affidavit of Greg Garrabrants,

25 which is Document Number 31-3 in this matter, which we'll have

Bar-Adon - Direct

65

 1  marked as Exhibit 7.

 2      (Plaintiff's Exhibit Number 7 for ID was marked.)

 3  BY MR. CRONTHALL:

 4  Q.  You've seen this document before, Mr. Bar-Adon?

 5  A.  Yes.

 6  Q.  If you look at Exhibit D, which appears at Pages 24, 25, 26,

 7  of the exhibit --

 8  A.  Yes.

 9  Q.  -- what is that?

10  A.  It is a wire request to TD Ameritrade.

11  Q.  What is the date of that wire request?

12  A.  It is March 8th, 2019.

13  Q.  In fact, was the money reflected in that Outbound Wire

14  Request on TD Ameritrade letterhead and signed by Mr. Reynolds

15  actually executed upon and transferred to Axos?

16  A.  No.

17  Q.  I would like you to look at Document Number -- it seems to

18  be cut off on this page, but it's Exhibit C within the affidavit

19  of Mr. Garrabrants.  Do you see texts and photos there?

20  A.  Yes.

21  Q.  What do you understand those to be?

22  A.  I understand those to be photos and renderings of the house

23  Mr. Reynolds is building for himself on I believe it's Venetian

24  Island, it's called.

25  Q.  If you look at the last two pages of the affidavit, at Pages

1  30 and 31, there appears to be an email string between

2  Mr. Reynolds and Mr. Gainor and Axos.

3        Do you see that, the last two pages of the document?

4  A.  The last two pages, yes.  Yes, sir.

5  Q.  And do you see at the last page on the top it says, "I

6      confirm that I reviewed the agreement dated March 8th, 2019,

7      and we discussed it before you signed it.  Regards, Ronald

8      Gainor, Esq."

9  A.  Yes.

10 Q.  Who do you understand Mr. Gainor to be?

11 A.  He was Mr. Reynolds' counsel.

12 Q.  And the agreement that's referred to there dated March 8th,

13 2019, what agreement is being referred to there, to your

14 understanding?

15 A.  The Settlement Agreement that was executed ultimately

16 between Mr. Reynolds and us.

17 Q.  And on the prior, 30 of 31, does it appear that Mr. Reynolds

18 was forwarding that email from his lawyer to Axos?

19 A.  Yes.

20       MR. CRONTHALL:  Axos moves in the document marked as

21 Exhibit 6, the affidavit of Mr. Garrabrants.

22       MR. A. FORD:  Objection, Your Honor, we request an

23 opportunity to examine the witness.

24       THE COURT:  Admitted.

25       THE WITNESS:  Excuse me.  Is that Exhibit 6 or Exhibit

1    7, the Affidavit of Gregory Garrabrants?

2                MR. CRONTHALL:  Oh, did I hand it to you as Exhibit 7?

3                THE WITNESS:  You did.

4                MR. CRONTHALL:  I'm sorry, I misspoke.

5                So that would be Exhibit 7, Your Honor.

6                Thank you, Mr. Bar-Adon.

7        (Plaintiff's Exhibit Number 7 was received in evidence.)

8    BY MR. CRONTHALL:

9    Q.  At the time that -- strike that.

10                Let me just ask you this:  To date, has Axos received

11   any part of the $7.5 million that's referenced in the Settlement

12   Agreement?

13   A.  No, we have not.

14   Q.  Are you familiar at all with efforts that have been made to

15   try and serve Mr. Reynolds or his entity that he owns, SRR, the

16   other defendant in the case?

17   A.  Yes.

18   Q.  And what is your understanding about those efforts to try

19   and serve him?

20   A.  They were unsuccessful because the address was not his

21   address, and the address that -- the other address that they

22   tried, I believe they could hear people inside, but nobody

23   answered the door.

24   Q.  I'd like to show you a document that's already been filed in

25   this matter and marked as Composite Exhibit D.

 1              We will have this marked as Exhibit 8.

 2          (Plaintiff's Exhibit Number 8 for ID was marked.)

 3     BY MR. CRONTHALL:

 4     Q.  It appears at Document Number 31-4, previously filed in this

 5     matter.  That document includes documents entitled Return of

 6     Non-Service.

 7              Do you recognize those to be --

 8     A.  Yes.

 9     Q.  -- reflecting efforts to try and serve the defendant?

10     A.  Yes.

11     Q.  And those explain that the server attempted to go to an

12     address on Hibiscus, and there were people inside, but nobody

13     responded to the knock on the door; is that a fair statement?

14     A.  Yes, that's what it appears to say.

15     Q.  And that's consistent with your understandings of what

16     happened?

17     A.  Yes, it is consistent with my understanding.

18              MR. CRONTHALL:  One second.

19              We will move Exhibit 8 into evidence as well.

20              THE COURT:  It will be admitted.

21          (Plaintiff's Exhibit Number 8 was received in evidence.)

22              MR. CRONTHALL:  And no further questions at this time.

23              THE COURT:  Cross.

24                          CROSS-EXAMINATION

25     BY MR. A. FORD:

1  Q.  Good afternoon, Mr. Bar-Adon.  Am I pronouncing that

2  correctly?

3  A.  Bar-Adon.

4  Q.  Bar-Adon?

5  A.  Yes, sir.

6  Q.  Adam Ford, counsel for defendants in this case.

7        Mr. Bar-Adon, you don't have any firsthand knowledge of

8  Mr. Reynolds attempting to abscond with any funds from his TD

9  Ameritrade account, do you?

10  A.  Not firsthand knowledge, no.

11  Q.  You're not aware of Mr. Reynolds trying to remove any funds

12  from his TD Ameritrade account; isn't that true?

13  A.  Not firsthand.  I don't run TD Ameritrade.

14  Q.  Now, you testified earlier that Mr. McComb had conveyed to

15  you that Mr. Reynolds was an attempting to abscond with funds;

16  is that correct?

17  A.  Yes.

18  Q.  But other than that conversation -- and you don't know

19  whether Mr. McComb was correct when he reported that, do you?

20  A.  I do not know that, no.

21  Q.  And in fact, isn't it true that Mr. McComb is not in any

22  possession of any information that Mr. Reynolds was attempting

23  to abscond with his funds?

24  A.  No, but it's consistent with communications between Amanda

25  Wright of TD Ameritrade, Mr. McComb.

Bar-Adon - Cross

70

1  Q.  Were you ever on a phone call with Ms. Wright and

2  Mr. McComb?

3  A.  I was never on a phone call with Ms. Wright and Mr. McComb,

4  but I've seen emails.

5  Q.  I'm sorry, you've seen emails?

6  A.  Emails, yes.

7  Q.  And in any of these emails, did Ms. Wright ever inform

8  Mr. McComb that Mr. Reynolds was making repeated attempts to

9  withdraw funds from the account?

10  A.  I believe so.  I believe that she did say that or that she

11  said that they were getting inquiries about that from

12  Mr. Reynolds' broker.

13  Q.  I'm sorry.  The question was not whether there was inquiries

14  from Mr. Reynolds, but whether Mr. Reynolds submitted -- is your

15  testimony here today that Mr. Reynolds submitted repeated wire

16  requests to TD Ameritrade to remove funds from the account on

17  March 6th and 7th?  Is that your testimony?

18  A.  No, that's not what I said.

19  Q.  And in fact, Mr. Reynolds only submitted two wire requests

20  to remove funds on March 6th and 7th; isn't that correct?

21  A.  I don't know.

22  Q.  You're not aware of any attempt by Mr. Reynolds to withdraw

23  any funds, are you?

24  A.  Oh, I'm aware of attempts because they were reported to me

25  by others.  I do not have personal knowledge of --

Bar-Adon - Cross

71

1  Q.  Would you agree that if, in fact, Mr. Reynolds never made

2  any requests to TD Ameritrade, on March 6th and 7th, to withdraw

3  more than that $2 million, that that would demonstrate that

4  there's no attempt to abscond with those funds?

5  A.  No.

6  Q.  Now, Mr. Bar-Adon, are you an expert in securities trading?

7  A.  Not at all.

8  Q.  But you are an expert in the trading of Bio-Path Holdings;

9  is that true?

10  A.  No, I'm here as a percipient witness, not an expert witness.

11  Q.  Do you understand the algorithm that caused the spike in

12  share price to occur in Bio-Path Holdings on March 6th and 7th?

13  A.  I don't believe there was an algorithm that caused the spike

14  to occur on March 6th and 7th.

15  Q.  Why do you believe the share price spiked up to $74 on March

16  7th?

17  A.  I believe that there was speculation in the stock that

18  caused it to go there.  It was based on good news.

19  Q.  Really?

20        Did any bad news come out about Bio-Path on March 7th?

21  A.  I don't believe so.

22  Q.  So what explains the precipitous drop in that stock price

23  down to $38 that day?

24  A.  It was speculation, and you know, the speculators decided to

25  close out their positions by the end of the day, is what I would

1  assume.

2  Q.  And what is Bio-Path Holdings trading at today, sir?

3  A.  I believe about $20 a share; $19, $20 a share.

4  Q.  And was there any bad news that came out during that time?

5  A.  Not that I'm aware of, but I don't follow Bio-Path stock.

6  Q.  Can you tell me what you know about Scott Reynolds' ability

7  to trade in his TD Ameritrade account?

8  A.  What I know about his ability to trade in his TD Ameritrade

9  account?  I'm not sure what you mean by that.

10  Q.  I mean, can you tell me what types of trades he's able to

11  place in his TD Ameritrade account?

12          MR. CRONTHALL:  Objection.

13          THE COURT:  Overruled.

14          THE WITNESS:  I have no knowledge as to what kind of

15  trades they allow him to trade.

16  BY MR. A. FORD:

17  Q.  You've testified earlier that you were concerned about the

18  trades that he might place in his account that would lead him to

19  lose money; isn't that correct?

20  A.  I said that I was concerned that he trades recklessly, yes,

21  that is correct.

22  Q.  Do you know whether he places naked shorts in his TD

23  Ameritrade account?

24  A.  I don't know, but if he were permitted to remove the money

25  from his TD Ameritrade account, he could place naked shorts

Bar-Adon - Cross

73

1  elsewhere.

2  Q.  Do you know how much money Mr. Reynolds has made trading

3  over the past ten years?

4  A.  I don't know.

5  Q.  So when you say Mr. Reynolds is a reckless trader, that's

6  solely based on this one trade; is that correct?

7  A.  Yes, yes, that's the only trade of which I have intimate

8  knowledge.

9  Q.  Would you testify that every trader that has a trading loss

10 is a reckless trader?

11 A.  No, I would testify that every trader who continues to

12 increase his position under these circumstances and loses $16.6

13 million and puts his company basically out of business is

14 reckless.

15 Q.  When did COR Trading [sic], sir, first become aware of the

16 Bio-Path trading in the account at Spartan Securities?

17 A.  I'm not sure.

18 Q.  Were you sitting in the room earlier when someone testified

19 that it was no later than 2:00 p.m. on March 6th?

20 A.  I was sitting in the room.

21 Q.  And so would you agree then that Axos Clearing was aware of

22 Spartan Securities trading in Bio-Path by 2:00 p.m. on March

23 6th?

24 A.  No, I don't know one way or the other.

25 Q.  Now, Axos Clearing has the ability to stop trades from being

Bar-Adon - Cross

74

1  placed in its accounts if it's over its exposure limits; is that

2  correct?

3  A.  I'm not sure exactly what that mechanism is.

4  Q.  In fact, isn't Axos Clearing obligated to not permit its

5  customers from trading above its exposure limits?

6  A.  Again, I don't know what the exact mechanism for that is.

7  We only acquired Axos in January.

8  Q.  What was Spartan's trading limits at Axos Clearing in March?

9  A.  Spartan's trading limits?  I believe overall --

10  Q.  Spartan's trading limits.

11  A.  -- it was $10 million.

12  Q.  And did Spartan exceed its trading limits?

13  A.  Yes.

14  Q.  And what did COR Clearing do when it became aware that

15  Spartan exceeded its trading limits?

16  A.  My understanding is COR Clearing contacted Spartan and told

17  them to cover the positions, close them out.

18  Q.  But COR Clearing itself did not cover the positions itself,

19  did it?

20  A.  Well, COR Clearing is a clearing company.  It's not a

21  trading company.  We are not the traders.

22  Q.  I understand.  But COR Clearing has the authority to cover

23  those positions --

24  A.  COR Clearing has the authority to shut down the account --

25  Q.  Sir, if I may finish my question.

Bar-Adon - Cross

75

```
 1           THE COURT:  Yeah, let him finish his answer, too, while
 2   you're at it.
 3           MR. A. FORD:  Oh.
 4           THE COURT:  In this past.
 5           MR. A. FORD:  Oh, in the past.  I apologize.  I didn't
 6   notice that.  Absolutely, Your Honor.
 7   BY MR. A. FORD:
 8   Q.  When a client of Axos Clearing exceeds its trading limits,
 9   COR Clearing is obligated to cover those positions at that time;
10   isn't that true?
11   A.  That is not true.  COR Clearing is required to close out the
12   positions or tell them to close out the positions.  It can
13   terminate or suspend the trading in the account completely.
14   Q.  So the answer is that it is supposed to terminate trading in
15   the account when those trading limits are exceeded; isn't that
16   correct?
17   A.  I don't know what the word "supposed" means.
18   Q.  Do you have written policies at Axos Clearing --
19   A.  Yes.
20   Q.  -- about how to handle trading accounts?
21   A.  Yes.
22   Q.  Do those policies discuss trading limits imposed on clients?
23   A.  I have not reviewed them in detail.
24   Q.  So you don't know whether Axos Clearing is obligated, under
25   your clearing agreement, to terminate trading at the point that
```

Bar-Adon - Cross

76

1  a client exceeds its trading limits?

2  A.  I do not believe that under the clearing agreement, it

3  specifically states that.  You know, so I don't know that it's

4  an obligation.  I believe that COR Clearing, Axos Clearing has

5  the right to terminate the account or suspend the account if

6  limits are exceeded.

7       COR Clearing, Axos Clearing becomes liable on those

8  trades, however, because they have to -- at the end of the day,

9  it's COR that's responsible or Axos that's responsible for, you

10  know, for paying the monies or covering the trades.

11  Q.  So can I get you to admit that even if you're not aware of

12  the written policy at Axos, it's good practice for Axos Clearing

13  to terminate trading in an account that has past its limits?  Is

14  that a fair statement, that it would be a good practice?

15  A.  Again, I'm not here as an expert, so I won't say what good

16  practice or bad practice is.

17  Q.  I'm sorry.  I'm not asking you to testify as an expert.  I'm

18  asking you to testify in your role as the chief legal officer of

19  Axos Clearing.

20  A.  I would say that it's facts and circumstances.  Under these

21  circumstances, if somebody were to ask me, I might have

22  terminated the account.  But, you know, the decision was not --

23  we were not even aware in the San Diego headquarters until the

24  7th in the morning.

25  Q.  And so how much money did Spartan have in its trading

 1  account with COR on March 6th?

 2  A.   I believe it was $1.4 million.

 3  Q.   It was $1.4 million, and as of 2:00 p.m. on March 6th, do

 4  you understand what the loss was at that time?

 5  A.   I do not.

 6  Q.   But it was in excess of that $1.5 million; isn't that

 7  correct?

 8  A.   I believe it was in excess of $1.4 million, yes.

 9  Q.   And so had COR Trading terminated the account, terminated

10  the trading at the point that the trading limits were exceeded,

11  there would be no further damages; isn't that correct?

12  A.   That's not necessarily true.  It depends on what trades had

13  been placed.  It also depends on, you know, what orders were

14  open.  It depends on the ability to acquire stock to cover it.

15       It's a thinly traded nano stock, and it would depend

16  on, you know, a number of other factors.  So it doesn't

17  necessarily, you know -- and the loss situation.

18  Q.   Did you just say that Bio-Path was a thinly traded stock?

19  A.   It had been a thinly traded stock.

20  Q.   Do you understand that Bio-Path traded 74 million shares on

21  March 6th?

22  A.   There was a lot of trading on March 6th, but the

23  availability of shares -- the stock is a small cap -- the

24  company is a small cap company with a limited number of shares

25  available at any one time.

Bar-Adon - Cross

1  Q.  Is a share that trades 74 million shares in one day thinly

2  traded?

3  A.  In one day?  It depends on what it does on the other days.

4  If you want me to characterize it, I would say that that day it

5  was not thinly traded, but on other days, it may be.

6  Q.  So to go back to your prior answer, now that we know March

7  6th was not thinly traded, COR, under its policies, should have

8  terminated the account by the afternoon on March 6th to prevent

9  further losses; isn't that correct?

10  A.  That's incorrect because I have insufficient evidence to

11  make that determination.  The fact is that just because there

12  were 74 million shares traded doesn't mean that there were 74

13  shares available.

14        I may be wrong about this, but I don't think that

15  Bio-Path has those shares issued and available at all times.

16  The same shares are traded over and over again.  So I don't know

17  exactly what their position was and whether the stock would have

18  been available to cover the trades.

19  Q.  Now, I believe you testified earlier about whether you were

20  involved in the attempt to mitigate the losses stemming from

21  this trading; is that correct?

22  A.  Yes.

23  Q.  And were you involved in COR Clearing's instruction to

24  Spartan to close out the account on March 6th, or to terminate

25  the trading?

 1    A.   No.

 2    Q.   You were not?

 3         Were you involved in the instructions from COR Clearing

 4    to Spartan to cover the position at any time on March 7th?

 5    A.   No.

 6    Q.   Did you take part in any conversations with Scott Reynolds

 7    regarding the document that's entitled Settlement Agreement?

 8    A.   No.

 9    Q.   Did you draft that document?

10    A.   I believe that's attorney/client privilege.

11    Q.   I believe it's not.

12         MR. CRONTHALL:  Well, I'll object that it calls for

13    attorney/client privileged communication.

14         MR. M. FORD:  The individual who drafts a document

15    that's signed by another client is not attorney/client because

16    it's intended to go out to someone else.

17         THE COURT:  Ask your next question.

18         THE WITNESS:  I was involved in it.  I did not draft

19    it.  I shouldn't say that.  I did not solely draft it.  I was

20    involved in the drafting.

21    BY MR. A. FORD:

22    Q.   You were involved in the drafting of this document?

23    A.   Absolutely.

24    Q.   Now, in the recitals of the Settlement Agreement, Recital

25         Number 1, I'll represent, states, "Whereas, Reynolds made

1        trades resulting in trading losses that created a margin

2        account deficiency at Axos Clearing," and then it's defined

3        as "the incident".

4   A.   Yes.

5   Q.   But in fact, Reynolds never made any trades with Axos

6   Clearing; isn't that correct?

7   A.   No.

8   Q.   Does Scott Reynolds have a trading account at Axos Clearing?

9   A.   No.  Spartan does, but Reynolds, on behalf of Spartan, made

10  trades.

11  Q.   But just to be clear, Reynolds never placed any trades at

12  Axos Clearing; isn't that correct?

13            MR. CRONTHALL:  Objection.

14            THE COURT:  Overruled.

15            THE WITNESS:  It depends on how you define "placing

16  trades."

17  BY MR. A. FORD:

18  Q.   Well, it always depends on what is, is; but in this case,

19  the question is whether Mr. Reynolds had account at Axos

20  Clearing?

21  A.   He did not have an individual account.  He had access to

22  Spartan's account.

23  Q.   And it also says "made trades".  What trades are those

24  referring to?

25  A.   I believe that those are referring to the Bio-Path trades.

Bar-Adon - Cross

81

1   Q.  Okay.  And earlier today, Mr. Lopez testified that

2   Mr. Reynolds was precluded from further trading on March 6th.

3   Do you remember him testifying to that?

4   A.  Yes.

5   Q.  And so to be clear, this recital only refers to or I don't

6   know -- strike that.  Strike that.  Okay.  But to be clear, this

7   document is -- strike that.

8          Okay.  Now, second recital says, "Axos Clearing" -- I'm

9   quoting -- "intends to hold the defendants responsible for the

10  deficiency."

11         Did Axos Clearing have any agreement with Scott

12  Reynolds regarding trades being placed in the account?

13  A.  Not a direct agreement.

14  Q.  So, in fact, Axos Clearing could not hold Scott Reynolds

15  responsible for the deficiency, could it?

16         MR. CRONTHALL:  Objection.

17         THE WITNESS:  No, that's not correct.  Axos Clearing

18  could, on a variety of legal theories, but I believe that, you

19  know, as a practical matter, Axos could have filed -- there are

20  a variety of ways we could have gone after Mr. Reynolds.  I

21  don't -- I just disagree with the idea that we had no ability to

22  do that.

23  BY MR. A. FORD:

24  Q.  Now, SRR Fortress Capital LLC, can you tell me what that is?

25  A.  I believe that that's a single member LLC that Mr. Reynolds

1   owns and controls.

2   Q.  And what was SRR Fortress Capital's involvement in the

3   trades in Bio-Path?

4   A.  I do not believe that it had any involvement in the trades.

5   Q.  So how is Axos Clearing going to hold SRR Fortress Capital

6   responsible for the deficiency?

7           MR. CRONTHALL:  Objection.

8           THE COURT:  Overruled.

9           THE WITNESS:  I believe that it's an alter ego of

10  Mr. Reynolds.  It's simply a titling entity in order to protect

11  Mr. Reynolds or designed to protect Mr. Reynolds' assets from

12  liability, and I believe that is something that we would be able

13  to try to pierce.

14  BY MR. A. FORD:

15  Q.  Now, this Settlement Agreement, this was first sent to Scott

16  Reynolds at 4:04 p.m. on March 8th; is that correct?

17  A.  I don't know when it was sent to him.

18  Q.  Do you know what time Mr. Reynolds returned the signed copy

19  of this document?

20  A.  I don't.

21  Q.  Would it surprise you to learn that it was within 46

22  minutes?

23  A.  I have no idea.

24  Q.  Is 46 minutes an ordinary amount of time for a party to

25  understand the parts of a contract?

1           MR. CRONTHALL:  Objection.

2           THE COURT:  Overruled.

3           THE WITNESS:  I suppose it depends on the party, the

4    contract, and the circumstances.

5    BY MR. A. FORD:

6    Q.  Now, you testified earlier that Axos Financial is the parent

7    corporation of Axos Clearing; is that correct?

8    A.  I said ultimate parent, yes.

9    Q.  Ultimate parent?  What does that mean?

10   A.  I believe that there is another entity in between them.

11   Q.  And you understand that a subsidiary doesn't have legal

12   authority to bind a parent corporation, correct?

13   A.  A subsidiary doesn't have legal authority to bind a parent

14   corporation?  It depends on what the authority is that the

15   parent has given.  Again, it depends on the circumstances.

16   Q.  And you also understand that a company does not have the

17   authority to bind a subsidiary; isn't that correct?

18   A.  That is correct in some circumstances.  Again, it depends on

19   what the arrangements are between the parent and the subsidiary,

20   what the delegations are of duties, rights, and

21   responsibilities.

22   Q.  Now, the Settlement Agreement that was sent to Scott

23   Reynolds was not edited at all; isn't that correct?

24   A.  I have no idea what that means.

25   Q.  There were no -- I apologize -- there were no edits made to

Bar-Adon - Cross

84

1    the original draft that was sent to Scott Reynolds; isn't that

2    correct?

3    A.   Prior to sending it?

4    Q.   The document -- I'll rephrase.

5              The document that Mr. Garrabrants sent to Mr. Reynolds

6    that was entitled Settlement Agreement, when it was returned

7    signed, no changes had been made to that document; is that

8    correct?

9    A.   I don't know.

10   Q.   You testified earlier that you believe Mr. Reynolds had

11   received or had an attorney in connection with the Settlement

12   Agreement; is that correct?

13   A.   Yes.

14   Q.   But you don't know what the nature of that representation

15   was, do you?

16   A.   What do you mean the "nature of the representation"?  It was

17   legal representation.

18   Q.   And beyond that?  You don't know --

19   A.   Please be specific.

20   Q.   I will rephrase.

21             You don't know whether Mr. Reynolds received any advice

22   in connection with signing this Settlement Agreement, do you?

23   A.   I know that I have seen an email from a licensed attorney

24   saying that he consulted with Mr. Reynolds regarding this

25   agreement.

1  Q.  But you don't know what the nature of that consultation was,

2  do you?

3  A.  I would assume that it's between him and Mr. Reynolds.

4  Q.  Now, this agreement, would you agree that Axos Clearing

5  still has the ability to sue Spartan Securities for the trading

6  losses in Bio-Path?

7  A.  Yes.

8  Q.  In fact, they could sue Spartan Securities for $16.5

9  million, correct?

10  A.  Well, there would be an offset for any amounts that

11  Mr. Reynolds paid.

12  Q.  And do you understand whether Axos Financial is still able

13  to file a complaint against Mr. Reynolds?

14  A.  Axos Financial?

15  Q.  Axos Financial.

16  A.  I don't know one way or the other.  I haven't looked into

17  that.

18  Q.  And would Axos Bank be able to file a lawsuit against

19  Mr. Reynolds?

20  A.  Again, I have not looked into that.

21  Q.  Okay.  And is that because the Settlement Agreement is not

22  clear?

23  A.  No, it is because the fact is that I haven't looked at all

24  the possible causes of action that any of the family of

25  companies that constitutes Axos Financial might have against

Bar-Adon - Cross

86

 1  Mr. Reynolds.

 2  Q.  But in your mind, the constellation -- I think you called it

 3  a constellation of families of Axos Financial entities?

 4  A.  No, I just said the family of companies.

 5  Q.  The family of companies of Axos Financial --

 6  A.  Right.

 7  Q.  -- still has open claims against Mr. Reynolds; is that

 8  correct?

 9  A.  I don't know.  I believe that this release speaks for

10  itself.

11  Q.  That's to be determined.

12      MR. A. FORD:  Your Honor, may I have just one moment?

13      THE COURT:  Sure.

14      MR. A. FORD:  Just a few more questions.

15  BY MR. A. FORD:

16  Q.  Were you involved in getting a freeze on Mr. Reynolds'

17  account, the TD Ameritrade account, on March 7th?

18  A.  In what sense involved?

19  Q.  Were you aware of efforts, on behalf of Axos Clearing, to

20  freeze the SRR Fortress account at TD Ameritrade?

21  A.  Yes.

22  Q.  And were you aware of statements to TD Ameritrade that Axos

23  Clearing had obtained a pledge agreement from Mr. Reynolds?

24  A.  No.

25  Q.  And this is on March 7th?

1  A.  I'm saying I was not aware one way or the other.

2  Q.  Are you aware of what information was communicated to TD

3  Ameritrade to effectuate the freeze on March 7th?

4  A.  No, I was not involved in that conversation.

5  Q.  But you agree that there was, in fact, no pledge agreement

6  between Mr. Reynolds and Axos on March 7th; is that correct?

7  A.  I believe that there was an oral pledge agreement, is my

8  understanding, but again, I was not involved.

9  Q.  You understood that there was an oral pledge agreement and

10  is it fair to say --

11  A.  That he had committed to pledge the account.

12  Q.  And you understood that because David Lopez had said that;

13  isn't that correct?

14  A.  I don't recall, but I do recall that it was the -- it was my

15  understanding that he had committed to that.

16  Q.  Are you aware of Mr. Reynolds speaking to anyone at Axos

17  Clearing before 9:00 p.m. on March 7th when he spoke with

18  Mr. Garrabrants?

19  A.  Again, I don't know who he spoke to.

20  Q.  So on March 7th, you have no way of confirming that

21  Mr. Reynolds personally had made an oral agreement to pledge the

22  account?

23  A.  Not from my personal knowledge.

24  Q.  And in fact, Ethan McComb, in his affidavit, states that he

25  obtained this information from David Lopez; isn't that correct?

Bar-Adon - Cross

88

1   A.   Whatever he says in his affidavit.

2   Q.   And so the only source of that purported oral pledge was

3   coming from Lopez, correct?

4   A.   Again, that's a conclusion that I have no information about.

5   Q.   Do you know who Mark Bell is?

6   A.   Mark Bell?

7   Q.   Mark Bell.

8   A.   Yes.

9   Q.   And who is Mark Bell?

10  A.   He is a lawyer who works for COR Clearing and Axos Clearing.

11  Q.   Okay.  And was he terminated from his position recently?

12  A.   He resigned, I believe.

13  Q.   And I know you testified earlier that there's a document,

14  that there's a Delaware filing about these companies being

15  combined.

16        Do you know why COR Clearing is making filings with the

17  Nebraska Secretary of State as late as March 18th, 2019

18  asserting that it's an independent company?

19        MR. CRONTHALL:  Objection.

20        THE COURT:  Overruled.

21        THE WITNESS:  I don't know one way or the other.  I

22  didn't make a filing.

23        MR. A. FORD:  Fair enough.

24        THE WITNESS:  And I didn't authorize a filing.

25  BY MR. A. FORD:

1  Q.  Fair enough.

2         Just to be clear, in addition to the corporate filing

3  that was made, it's your testimony that all of the corporate

4  documents necessary to effectuate the combining of the companies

5  have been fully executed by today?

6  A.  All of the corporate documents?

7  Q.  Yes.

8  A.  Yes.  Potentially, not all of the name changes in the

9  various jurisdictions where COR may be doing business have been

10  filed.  The company is the same company.  It would just be a

11  name change.

12         So I don't know when or what document you're

13  referencing in Nebraska, but you know, oftentimes, it takes a

14  period of time to, you know, get all those filings on record.

15         MR. A. FORD:  Thank you.  No further questions.

16         THE COURT:  Redirect.

17         MR. M. FORD:  Your Honor, if we could, too, move to

18  have introduced all of our exhibits to our memoranda that we

19  submitted, the opening brief and reply.

20         THE COURT:  Can you identify them?

21         MR. CRONTHALL:  Without Mr. Reynolds --  I'm sorry.

22         THE COURT:  Go ahead.

23         MR. CRONTHALL:  Without Mr. Reynolds testifying, we

24  would object to just that omnibus admission of everything.

25         THE COURT:  I mean, I'd like to know what you're

Bar-Adon - Redirect

90

1    referring to.

2         MR. A. FORD:  We can perhaps even, without wasting the

3    witness' time, we can set some time aside to go through it one

4    by one if that's easier for Your Honor.

5         THE COURT:  Okay.  All right.

6         MR. A. FORD:  And determine maybe on a document by

7    document basis, whether there's an objection.

8         THE COURT:  Yeah, I think that would be better.

9                        REDIRECT EXAMINATION

10   BY MR. CRONTHALL:

11   Q.  Mr. Bar-Adon, you were asked by counsel a few minutes ago

12   about the timing of the execution of the Settlement Agreement,

13   and I want to get into that a little bit with you in terms of

14   what occurred earlier on.

15        If you look at Exhibit 7, which I believe should be

16   before you, which is the affidavit of Mr. Garrabrants -- let me

17   know if you have that there.

18   A.  Yes.

19   Q.  I'd like you to take a look at Exhibit A thereto, which

20   appears to be an email, time and date stamped March 8th at 5:25

21   a.m., from Scott R. to Greg Garrabrants.  Do you see that?

22   A.  I'm not quite there.  Exhibit A?

23   Q.  Exhibit A to the affidavit of Mr. Garrabrants.

24   A.  Yes, yes.

25   Q.  All right.  After that particular email there's a Temporary

 1  Pledge and Security Agreement.  Do you see that?

 2  A.  Yes.

 3  Q.  The email that's in front of it is from Mr. Reynolds to

 4  Mr. Garrabrants?

 5  A.  Yes.

 6  Q.  So again, that's from early in the morning on March 8th,

 7  correct?

 8  A.  Right, early in the morning Pacific Time.

 9  Q.  Now, I'd like you to take a look at Exhibit B to that same

10  document, Exhibit 7.

11  A.  Yes.

12  Q.  We've seen some text messages earlier today involving

13  Mr. Lopez.  This appears to be one from March 8th at 9:52 a.m.

14  A.  I assume that that would be Eastern Time.

15  Q.  Correct, and it's to Greg.

16          Do you understand that to be Mr. Garrabrants?

17  A.  Yes.

18  Q.  And then David from Spartan, and we've heard from Mr. Lopez

19  earlier today, correct?

20  A.  Yes.

21  Q.  And what's the gist of that text?

22  A.  So it's that there is the opportunity for a settlement.

23  Q.  So Mr. Lopez is telling Axos that Scott told him there might

24  be a settlement here as early as March 8th at 9:52 a.m.?

25  A.  Yes.

1  Q.  You were also asked about some issues concerning the TD

2  Ameritrade account, and the reasons for your concern about there

3  being transfers out of that account in the event the writs are

4  dissolved.

5        I want to go into that a little bit further, and I'd

6  like you to take a look in that regard at Exhibit 6, which is

7  the supplemental affidavit of Mr. McComb.  Do you have that

8  before you?

9  A.  Yes.

10 Q.  If you look at the second page of the document at paragraph

11 5 --

12 A.  Give me a second to get organized here.

13 Q.  Sure.

14 A.  Okay.  This is --

15 Q.  Exhibit 6.  Maybe it's on the shelf there in front of you.

16 A.  No, no, this is the David Lopez'.  Oh, here, supplemental

17 affidavit.  Okay, got it.

18 Q.  Would you look at the second page at paragraph 5, please.

19 A.  Yes.

20 Q.  And that particular paragraph reports that, on March 8th,

21 2019, Mr. McComb was concerned regarding the status of the

22 transfer because Spartan advised us that Reynolds had possibly

23 committed fraud by making fake entries into their trading

24 software and that Spartan had been talking to the FBI about this

25 and the trading loss.  Do you see that?

Bar-Adon - Redirect

1  A.  Yes.

2  Q.  And you recall Mr. Lopez testifying earlier today about the

3  FBI having visited on March 7th, right?

4  A.  Yes.

5  Q.  Do you recall Mr. Lopez' testimony about the apparent

6  falsification of trades having occurred?

7  A.  Yes.

8  Q.  Was that any part of a reason for your concern that if the

9  writs are dissolved that there could be problems with the assets

10  remaining in the TD Ameritrade account?

11  A.  Yes.

12  Q.  And why is that?

13  A.  Because again, I do not believe, given Mr. Reynolds'

14  behavior, his failure to meet his agreements, and his, what I've

15  described as reckless conduct, I think that it is another

16  factor, another element for reaching a conclusion that without a

17  freeze of the account, without the attachment/garnishment, we

18  would not be able to recover the losses for our shareholders.

19       At the end of the day, this money is our shareholders'

20  money.  We're a public company.  We're owned by the public, and

21  our shareholders, you know, have the lawsuit.  That's why we

22  filed the 8-K, and it's, you know, it's a serious situation.

23  Q.  Mr. McComb, in the balance of that paragraph, Number 5 on

24       Page 2 of Exhibit 6, reports, "Also, as detailed in my prior

25       attached affidavit, TD Ameritrade's counsel advised me on

Bar-Adon - Redirect

94

1        March 7th, 2019 and subsequently, that Mr. Reynolds had

2        attempted several times to remove funds from the account

3        after agreeing to pledge the assets in the account pending a

4        resolution of the dispute."

5            Do you recall that being brought to your attention?

6   A.   Yes.

7   Q.   What I've just read that was reported to you, is that a part

8   of Axos' concern that if the writs are dissolved that there

9   could be a problem being able to recover in the event of an

10  execution on a judgment here?

11  A.   Yes.

12  Q.   We talked a bit earlier about the TD Ameritrade request

13  signed by Mr. Reynolds to transfer the $7.5 million, but that

14  amount was never actually transferred.

15            Was that at all a contributing factor to any concern on

16  your part that if the writs are dissolved in this matter that

17  there would be a problem collecting on a judgment?

18  A.   Yes.

19            MR. CRONTHALL:  I have nothing further at this time,

20  Your Honor.

21            THE COURT:  Thank you.  You may step down.

22            Where are you in your presentation of witnesses?

23            MR. CRONTHALL:  Your Honor, those are the only

24  witnesses that we would call other than to call, as an adverse

25  witness, Mr. Reynolds.

Bar-Adon - Redirect

95

1          THE COURT:  Okay.  I was trying to get the schedule

2    down.

3          And what's the defense presentation?

4          MR. A. FORD:  Your Honor, the defense still needs a few

5    minutes to -- I'd like to discuss with my counsel.  There's a

6    possibility that we will call Mr. Reynolds to the stand, but I'm

7    not prepared to commit to that right this second.

8          THE COURT:  Well, if you don't, they are going to.

9          MR. CRONTHALL:  I'm sorry?

10         THE COURT:  If they don't call Mr. Reynolds, it's your

11   intention to call Mr. Reynolds.

12         MR. CRONTHALL:  Yes, it would be.  I am mindful though

13   of Mr. Lopez, who I understand has a plane ticket for this

14   afternoon.  So I would ask that if counsel has any further

15   questions of Mr. Lopez, that perhaps we could call him out of

16   order to get him taken care of before I call Mr. Reynolds as an

17   adverse witness.

18         THE COURT:  No problem with that?

19         MR. A. FORD:  I don't have any problem with that, Your

20   Honor.  I just have a few questions, so we can squeeze him in.

21         THE COURT:  All right.  Let's get him back up here

22   then.

23         You are still under oath.

24         THE WITNESS:  Yes, sir.

25         MR. A. FORD:  Just a few seconds, Your Honor.

Lopez - Direct

96

1          DAVID D. LOPEZ, DEFENSE WITNESS, PREVIOUSLY SWORN.

2                        DIRECT EXAMINATION

3   BY MR. A. FORD:

4   Q.  Good afternoon, Mr. Lopez.

5          Just very quickly, do you recall telling Mr. Reynolds

6   that you absolutely could not let COR cover the position limits,

7   and therefore, you had made the decision for Spartan to cover

8   the limits itself?

9   A.  That would not be my call to make.  I couldn't tell COR

10  whether or not to cover the position.  I think it was certainly

11  our discussion that, in doing so, it would give it to a

12  wholesaler.  That would have made the loss significantly worse,

13  but it was COR's ultimate decision to allow us to continue

14  ourselves.

15  Q.  But you did engage in conversations with COR where you

16  explained that Spartan had made the decision that it wanted to

17  keep the position open; isn't that correct?

18  A.  No.  We didn't decide one way or the other to keep the

19  position open.  It was COR's direction for us to close the

20  position.

21  Q.  Right.  But you had told COR that Spartan was going to

22  figure out how to cover the position; isn't that correct?

23  A.  COR and I were in discussions about whether or not we were

24  going to continue to cover the position, but it was ultimately

25  COR's decision whether we continued or they would take it over.

Lopez - Direct

97

1  Q.  I'm sorry.  So you just testified that it was COR's decision

2  whether or not they would take over the position or leave it

3  open for you to cover; isn't that correct?

4  A.  They would have the right to take that position and have one

5  of their routed wholesalers cover the position.

6  Q.  Did you have an understanding that Spartan had exceeded its

7  trading limits as of March 7th --

8  A.  Correct.

9  Q.  -- at Axos?

10  A.  Yes.

11  Q.  You had an understanding that Axos knew that before trading

12  opened on March 7th, that Spartan had exceeded its trading

13  limits, correct?

14  A.  I had a discussion with them that we were only allowed to do

15  closing transactions because we could no longer have any

16  securities business to be done.

17  Q.  Now, earlier today, there was testimony that -- well, strike

18  that.

19        Do you remember sending a text message to Mr. Reynolds

20  on the morning of March 7th, that said, "I can't let COR cover

21  the position or the loss will be astronomical"?

22  A.  As I discussed, if they sent it to a wholesaler, it would be

23  horrific, but I have no say in what COR does.

24  Q.  And now, these trading limits that you testified are in

25  existence, do you remember what the trading limits were that you

Lopez - Cross

98

 1  believe were applicable?

 2  A.  To this specific --

 3  Q.  I'm sorry.  For Mr. Reynolds' trading limits.

 4  A.  They were acknowledged as $500,000 per position interday

 5  maximum limit.  I believe it's 3 million total positions as a

 6  firm.  Interday limits, buys and sells.  We have had an ax,

 7  NASDAQ limit of 10 million.

 8  Q.  Do you recall Mr. Reynolds adding or making a $375,000

 9  contribution to Spartan's proprietary trading account last fall?

10  A.  I don't recall exactly when it was, but he has made

11  contributions to Spartan, yes.

12  Q.  And do you recall communications with Scott Reynolds that in

13  exchange for him adding that $375,000, that the trading limits

14  would be eliminated?

15  A.  Eliminated, no.  It would be -- prior to the limits we were

16  speaking of, the $500,000 per position, it was actually $100,000

17  per position.  Those were adjusted due to the extra capital that

18  Spartan was able to put into the trading accounts.

19          MR. A. FORD:  One moment, Your Honor.

20          I have no further questions, Your Honor.

21          THE COURT:  Any cross?

22                      CROSS-EXAMINATION

23  BY MR. CRONTHALL:

24  Q.  I would just like to confirm, Mr. Lopez, do you happen to

25  have your affidavit before you?  I believe I showed it to you

Lopez - Cross

99

 1  earlier this morning.

 2  A.  There are a few here.  Let me see if I can find it.

 3          MR. CRONTHALL:  If I may approach.

 4          THE WITNESS:  Yeah, that might help.  I don't see --

 5          MR. CRONTHALL:  I would like to hand the witness what's

 6  been marked as Exhibit 9, and if you can hand me back --

 7          THE WITNESS:  Sure.

 8          MR. CRONTHALL:  Here it is.

 9  BY MR. CRONTHALL:

10  Q.  And is the document that I just handed you as Exhibit 9,

11  Mr. Lopez, is that your true and correct affidavit?

12  A.  Looks to be.

13          MR. CRONTHALL:  We move Exhibit 9 into evidence.

14          THE COURT:  It will be admitted.

15      (Plaintiff's Exhibit Number 9 was received in evidence.)

16          MR. CRONTHALL:  I have nothing further, Your Honor.

17          THE COURT:  Thank you.  You may step down.

18          Okay.  So it's your intention to call Mr. Reynolds?

19          MR. CRONTHALL:  That is correct, Your Honor.

20  Mr. Reynolds would be our last witness.

21          THE COURT:  And how long do you anticipate that

22  lasting?

23          MR. CRONTHALL:  Well, probably at least a half an hour,

24  I would assume.

25          THE COURT:  Let's go ahead and break for lunch and ask

1  you to be back at quarter after 2, okay?

2      (There was a luncheon recess taken at 1:40 p.m.)

3                    AFTERNOON SESSION

4      (The following proceedings were held at 2:15 p.m.:)

5            THE COURT:  All right.  Call your next witness.

6            MR. CRONTHALL:  Axos Clearing calls Scott Reynolds as

7  an adverse witness.

8            MR. BERKELEY:  Your Honor, can we just clarify what

9  adverse witness -- I don't understand what opposing --

10           THE COURT:  That means he could lead.

11           MR. BERKELEY:  Well, there has been no basis for that

12 whatsoever at this point in time, so we would object.

13           THE COURT:  Overruled.

14           THE COURTROOM DEPUTY:  Raise your right hand.

15         SCOTT R. REYNOLDS, PLAINTIFF'S WITNESS, SWORN.

16           THE WITNESS:  Yes, I do.

17           THE COURTROOM DEPUTY:  Thank you.  Please be seated.

18 Speak into the microphone and state your full name and spell it

19 for the record.

20           THE WITNESS:  Sure.  My name is Scott Richard Reynolds.

21 First name, S-c-o-t-t, R-i-c-h-a-r-d, R-e-y-n-o-l-d-s.

22           THE COURTROOM DEPUTY:  Thank you.

23                    DIRECT EXAMINATION

24 BY MR. CRONTHALL:

25 Q.  Good afternoon, Mr. Reynolds.

Reynolds - Direct

101

1    A.   Good afternoon.

2    Q.   You were terminated from your employment with Spartan; is

3    that correct?

4    A.   Yes, sir.  Yes, I was.

5    Q.   And that termination was a result of the trades that you

6    were involved in on March 6 and/or March 7, correct?

7    A.   That is correct.

8    Q.   Now, you are a member, that is, you had an ownership

9    interest in the company that is or was the parent company of

10   Spartan as of March 6, 7, 2019, correct?

11   A.   I have a tiny position.  I'm not actually sure what part of

12   what company I own because the company went through so many

13   transformations.  I put in $50,000 probably somewhere around

14   like 2009, so I'm not sure how I'm in the whole share structure.

15   Q.   Isn't it a fact, though, that you are a member of that LLC

16   that is the parent of Spartan?

17   A.   I'm not sure.

18   Q.   I'd like to show you what's been marked as Exhibit 2.

19   A.   Sure.

20   Q.   That has been marked as the Settlement Agreement in this

21   matter.  Do you recognize your signature on that document, sir?

22   A.   Yes, I do.

23   Q.   At the time that you signed that document, Mr. Gainor was

24   your lawyer, correct?

25   A.   Correct.

Reynolds - Direct

102

1   Q.  Mr. Gainor submitted an email which you forwarded to Axos'

2   CEO attesting that he had discussed and read the agreement with

3   you prior to your execution of it, correct?

4            MR. A. FORD:  Objection, mischaracterizes the email.

5            THE COURT:  Overruled.

6            THE WITNESS:  Yes, he sent an email.

7   BY MR. CRONTHALL:

8   Q.  In the Settlement Agreement you, among other things, agreed

9   to pay Axos $7.5 million, correct?

10  A.  Correct.

11  Q.  You also agreed to pledge your TD Ameritrade account with

12  respect to that obligation, right?

13  A.  Correct.

14  Q.  You also agreed, at paragraph 16, that this agreement

15  contains the full, final, and entire agreement between the

16  parties hereto with respect to the matters addressed herein and

17  supersedes all prior negotiations and proposed agreements,

18  whether written or oral, correct?

19  A.  I see that, yes.

20  Q.  Have you paid any part of the $7.5 million obligation to

21  Axos?

22  A.  No, I have not.

23  Q.  Isn't it a fact, sir, that you signed the request that the

24  $7.5 million in your TD Ameritrade account be transferred from

25  TD Ameritrade to Axos?

Reynolds - Direct

103

1    A.   Yes, however it was part of a global agreement.

2    Q.   I'm sorry?

3    A.   Yes, however this was part of a global agreement and the

4    other party did not receive release.

5              MR. CRONTHALL:  Move to strike as unresponsive.

6              THE COURT:  Sustained.

7    BY MR. CRONTHALL:

8    Q.   The Settlement Agreement --

9              MR. A. FORD:  Your Honor, can he have an opportunity to

10   answer the actual question then, if his answer was stricken?

11             THE COURT:  Okay.  It calls for a yes or no.

12             You said yes?

13             THE WITNESS:  Yes.

14   BY MR. CRONTHALL:

15   Q.   With respect to the Settlement Agreement, it's also signed

16   by you on behalf of SRR Fortress Capital, LLC, correct?

17   A.   Yes.

18   Q.   That LLC is a one-person LLC in which you are the sole

19   member; is that right?

20   A.   Correct.

21   Q.   Let's take a look at Exhibit 7, which is the declaration, or

22   affidavit I should say, of Mr. Garrabrants, and I'm pointing out

23   Exhibit D to you.

24   A.   Okay.

25   Q.   Is that document the request to transfer the $7.5 million

Reynolds - Direct

104

1    from your TD Ameritrade account that you sent to

2    Mr. Garrabrants?

3    A.   Yes.

4    Q.   You immediately canceled that request to transfer, correct?

5    A.   Yes.

6    Q.   Now, you heard Mr. Lopez' testimony earlier today concerning

7    the trading activity that occurred on March 6, 2019, right?

8    A.   Correct.

9    Q.   And you agree with Mr. Lopez that you falsified certain

10   trades to make it appear that you were taking long positions

11   instead of closing out the short positions that you had taken in

12   Bio-Path; is that correct?

13   A.   That's 100 percent false.

14   Q.   Prior to the day of trading on March 6, did you already have

15   a plan in place to sell short securities in Bio-Path?

16   A.   I actually had a thousand shares short coming into that day.

17   Q.   Before the start of trading on March 6, were you aware of

18   reports showing that in premarket trading Bio-Path was up 54

19   percent?

20   A.   Yes.

21   Q.   Were you aware that the reports were that Bio-Path shares

22   were going up because, among other things, there had been

23   successful studies done concerning their leukemia drugs?

24   A.   Yes.

25   Q.   So you were familiar with these press releases and articles

1   concerning the successes at Bio-Path before the start of trading

2   on March 6?

3   A.   That is correct.

4   Q.   Despite your knowledge of these successes at Bio-Path and

5   the fact that the premarket price had gone up 54 percent

6   according to the press, you nevertheless had a plan in place to

7   continue to take a short position in Bio-Path, right?

8   A.   Yes.

9   Q.   And it's a fact, is it not, that Mr. Lopez, when your

10  trading authority in Bio-Path shares was exceeded, that is

11  exceeded the $500,000 limit, he asked you to close out your

12  position and flatten it out?  Isn't that a fair statement?

13  A.   No.  I do not have a $500,000 share limit.

14  Q.   You've seen the affidavit of Mr. Lopez?

15  A.   I did.

16  Q.   And you see that Mr. Lopez, as chief compliance officer, set

17  forth limits for trading on a daily basis in paragraph 7.  Let

18  me know if you need to see the exhibit.

19  A.   You can bring it up, sir.  Thank you.

20  Q.   If you look at paragraph 2 of that exhibit, according to

21  Mr. Lopez, the chief compliance officer, the maximum limit for

22  trading in a given day for a given security was $500,000.

23  A.   Which is absolutely not true because I do multiple positions

24  far exceeding that amount daily.  If we put up all the trade

25  recaps, it's easy to prove.

Reynolds - Direct

1    Q.   That wasn't mentioned anywhere --

2         MR. A. FORD:  Your Honor, could I ask counsel to return

3    to the podium, so he's not on top of my client.

4         MR. CRONTHALL:  No problem.

5    BY MR. CRONTHALL:

6    Q.   You submitted an affidavit in support of the emergency

7    motion that is the subject of today's proceedings, correct?

8    A.   I'm not sure what that is.

9    Q.   Well, it's a statement under oath.  You recall, do you not,

10   submitting a statement under oath in this matter?

11   A.   Yeah.  Which statement, though, please?

12   Q.   I'm sorry?

13   A.   Which statement?

14   Q.   Well, the statement in support of this motion, your

15   emergency motion to dissolve the writs that were obtained from

16   the Court by Axos?

17   A.   Oh, correct, yes.

18   Q.   Now, that affidavit doesn't mention anything about your

19   authority being greater than $500,000 for a security on a given

20   day, does it?

21   A.   It's easy to prove if we look at the trading history.

22   Q.   And that wasn't submitted as part of your showing in support

23   of your emergency motion, correct?

24   A.   I guess they did not add that, no.

25   Q.   Now, in the Settlement Agreement you also agreed to have a

Reynolds - Direct

1    lien placed on a residence, on a piece of real property that you

2    owned here in Miami in the amount $3 million, correct?

3    A.  Yes.

4    Q.  Did you, in fact, follow through in executing any documents

5    in order to accomplish that lien?

6    A.  I received no documents pertaining to that.

7    Q.  You've referred in your affidavit submitted in this matter

8    to a pump-and-dump algorithm scheme.  Do you recall that?

9    A.  Yes.

10   Q.  Is "pump-and-dump" a term of art in your business that

11   reflects what happens sometimes in trading on short or long

12   positions with specific securities?

13   A.  Correct.

14   Q.  So that's something that is a normal risk of doing business

15   in your profession, is it not?

16   A.  In certain -- it varies case by case.

17   Q.  And the algorithm that you mentioned, the use of algorithms

18   with respect to trading and securities is something that you're

19   well aware of having been in the business for at least 14, 15

20   years, correct?

21   A.  Well, there are always new algorithms created, so each

22   algorithm has its own identity, so I cannot distinguish.

23   Q.  And that's another risk that you have to take into account

24   when you're considering whether to place your own firm's or your

25   clients' monies at risk when you're trading securities, right?

1        MR. A. FORD:  Objection, Your Honor.  There's no

2   evidence about client's money in this case.

3        THE COURT:  Overruled.

4        THE WITNESS:  That is a risk I have to take into

5   account, yes.

6   BY MR. CRONTHALL:

7   Q.  In this particular case, it's true that the trades that you

8   executed on or about March 6 led to the $16.6 million, or

9   thereabouts, loss to Spartan and to Axos, correct?

10  A.  It is not true it led to that large of a loss.

11  Q.  I'd like you to take a look at the affidavit of Mr. Lopez

12  which is marked as Exhibit 9.  Specifically, I'm drawing your

13  attention to Page 8 of 12.

14  A.  Yes, sir.

15  Q.  Mr. Lopez testified that the "Okay, will do" response to his

16  text is yours.  That's correct, is it not?

17  A.  Yes.  This was a series of probably seven texts, and so some

18  of it is not included on here.

19        MR. CRONTHALL:  Move to strike everything after "yes."

20        MR. BERKELEY:  Objection as to the motion to strike.

21        THE COURT:  What was his answer?

22  BY MR. CRONTHALL:

23  Q.  When you said, "Okay, will do" in response to Mr. Lopez'

24  texts and his text referred to "COR said flat by end of day and

25  money to them to cover realized loss; no exceptions; please,

Reynolds - Direct

 1   please, please cover all of it and send funds before wire cutoff

 2   or we are all over," you understood that to mean that if you

 3   didn't close out and somehow balance out the trading that you

 4   had done concerning Bio-Path, that Spartan could no longer be

 5   able to operate because it couldn't meet its capital

 6   requirements, correct?

 7   A.   No, sir.   There was an earlier text you are missing in that

 8   chain that said the most important thing was to cover our net

 9   cap, which I intended to do.

10   Q.   But you didn't do that, correct?

11   A.   I did not.

12   Q.   You were aware of FINRA and the FBI being in contact with

13   Spartan by no later than March 7, 2019, correct?

14   A.   I did not know the FBI was there, no.

15   Q.   Is your personal email address abrownsfan232@gmail.com?

16   A.   No.   You're missing a digit.   That's inaccurate, what you

17   described.

18   Q.   Okay.   What is the email address?

19   A.   abrownsfan23@gmail.com.

20   Q.   Oh, 23.   Okay.   It's a typo.

21           So that refers to you being a fan of the Cleveland

22   Browns?

23   A.   Yes.

24   Q.   And you're also a fan of the Cleveland Cavaliers, are you?

25   A.   Sometimes.

Reynolds - Direct

110

1  Q.  Did you attend the Miami Heat, Cleveland Cavaliers

2  basketball game on the evening of March 8, 2019?

3  A.  Yes, I did.

4  Q.  Excuse me?

5  A.  Yes, I did.

6  Q.  That was the same day that earlier in the day you were

7  speaking with Mr. Garrabrants of Axos and finalizing and signing

8  the Settlement Agreement, correct?

9  A.  Correct.

10  Q.  So you managed to sign the agreement in time to still make

11  it to the basketball game, right?

12  A.  Yes, I did go to the game.

13  Q.  You mentioned that you were intending to do that to

14  Mr. Garrabrants, didn't you?

15  A.  Mr. Garrabrants informed me if I did not have that

16  Settlement Agreement signed that day, I needed to cancel all

17  plans, and he asked what plans I had that day because it was

18  going to be released to the board, what had transpired for the

19  day.

20  Q.  But you informed Mr. Garrabrants of your plans to attend the

21  game that night, which you, in fact, did, right?

22  A.  Yes.

23  Q.  Do you know a guy Gentile or Gentilly?

24  A.  Yes, I have heard of him.

25  Q.  How do you know him?

1    A.  I met him twice at trader shows.

2    Q.  On what do you base the statement in your affidavit

3    concerning the Bio-Path price fluctuations on March 6th and/or

4    7th being the result of a pump-and-dump scheme or algorithms?

5    A.  So I would like to describe the whole trading scenario if we

6    should get into that.

7    Q.  Well, perhaps your counsel will ask you questions about

8    that.  I'm just asking the questions I'm asking.

9    A.  Can you repeat the question then, please?

10   Q.  Certainly.

11       On what do you base the statement in your affidavit

12   submitted in this matter that the Bio-Path trading that occurred

13   on March 6th and/or March 7th was a consequence of what you

14   thought was a pump-and-dump scheme or algorithms?

15       MR. BERKELEY:  Your Honor, counsel limiting the

16   witness' testimony in response to his question is improper.  So

17   if the witness --

18       THE COURT:  Overruled.

19       MR. BERKELEY:  Thank you.

20       THE WITNESS:  So three days prior, that same stock also

21   had a huge move on a press release and it went from 4 to a high

22   of 8.55.  The next two days the stock sold off significantly and

23   fell 50 percent.  In trading terms, we are at T plus 2, which is

24   everybody that was short the prior day was going to need to

25   cover the day of March 6th.  So just happenstance, a press

Reynolds - Direct

112

1  release comes out with favorable leukemia results, supposedly,

2  and the stock runs, which I think was an algorithm pump-and-dump

3  creating a short squeeze for those earlier shorts from the prior

4  two days.

5  BY MR. CRONTHALL:

6  Q.   In your affidavit submitted in this matter, you asserted

7  under oath that there was on March 6th, at the time of the

8  trading of the Bio-Path shares by you, no significant news

9  concerning Bio-Path.  That isn't true, is it?

10  A.   I didn't consider that to be significant news.

11  Q.   Excuse me?

12  A.   I did not consider that to be significant news.  It's normal

13  for small cap bios to put out supposedly favorable results

14  without any clinical studies.

15  Q.   So if you were, in fact, aware of the successful clinical

16  tests of the leukemia medications being produced by Bio-Path,

17  you were aware of the press release and the press reports about

18  it, and you are aware of the 54 percent increase in the share

19  price of Bio-Path prior to the start of trading on March 6, then

20  why would you say without qualification there was no significant

21  news regarding Bio-Path that day?

22  A.   I don't believe there was significant news to this day.  I

23  think it was just a timed press release to create a short

24  squeeze.

25  Q.   So you don't consider a 54 percent increase in the price

1  following a successful trial of their leukemia drug to be a

2  significant fact?

3  A.  No.  That's a common move among small cap bio stocks.

4  Q.  If the writs are dissolved in response to your motion to do

5  so, do you have any intention of paying the $7.5 million owed

6  pursuant to the Settlement Agreement to Axos?

7         MR. A. FORD:  Objection, Your Honor, relevance.

8         THE COURT:  Overruled.

9         THE WITNESS:  If the global Settlement Agreement was

10  agreed as per we all discussed, then I would honor that.

11  BY MR. CRONTHALL:

12  Q.  Where in the Settlement Agreement is there a reference to a

13  global agreement that you're referring to?

14  A.  That's what I understood to be the case as well as per David

15  Lopez' affidavit.

16  Q.  You mean the unsigned affidavit of Mr. Lopez?

17  A.  Yes.

18  Q.  I'd like you to take another look at Exhibit 2, the

19  Settlement Agreement, and take your time and let us know if you

20  can see in there any reference to a global settlement, or what

21  you consider to be a global settlement and confirm that it's not

22  in there.

23  A.  I do not see a global settlement in here.

24  Q.  But you do see the integration clause there at, I believe,

25  paragraph 16 or 17, that states that the agreement supersedes

Reynolds - Cross

114

 1   all prior understandings and discussions, et cetera, correct?

 2   A.  I see that.  I did not read through this contract when I

 3   signed it.

 4   Q.  So I take it, then, the answer to the question is, given

 5   that the agreement only refers to a release of you in exchange

 6   for the payments reflected in the agreement, you have no

 7   intention of paying that settlement amount to Axos, correct?

 8   A.  Correct.

 9        MR. CRONTHALL:  I have nothing further.

10        THE COURT:  Cross.

11                       CROSS-EXAMINATION

12   BY MR. A. FORD:

13   Q.  Good afternoon, Mr. Reynolds.

14   A.  Hello.

15   Q.  Mr. Reynolds, at any time since March 6th have you attempted

16   to abscond from Florida with any money from your TD Ameritrade

17   account?

18   A.  No, I have not.

19   Q.  And about how much money was in the TD Ameritrade account as

20   of March 6th?

21   A.  Around 13 million.

22   Q.  And is it accurate to say that on March 6th you put in

23   exactly one wire request for $600,000 to transfer out of the

24   account?

25   A.  That is correct.

Reynolds - Cross

1  Q.  Were there any other wire requests sent to TD Ameritrade

2  that day?

3  A.  No, sir.

4  Q.  And on March 7th, did you put in exactly one request for 1.5

5  million to be transferred to another personal account of yours?

6  A.  Yes.

7  Q.  And did you make any other requests from TD Ameritrade to

8  transfer any other funds that day?

9  A.  No, I did not.

10  Q.  So is it fair to say that, accounting for those two wire

11  transfers, there was $11 million in cash in that TD Ameritrade

12  account?

13  A.  Actually, a little more.

14  Q.  Okay.  And you have not tried at any time to remove any of

15  those funds; isn't that correct?

16  A.  Correct.

17  Q.  And if the writs currently at issue were vacated, would you

18  attempt to fraudulently abscond with any of the money from your

19  TD Ameritrade account?

20  A.  No, I would actually leave it there.

21  Q.  And did you make any comments to any representative of TD

22  Ameritrade that you intended to leave your money in that account

23  so that you could continue to trade in it?

24  A.  Yes, I did.

25  Q.  Now, Mr. Reynolds, I want to talk to you about the trading

1    that took place on March 6th and 7th in Bio-Path.

2    A.   Sure.

3    Q.   But before I get to that, I think you testified earlier that

4    you did not believe you had any trading limits with Spartan

5    Securities; is that correct?

6    A.   That is correct.

7    Q.   And can you tell me, did you have any conversations with

8    Mr. Lopez about trading limits?

9    A.   No.  We had an email that was never signed from a few months

10   back, but we've never set or signed any official trading limits.

11   Q.   And on any average day or week, about how many trades are

12   you placing in the Spartan proprietary account?

13   A.   I would probably trade 25 different securities a day.

14   Q.   And what was the average value?

15   A.   Maybe a million dollars per position.

16   Q.   Per position?

17   A.   On average.

18   Q.   So you would --

19   A.   Some would be higher, some would be lower.

20   Q.   Is it fair to say that you would average trading $25 million

21   a day in Spartan's account?

22   A.   Correct.

23   Q.   And was Mr. Lopez aware of all of your trading in Spartan's

24   account?

25   A.   Yes.

1  Q.   And Mr. Lopez has stated in his affidavit that you were

2  fraudulently altering the BRASS Trading System.  Would that be

3  an accurate statement?

4  A.   That's completely inaccurate.

5  Q.   Can you explain to the judge what your trading -- what

6  Mr. Lopez might be referring to when he talks about the

7  alterations that you make in the BRASS Trading System?

8  A.   Sure.  What we have is what's called an order management

9  system and that's an internal thing so we can see what price are

10  short or long securities and what our position size is.  So on a

11  day-to-day basis sometimes we have to make adjustments.

12       For example, if a stock does a reverse split, we have

13  to change the share structure in the order management system.

14  It's not done automatically.  Sometimes the trade price from the

15  prior day is not correct in the order management system the

16  following day, so we have to do a correction on that.

17       The trades in question that Adam just brought up, and

18  this is per other daily routines, if I'm trading a significant

19  amount of shares, which is normal for me, I had a hundred

20  thousand shares and I like to keep a core short, like a core

21  position short, and I'm out a little bit of money, I'll what's

22  called do an internal adjustment which flattens it out and then

23  sell a little bit more and then trade that back and forth

24  because I want to keep a hundred thousand shares short because I

25  think it's going to sell off later in the day.  So I did that

1   three times on the 6th, and then when I got past 350,000 shares,

2   I decided I didn't want to do it anymore, the position was

3   getting large, I needed to concentrate on the whole position.

4   So that's what I did that day.

5   Q.  And was your style of trading on March 6th consistent with

6   your style of trading since you started trading for Spartan?

7   A.  Yes, I have done that before.

8   Q.  Was Mr. Lopez aware of this technique that you just

9   described of altering the BRASS system?

10  A.  Yes, he's seen it before.

11  Q.  And COR Clearing -- is it a fair statement that COR Clearing

12  at all times knows exactly what all of your trade positions is?

13  A.  That is correct.  What I adjusted was an internal position.

14  They have their own system which monitors realtime, which sees

15  everything that hit.  I could not affect what they see.

16  Q.  So it's not even possible for you to make an adjustment

17  which would show sort of an erroneous position, correct?

18  A.  That is correct.

19  Q.  So just to be clear, these alterations that you made in the

20  BRASS system were known to Mr. Lopez; is that correct?

21  A.  Yes.

22          MR. CRONTHALL:  Objection, leading.

23          THE COURT:  Overruled.

24  BY MR. A. FORD:

25  Q.  And certainly -- strike that.

Reynolds - Cross

119

1          And Mr. Lopez was aware on March 6th that you were

2    making these similar alterations to the BRASS system for the

3    Bio-Path stock; is that correct?

4          MR. CRONTHALL:  Same objection, leading.

5          THE COURT:  Overruled.

6          THE WITNESS:  Yes.

7    BY MR. A. FORD:

8    Q.  And so certainly there was nothing fraudulent about these

9    alterations in the system; isn't that correct?

10   A.  That is correct.

11   Q.  Were there other traders at Spartan Securities that traded

12   in the proprietary account?

13   A.  Yes.

14   Q.  Did the other traders know about these alterations that you

15   would make?

16   A.  Yes.

17   Q.  And did anyone at any time at Spartan suggest that these

18   types of alterations were fraudulent?

19   A.  Never.

20   Q.  Did anyone suggest that they were improper?

21   A.  No.

22   Q.  Did anyone ever suggest that they were being done to hide

23   positions from Mr. Lopez?

24   A.  No.

25   Q.  Now, Mr. Reynolds, your trading in the Bio-Path stock was

Reynolds - Cross

1   cut off on the evening of March 6th; is that correct?

2   A.   Yes.

3   Q.   And after that, do you have an understanding of who placed

4   trades for Bio-Path on March 7th?

5   A.   George Lindner.

6   Q.   Do you believe that Mr. Lindner's trading exacerbated the

7   losses in Bio-Path on March 7th?

8   A.   Absolutely.

9   Q.   Can you explain to me what you believe he did wrong?

10  A.   I don't know if it was per COR's instruction or him, they,

11  per Dave, started covering premarket before the opening print,

12  which the opening print is around 9:30 and that's when the

13  majority of volume is done.  They started executing orders on

14  the stock premarket, around 8:00ish, when there's very little

15  volume trading and they ran the stock up premarket, and then

16  they didn't participate at all on the stock market opening and

17  they could have covered the whole position right on the opening

18  and we would have been out about $3 million.

19  Q.   So is it a fair statement, Mr. Reynolds, that if you were

20  permitted to continue trading in Bio-Path on March 7th, you

21  believe you could have limited the losses to $3 million?

22  A.   I actually believe that if we didn't cause the short squeeze

23  at the opening with the premarket trading, which sets off all

24  kinds of alerts to other day traders, et cetera, I actually

25  think it would have been profitable because I've had similar

1  size positions before with Spartan and it turned out the same

2  way, profitable.

3  Q.  Now, given that testimony you just gave, did you ever tell

4  anyone from Axos Clearing that you were responsible for $16.5

5  million in losses?

6  A.  No, I did not.

7  Q.  Now, on March 7th, you received a phone call from Greg

8  Garrabrants.  Do you remember that?

9  A.  Yes, I do.

10  Q.  Do you recall about what time that phone call was?

11  A.  Originally, he left a voicemail at around 6:30 my time.

12  Q.  And then, did you have a subsequent live call with him?

13  A.  About two and a half hours later, correct.

14  Q.  And that was about 9:30 p.m. Eastern Standard Time?

15  A.  About then, yes.

16  Q.  Do you recall what Mr. Garrabrants said to you on that phone

17  call?

18  A.  It was a lengthy phone call.  He wanted to resolve the

19  situation, however, it was also in a threatening manner that --

20  should we just get into all details?

21  Q.  Yes.  Did Mr. Garrabrants threaten you during that phone

22  call?

23  A.  I was threatened with possible jail time.  I was told that

24  he would freeze other accounts of mine, my bank account.  It was

25  good cop, bad cop.  He was like, hey, let's make a deal, or we

Reynolds - Cross

122

1  can be bad cop and I will wreck your life.

2  Q.  And by March 7th or on that call with Mr. Garrabrants, did

3  you come to any agreement with him on that call?

4  A.  No, we did not.

5  Q.  You had another call with Mr. Garrabrants on March 8th; is

6  that correct?

7  A.  Yes.

8  Q.  And was that call also with David Lopez?

9  A.  Amongst many calls with Mr. Garrabrants, yes, we had one.

10  Q.  And on the call with Mr. Garrabrants and Mr. Lopez, was a

11  global settlement discussion discussed involving Spartan and COR

12  and Axos Clearing?

13  A.  Yes, it was.

14  Q.  Can you explain to me what you understood the terms of that

15  Settlement Agreement were to be?

16  A.  Yes.  I was to pay COR, or I should say Axos Clearing, 7.5

17  million and do the $3 million lien on the house, and they were

18  going to release me of all liability.  Spartan was going to be

19  released of all liability and Spartan was going to release me of

20  all liability and I was going to fund Spartan $1 million so we

21  could resume trading operations.

22  Q.  So the purpose of the Settlement Agreement, as you

23  understood it, was that Spartan would continue to trade through

24  Axos Clearing; is that correct?

25  A.  That is correct.

Reynolds - Cross

123

1  Q.  And would there have been -- strike that.

2        Now, did you understand when you hung up that phone

3  call that Mr. Garrabrants would be sending you a Settlement

4  Agreement that reflected the phone call that you had just had

5  with him?

6  A.  Yes.

7  Q.  And did you expect that Settlement Agreement to include

8  Spartan Securities as a party?

9  A.  Yes.

10  Q.  And did you expect that Axos was going to release Spartan

11  Securities from further liability?

12  A.  Yes, I did.

13  Q.  And did you understand that Spartan Securities was going to

14  release you from further liability?

15  A.  Correct.

16  Q.  And you understood that at the end of this Settlement

17  Agreement, you would be able to continue trading at Spartan

18  Securities; is that correct?

19  A.  Yes, and Spartan would continue to operate.

20  Q.  And that Axos would permit Spartan to operate through its

21  clearing system?

22  A.  Correct.

23  Q.  Now, you testified earlier that you did not actually read

24  the Settlement Agreement before signing it; is that correct?

25  A.  That is correct.

Reynolds - Cross

1  Q.  And you sent a signed Settlement Agreement back to

2  Mr. Garrabrants about 50 minutes after you received it; is that

3  correct?

4  A.  Yes.

5  Q.  And do you recall what Mr. Garrabrants said to you in

6  response to you sending it?

7  A.  I don't recall the conversation.

8  Q.  Do you recall him requesting that you ask a lawyer to

9  confirm that the lawyer reviewed it?

10  A.  Oh, yes, I do.

11  Q.  And without going into any communications you may have had

12  with your lawyer -- and by the way, your lawyer was Ron Gainor;

13  is that correct?

14  A.  That is correct.

15  Q.  Ron Gainor is a criminal lawyer; is that correct?

16  A.  Correct.

17  Q.  Did Mr. Gainor provide you with any advice regarding the

18  Settlement Agreement?

19  A.  No, he did not.

20  Q.  But you do know that Mr. Gainor sent an email to you

21  confirming that you've sent him the agreement and that he

22  discussed it with you --

23  A.  Yes.

24  Q.  -- is that correct?  Okay.

25          In fact, he did not write in that email that he gave

Reynolds - Cross

125

1   you advice with respect to the agreement; is that correct?

2   A.   Correct.

3   Q.   Mr. Reynolds, if you had known that the Settlement Agreement

4   that Mr. Garrabrants sent you did not include a release for

5   Spartan, would you have signed it?

6   A.   No, I would not have.

7   Q.   And if you knew that the Settlement Agreement he sent you

8   did not include a release of Spartan's claims against you, would

9   you have signed it?

10  A.   No, I would not have.

11  Q.   Did there come a time when you realized that the document

12  you had signed did not contain the actual terms you believed

13  they did?

14  A.   Yes.

15  Q.   And about when was that?

16  A.   Probably within 20 minutes, Micah Eldred, the owner of

17  Spartan Securities, and both Dave Lopez contacted me saying that

18  they were not being released per this document I signed and they

19  had not received a release themselves.

20  Q.   And that was contrary to your understanding of what the

21  agreement was that was reached on the phone?

22  A.   That is correct.

23           MR. A. FORD:  One second, Your Honor.

24  BY MR. A. FORD:

25  Q.   Is the reason that you did not wire the 7.5 million as part

Reynolds - Cross

126

 1  of the Settlement Agreement because you realized that the

 2  document you signed was not the Settlement Agreement you had

 3  intended to enter into?

 4  A.  Yes, that is correct.

 5  Q.  Okay.  I may come back to that issue.

 6       Now, I'd like to just return briefly to the

 7  conversations with TD Ameritrade which we discussed earlier.

 8  A.  Yes.

 9  Q.  Have you seen the Affidavit of Suzanne Pope that was

10  submitted in this case yesterday?

11  A.  Yes.

12       MR. A. FORD:  Your Honor, may I approach the witness?

13       THE COURT:  All right.

14       THE WITNESS:  Thank you.

15  BY MR. A FORD:

16  Q.  And if you could take a look at that?

17  A.  Okay.

18       MR. A. FORD:  Your Honor, I'd like to move into

19  evidence the Affidavit of Suzanne Pope.  This was attached as an

20  exhibit, I believe it was Exhibit J, to our Reply Memorandum.

21       THE COURT:  It will be admitted.

22    (Defendants' Exhibit J was received in evidence.)

23  BY MR. A. FORD:

24  Q.  And this affidavit discusses a conversation that Ms. Pope

25  had with counsel for TD Ameritrade; is that correct?

Reynolds - Cross

127

```
 1  A.  Yes.

 2  Q.  And do you recall the conversation where Ms. Pope disclosed

 3  the contents of the discussion that she had with TD Ameritrade?

 4  A.  Yes.

 5  Q.  And is it fair to say that Ms. Pope discussed what the

 6  reason for the freeze was?

 7  A.  Yes.

 8  Q.  And she discussed the need for the account to be unfrozen so

 9  that you could trade in the account; isn't that correct?

10  A.  Correct.

11  Q.  She also discussed with you that at no time on this call did

12  anyone suggest that you were intending to remove funds from the

13  account?

14  A.  Correct.

15          MR. A. FORD:  Your Honor, I apologize, just one second.

16  I seem to have misplaced a couple of pages.

17  BY MR. A. FORD:

18  Q.  Mr. Reynolds, do you have a copy of the Verizon phone

19  records --

20  A.  Oh, yes, I do.

21  Q.  -- for your phone?

22  A.  Yes.

23          MR. A. FORD:  Your Honor, may I approach the witness?

24          THE COURT:  All right.

25          MR. A. FORD:  Your Honor, we have a copy of Scott
```

Reynolds - Cross

1  Reynolds' phone records from his Verizon account.  We just

2  received them ourselves so we don't have copies for counsel.

3  We're happy to provide copies.  I just want to ask a few

4  questions about what they reflect, and we're happy to hand them

5  over.

6          You can look at them now.

7          MR. CRONTHALL:  Well, I would object if there's no copy

8  for us to review, and we haven't been given this document in

9  advance.

10         MR. A. FORD:  I'm happy to also have Mr. Reynolds

11 simply testify as to their contents as well.

12         THE COURT:  You want to show him the document?

13         MR. A. FORD:  Yes, sir.

14         THE COURT:  You want to show opposing counsel the

15 documents?

16         MR. A. FORD:  Oh, opposing counsel, yeah.

17         I am going to hand them back to the witness so he can

18 review them while we are discussing.

19 BY MR. A. FORD:

20 Q.  Mr. Reynolds, you have a copy of a Verizon bill reflecting

21 calls that were placed on your personal cell phone; is that

22 correct?

23 A.  Yes.

24 Q.  And can you tell me what this document reflects?

25 A.  Phone calls between Spartan and myself and Greg Garrabrants

1    and myself.

2    Q.   On what dates?

3    A.   March 6th, 7th and 8th.

4    Q.   On March 6th, you had testified earlier that you believe

5    Mr. Lopez was fully aware of your trading positions all

6    throughout the day; is that correct?

7    A.   Yes.

8    Q.   And in fact, how many times did you talk to Mr. Lopez on

9    March 6th on that cell phone?

10   A.   This is just talk time, we texted also, but let's see, there

11   is -- it appears to be six phone calls with Mr. Lopez.

12   Q.   And the topic of the phone calls were about your position in

13   Bio-Path; is that correct?

14   A.   That is correct.

15   Q.   And on each of these calls, was Mr. Lopez fully apprised of

16   the actual size of your position in Bio-Path?

17   A.   Yes, he was.

18   Q.   And regardless of the edits that were made in the BRASS

19   system pursuant to your system, Mr. Lopez did actually know the

20   firm's position at all times; is that correct?

21   A.   Yes.  I did the edits, they were canceled on my own right

22   around 10:45 a.m. when the position size wasn't extremely large.

23   Q.   So Mr. Reynolds, in Mr. Lopez' signed affidavit he says

24        that "Mr. Reynolds appears to have attempted to prevent

25        Spartan from learning that he had made these unauthorized

Reynolds - Redirect

130

1     trades by falsifying transactions in the BRASS order

2     management system to make it look like he had not exceeded

3     the limitations."

4          Is that a true statement?

5  A.  That's false.

6  Q.  Mr. Lopez also says "This apparent falsification of the

7     firm's business records is brought to my attention by

8     another trader at Spartan who is responsible for assisting

9     me in monitoring the transactions in Spartan's proprietary

10    accounts."

11         Is that correct?

12 A.  George Lindner is the guy responsible for watching over me,

13 told him the size of my position.

14         MR. A. FORD:  No further questions, Your Honor.

15         THE COURT:  Redirect.

16         MR. CRONTHALL:  Thank you, Your Honor.

17                   REDIRECT EXAMINATION

18 BY MR. CRONTHALL:

19 Q.  You testified, Mr. Reynolds, on examination by your own

20 counsel that you typically trade around 25 different stocks at

21 about a million dollars per stock.  Did I hear that correctly?

22 A.  When I think of the total dollar amount it's maybe less than

23 a million dollars per stock, but I do do positions, some are $3

24 million, some are $50,000, it just varies.  A million dollars is

25 a bad average.  I can't say what the average position is because

Reynolds - Redirect

131

1   it always varies.

2   Q.  Well, the position you ended up taking with respect to

3   Bio-Path was not anywhere near a million dollars.  It ended up

4   being a $16.5 million position, correct?

5   A.  No, it was not a $16.5 million position.

6   Q.  That was the amount of the loss, wasn't it?

7   A.  Well, that's the loss, but that's not the size of the

8   position that I took.

9   Q.  I'd like to have marked as Exhibit 10 your affidavit your

10  referred to earlier, and I just want to ask you a few questions

11  about that.

12  A.  Yes.  Thank you.

13  Q.  I'll hand it to you.

14       On the last page of the document, you recognize that to

15  be your notarized signature?

16  A.  Yes.

17  Q.  Getting back to what we had spoken about a little bit

18       before, I want to focus you on paragraph 5 of your affidavit

19       and the part specifically where it says "Seeing this unusual

20       spike which resulted in a stock price that was more than

21       double what it had previously been worth, and without any

22       news justifying this price spike, on March 6, 2019, Spartan

23       Securities took a short position believing the share price

24       would decrease again to its prior levels."

25       Do you stand by the accuracy of that statement today?

 1   A.  I still don't see a valid news story that showed significant

 2   results, so, yes, I do.

 3   Q.  You mentioned a belief that somehow Spartan was to be

 4   included in the releases.  Is Spartan a signatory to the

 5   Settlement Agreement that you looked at, Exhibit 2?

 6   A.  No, they're not on there.

 7   Q.  And you also testified about Mr. Gainor.  Mr. Gainor, he's

 8   had decades of experience as a lawyer; is that correct?

 9   A.  I believe so, yes.

10          MR. BERKELEY:  Objection.

11          THE COURT:  Overruled.

12   BY MR. CRONTHALL:

13   Q.  You had no reason to believe that Mr. Gainor wasn't

14   competent to counsel you concerning the Settlement Agreement, do

15   you?

16          MR. BERKELEY:  Objection.

17          THE WITNESS:  I actually found out he's not a

18   securities attorney.

19   BY MR. CRONTHALL:

20   Q.  Well, then why were you having a criminal lawyer, or a

21   lawyer with significant criminal experience, among other types

22   of experience, representing you?

23          MR. A. FORD:  Objection, Your Honor.  The client can't

24   answer why he hired a lawyer.

25          THE COURT:  Overruled.

Reynolds - Redirect

133

```
 1        THE WITNESS:  That was only attorney I knew, so that's

 2   why I reached out to him.

 3   BY MR. CRONTHALL:

 4   Q.   Where were you when you executed this affidavit, Exhibit 10?

 5   A.   My location?

 6   Q.   Yes.  Where were you?

 7   A.   I believe I was at home.

 8   Q.   And home is where?

 9   A.   Miami Beach, Florida.

10   Q.   Do you know why the notary stamp at the end of the affidavit

11   bears a stamp from Katherine Jaskot, a notary public of the

12   state of New York?

13   A.   Yes.

14   Q.   And why is that?

15   A.   She did a FaceTime notary for me.

16   Q.   So you weren't in the physical presence of the notary when

17   you had your affidavit for this particular proceeding notarized?

18   A.   No, I was not.

19   Q.   You mentioned this affidavit of Ms. Pope that was attached

20   to your most recent filing yesterday.  Do you recall testifying

21   about that?

22   A.   Yes.

23   Q.   That particular affidavit only has to do with discussions

24   that occurred on March 13, 2019, correct?

25   A.   I'd have to look at the actual dates.  Yes, I believe so.
```

 1   Q.   That's five days after the discussions that were occurring

 2   surrounding the Settlement Agreement, correct?

 3   A.   Yes.

 4   Q.   That's five days after, at least, the first discussions that

 5   you had with Mr. Garrabrants concerning a pledge of assets,

 6   correct?

 7   A.   Yes.

 8   Q.   That's five days or more after Mr. McComb was speaking with

 9   TD Ameritrade concerning the activity on your account, correct?

10   A.   Yes.

11   Q.   You mentioned discussions that you had with Mr. Garrabrants

12   in or around the March 7, March 8 time frame.  Do you have those

13   in mind?

14   A.   Yes.

15   Q.   And you mentioned these in your affidavit.  Specifically,

16   you first referred to a call that occurred with Mr. Garrabrants

17   at 6:30 p.m. on March 7th, and then at around 9:00 p.m. that

18   same evening "Garrabrants and I had a phone conversation without

19   any counsel present."

20            Where were you when that particular phone call with

21   Mr. Garrabrants occurred?

22   A.   In Miami Beach.

23   Q.   Were you at --

24   A.   At home.

25   Q.   You were at home.  Were you alone?

Reynolds - Redirect

135

1   A.  That evening, yes.

2   Q.  And you mentioned another phone call that you had with

3   Mr. Garrabrants in the early morning, about 7:30 a.m. on March

4   8, 2019, that's in paragraph 12.  Where were you when you had

5   that call with Mr. Garrabrants at 7:30 a.m. on March 8, when you

6   said you were willing to sign the pledge?

7   A.  At home.

8   Q.  Were you alone when you had that discussion with

9   Mr. Garrabrants?

10  A.  I was alone for that conversation, however, there was my

11  partner at our house.

12  Q.  Was that partner listening to or participating in any way in

13  the call?

14  A.  Not that particular call, no.

15  Q.  Was anyone other than you participating in any of the calls

16  that you had with Mr. Garrabrants that are mentioned in your

17  affidavit?

18  A.  Yes.

19  Q.  Who?

20  A.  My girlfriend overheard some of the calls on the 7th -- no,

21  the 8th.  I'm sorry, the 8th.

22  Q.  Which particular call on the 8th that your girlfriend

23  overheard some or all of the call?

24  A.  It was around 4:14, I believe.

25  Q.  Do you recall what was discussed in that particular call

Reynolds - Redirect

136

1  that your girlfriend was listening to?

2  A.  Yes.  That's when Greg told me I had 90 minutes to get the

3  document back before he would release all the information to the

4  board, and I would spend the weekend in jail.

5  Q.  Were there any other calls that someone else was a party to

6  or listening to the call other than yourself and

7  Mr. Garrabrants?

8  A.  No.

9  Q.  With respect to the call that occurred at 9:00 a.m. --

10  excuse me, 9:00 p.m. on March 7th, that was a call that you said

11  that only you and Mr. Garrabrants, to your knowledge, were

12  parties to?

13  A.  Yes.

14  Q.  And you were at home?

15  A.  Yes.

16  Q.  Was that call recorded?

17  A.  No.

18  Q.  If you look at paragraph 10 of your declaration, or your

19  affidavit -- can you look at that, please?

20  A.  Yes.

21  Q.  There are what appear to be lengthy purported quotations

22  from the discussion with Mr. Garrabrants.  Do you see that?

23  A.  Correct.

24  Q.  So while you were on the telephone, were you typing on a

25  keyboard what Mr. Garrabrants was saying or taking notes of some

1   sort?

2   A.   No.

3   Q.   Did you just recall what Mr. Garrabrants said from memory?

4   A.   Yes.

5   Q.   Let's take a look at the paragraph that you quote on Page 5

6   of 8 of Exhibit 10.  It's the --

7   A.   Okay.

8   Q.   The one next to the bullet point, it says, "You are never

9        gonna work in this industry..."  And then there are

10       ellipses, "... you will have no career left..."  Then it

11       goes on and on and on.

12            So the ellipses, what was left out of the conversation?

13  A.   That was the summary of what he told me that stood out in my

14  head.

15  Q.   Well, if it was a summary, then why is it in quotation

16  marks?

17  A.   That's actually what he said that stood out in my head.

18  Q.   Well, is it a summary or is it a quote?

19  A.   I'm sorry, quote.

20  Q.   So then, what did you leave out where you put the several

21  ellipses that appear in that paragraph?

22  A.   I am not sure what was left out.

23  Q.   Did your girlfriend record any portion of the calls with

24  Mr. Garrabrants?

25  A.   No, she did not.

Reynolds - Redirect

138

1   Q.  You mentioned that if there was no attachment and

2   garnishment in the case, that you would just leave that money in

3   the TD Ameritrade account.  Do you recall saying that?

4   A.  Yes.

5   Q.  Well, if that's the case, then there's no harm to you in

6   leaving the writs in place, is there?

7           MR. A. FORD:  Objection.

8           THE WITNESS:  Absolutely.

9           THE COURT:  Overruled.

10          MR. CRONTHALL:  Just a second.

11          THE WITNESS:  Just for the record, that's absolutely

12  there is harm, so I need to distinguish that.

13          MR. CRONTHALL:  I have nothing further, Your Honor

14          THE COURT:  Thank you.  You may step down.

15          Call your next witness.

16          MR. CRONTHALL:  No other witnesses, Your Honor.

17          THE COURT:  Any witnesses you wish to call?

18          MR. A. FORD:  Your Honor, we'll just leave Mr. Reynolds

19  on the stand.  We will just call him, and he'll be our only

20  witness.

21          THE COURT:  Okay.

22          MR. CRONTHALL:  Your Honor, we move into evidence

23  Exhibit 10, which was just shown to the witness.

24          THE COURT:  It will be admitted.

25      (Plaintiff's Exhibit Number 10 was received in evidence.)

Reynolds - Cross

139

1      SCOTT R. REYNOLDS, DEFENSE WITNESS, PREVIOUSLY SWORN.

2          THE COURT:  Go ahead.

3                         DIRECT EXAMINATION

4  BY MR. A. FORD:

5  Q.  Mr. Reynolds, your account at TD Ameritrade has been frozen

6  since March 7th; is that correct?

7  A.  That is correct.

8  Q.  In that time have you been financially harmed as a result of

9  that freeze?

10  A.  Yes, I have.

11  Q.  Can you explain to me the extent of the harm that you

12  suffered?

13  A.  Beyond having difficulty paying normal bills, I can't earn

14  money on that.  I was up $1 million in trading profits on that

15  account year-to-date.

16  Q.  And if the account were to remain frozen, about how much

17  money would that cost you over the next several months?

18  A.  Well, the account was frozen March 7th, and I was up $1

19  million, so that's in two months, so each month that goes by,

20  it's probably about 500,000.

21          MR. A. FORD:  No further questions, Your Honor.

22          THE COURT:  Cross.

23                         CROSS-EXAMINATION

24  BY MR. CRONTHALL:

25  Q.  Isn't it true, Mr. Reynolds, that you agreed to pledge the

1  TD Ameritrade account that's in the Settlement Agreement?

2  A.  As part of a global agreement, yes.

3  Q.  But that isn't what the Settlement Agreement says, correct?

4  A.  It should reflect that.  Unfortunately, it does not.

5          MR. CRONTHALL:  No further questions.

6          THE COURT:  Redirect.

7          MR. A. FORD:  Nothing further, Your Honor.

8          THE COURT:  Thank you.  You may step down.

9          Call your next witness.

10         MR. A. FORD:  We have no further witnesses, Your Honor.

11         THE COURT:  Any rebuttal?

12         MR. CRONTHALL:  No, Your Honor.

13         THE COURT:  So we are finished, then, with the

14  evidentiary portion of the hearing.

15         MR. A. FORD:  Your Honor, I apologize.  Before we

16  close, we had discussed our ability to introduce all of the

17  exhibits.  We can do that now or certainly do it later.

18         THE COURT:  Go ahead.  Let's get them in evidence.

19     (There was a brief discussion off the record.)

20         MR. A. FORD:  Judge, there appears to be no objection

21  to our just introducing whatever our attachments were to our

22  opening papers and our reply paper, what's filed on ECF in

23  connection with this matter.

24         THE COURT:  Well --

25         MR. CARVER:  Your Honor, I can paint the picture a

Case 1:19-cv-20979-RAR   Document 65-4   Entered on FLSD Docket 05/27/2019   Page 142 of 179
Hearing on Motion to Dissolve Writs

141

1    little bit more specifically for the record.  It is the

2    documents attached to Document 24-2, which is the affirmation of

3    Adam C. Ford.

4              THE COURT:  That's an exhibit number, right?

5              MR. CARVER:  I don't think Mr. Ford's -- Ms. Pope's

6    affirmation which was attached to the reply is an exhibit.

7              THE COURT:  I mean, just for the record, to make the

8    record clean, we have to be able to identify it somehow, and

9    normally we do that by assigning a number or a letter to it.

10             MR. CARVER:  So what we need to do now, Your Honor,

11   with respect to Ms. Pope's affirmation is we need to give that a

12   letter.  That should be letter A.

13             THE COURT:  Okay.

14             MR. CARVER:  And then Mr. Ford's affirmation should be

15   letter B because those are both defendants' --

16             THE COURT:  I'm with you.  Okay.

17             MR. CARVER:  Then, I think that is it.

18             THE COURT:  That's it?

19             MR. A. FORD:  Yeah, and Mr. Reynolds' was marked

20   under --

21             MR. CARVER:  He was Exhibit 10.

22             MR. A. FORD:  That's 10, and that's in the record as

23   10.

24             THE COURT:  Mr. Reynolds'.

25             MR. A. FORD:  His affidavit, and I believe that's all

Case 1:19-cv-20979-RAR   Document 65-4   Entered on FLSD Docket 05/27/2019   Page 143 of
179
Hearing on Motion to Dissolve Writs

142

1    that was filed.  On that assumption, that would be everything.

2           THE COURT:  All right.  I've got a couple of questions,

3    and then if you want to wrap up with brief closing remarks, I'm

4    happy to entertain them.

5           But my first question is:  Where is Ethan McComb?

6           MR. CRONTHALL:  Your Honor, Mr. McComb is in Nebraska.

7           THE COURT:  Why isn't he here?

8           MR. CRONTHALL:  Because Mr. Bar-Adon also is a counsel

9    with the company.  Mr. McComb is a counsel and Mr. McComb kept

10   Mr. Bar-Adon informed of various status of the matters, so we

11   thought that since Mr. Bar-Adon was available and could make it,

12   he would be the witness.

13          THE COURT:  Here's my concern:  In looking at the case

14   law on this and not being able to rely on evidence, and not

15   being able to rely on hearsay, my concern is that the issue in

16   terms of absconding or concealing assets, that I've heard no

17   direct evidence of that.  The witness that you put on repeatedly

18   testified that he had no personal knowledge of those calls.

19          So it seems to me that there is a deficiency in this

20   area.  Maybe you can correct me of that.  But to the extent that

21   you need to satisfy that prong to justify the writ, that it

22   would be helpful -- I'm not telling how to try your case, but it

23   would be helpful to have both Mr. McComb and the TD Ameritrade

24   representative.

25          MR. CRONTHALL:  We would be happy to.  If the Court

Hearing on Motion to Dissolve Writs

143

```
 1   would entertain a request to have a brief period of time to

 2   permit Mr. McComb to come here and testify, we would do that.

 3              THE COURT:  How brief is brief?

 4              MR. CRONTHALL:  Within a week, Your Honor.

 5              MR. A. FORD:  Your Honor, if I may.  I have an

 6   eight-week criminal trial starting on April 15th, with jury

 7   selection.  We are in on April 11th next week.

 8              But in terms of bringing Mr. McComb or even Ms. Wright

 9   back to testify, whatever statements may have been made are

10   entirely irrelevant for the analysis because the only question

11   is whether Mr. Reynolds was actually attempting to remove funds,

12   right?  And because the documentary record in evidence now shows

13   that he made no attempts to transfer any money out, even if

14   Ms. Wright erroneously told Mr. McComb that he had made repeated

15   attempts, that would be insufficient under the law because that

16   would mean only that Mr. McComb had a subjective belief, but his

17   subjective belief is irrelevant.

18              What the Court must determine is that Mr. Reynolds

19   actually and in fact took steps to abscond with the money, and

20   that has been proven here today, without contradiction in the

21   least bit, to be untrue.  We have the account records from TD

22   Ameritrade showing the transfers, we have Mr. Reynolds'

23   testimony, and with due respect, Your Honor, this really puts an

24   end to this question regardless of what Ms. Wright or Mr. McComb

25   might testify to.
```

Hearing on Motion to Dissolve Writs

144

1          THE COURT:  That's a good argument, but I want to hear

2    from Mr. McComb and, if possible, the TD representative.  I'd

3    like to do it sooner rather than later.  Okay?

4          MR. CRONTHALL:  Yes.

5          MR. A. FORD:  Your Honor, if I could.  We believe that

6    the writs, based on today's testimony, should be vacated and the

7    matter can be set for a subsequent hearing, at which point --

8          THE COURT:  That's denied.  Okay.  So the question is:

9    When can we schedule this hearing?

10         MR. A. FORD:  Your Honor, we're here in town.  We are

11   happy to stay and come back tomorrow.

12         THE COURT:  Good.  And I'm happy to be here tomorrow,

13   too.  I'm not sure they can get him here that quickly.

14         MR. A. FORD:  We would prefer that given our flight

15   status.

16         MR. CRONTHALL:  We're not aware of what flights may be

17   available even to get him from Omaha to here by tomorrow, but

18   early next week, very early next week, Monday, Tuesday.

19         THE COURT:  What do we have Monday, Robin?

20         THE COURTROOM DEPUTY:  Monday we are clear.

21         THE COURT:  I'm available Monday.

22         MR. CRONTHALL:  I'm sorry?

23         THE COURT:  I'm available Monday.

24         MR. CRONTHALL:  We'll be available Monday, Your Honor.

25         THE COURT:  Okay.

Hearing on Motion to Dissolve Writs

1    MR. CARVER:  Your Honor, may I make a suggestion that

2  we take a brief, what I mean by brief, I mean a five-minute

3  continuance to actually physically try to call Mr. McComb and

4  see that he can be here on Monday.  I think that is possible,

5  but until we know from that person --

6    THE COURT:  As long as you're on the phone with him,

7  see if he can be here tomorrow.

8    MR. CARVER:  Okay.

9    THE COURT:  Tomorrow morning anyway, not in the

10  afternoon, but that's one thing.

11    The second thing is, we have -- why don't one of you

12  call?

13    We have not entered a pretrial scheduling order in this

14  case yet, but it seems to me both sides have had a preview of

15  coming attractions.  I don't know how much more complicated this

16  case is going to be, but I'm certainly prepared to put this on a

17  fast track for trial purposes if that is something that you

18  would want to entertain and resolve the matter that way.  I

19  don't know if that's something that you would want to consider

20  and how much time you need to try the case or engage in any

21  pretrial discovery.

22    MR. CRONTHALL:  Okay.  Thank you, Your Honor, yes.

23    MR. A. FORD:  Thank you, Your Honor.

24    THE COURT:  So is that a "yes"?

25    MR. A. FORD:  We're certainly interested in an

Case 1:19-cv-20979-RAR   Document 65-4   Entered on FLSD Docket 05/27/2019   Page 147 of
179
Hearing on Motion to Dissolve Writs

146

1    expedited schedule, and as I mentioned, the criminal trial that

2    I have starting which will go for eight weeks, so I'll just have

3    to try and think about it in terms of that, but we want to move

4    this forward quickly.

5            THE COURT:  Okay.  How long do you anticipate the case

6    lasting, and how much time do you need for the discovery before

7    we can do that?

8            MR. CRONTHALL:  Well, definitely we will need at least

9    a few months for discovery, Your Honor.

10           THE COURT:  By a few, you mean two?

11           MR. CRONTHALL:  Sorry?

12           THE COURT:  What do you mean by a few?

13           MR. CRONTHALL:  Three.

14           THE COURT:  Three.  And how long do you anticipate your

15   case lasting?

16           MR. CRONTHALL:  I don't believe it should take longer

17   than one week, I mean probably three to four days at most.

18           THE COURT:  Okay.  So sometime in July the parties will

19   be available?

20      (There was a brief discussion off the record.)

21           THE COURT:  Is that acceptable, sometime in July?

22           MR. A. FORD:  You are talking for the trial?

23           THE COURT:  Right.

24           MR. A. FORD:  Yes.  If we can do it in late July, just

25   again, because of my trial schedule.

Hearing on Motion to Dissolve Writs

147

1          MR. CRONTHALL:  I have a trial August 7th.

2      (There was a brief discussion off the record.)

3          MR. CRONTHALL:  September would be better, Your Honor,

4  because I have a trial commencing August 7, and we'll be in the

5  throes of expert depositions in late and mid July.

6          THE COURT:  Okay.  September works for me.  We'll give

7  you an order.  We're going to collapse some of these time

8  periods for discovery as well as the time for filing dispositive

9  motions, so just be aware that that's coming.

10         The last question I had -- you know, I don't want to

11 get into settlement discussions or trying to mediate this, but

12 what I've heard is that there was an agreement reached, and then

13 for one reason or another, it was not completed successfully;

14 and I'm just wondering, have you all attempted to engage or

15 restart any of the settlement negotiations and were they just

16 unsuccessful, if they were given a shot?  Both sides have kind

17 of seen a preview of each other's case.  I don't know if it's

18 worth trying to go back to the drawing board in an attempt to

19 resolve it.

20         MR. CRONTHALL:  We haven't had any such discussions,

21 Your Honor, but that doesn't mean that we can't have them.

22         MR. A. FORD:  Your Honor, if I could on that point, and

23 I don't want to foreclose any settlement discussions because

24 they are certainly possible and we're always willing to sit with

25 counsel from the other side; but as you heard both Mr. Lopez and

Hearing on Motion to Dissolve Writs

148

1  Mr. Reynolds testify to, the entire agreement that the parties

2  contemplated when they were on that phone call was that

3  Mr. Reynolds would agree to pay some money personally for the

4  ability for Spartan to be able to continue trading at COR in its

5  account, and that was sort of the only agreement that made sense

6  from my client's perspective because he believed that he could

7  lend the money effectively to Spartan to pay back Axos and then

8  just go back trading the next day and make all of his money back

9  eventually.  It might have taken him a little while.

10        But because he was now terminated, because of what

11  happened and he wound up terminating, he now doesn't have that

12  ability to go back to Spartan and clear through Axos and make

13  any money back.  And again, my client was under no direct

14  obligation at all to pay these funds to Axos at all.  It was an

15  agreement where the money was going to be lent.

16        So from my client's perspective, any sort of settlement

17  that involves money out of his pocket will be difficult.  That

18  said, we're certainly willing to speak with counsel for Axos and

19  counsel for Spartan to see if there's something to be done here,

20  but that's just to be clear on what happened and what the result

21  of this is.

22        THE COURT:  Well, I mean, you know your cases better

23  than I do, but I thought the guts of this was, there was so much

24  in the TD Ameritrade account, he was willing to turn it over,

25  they part company and, you know, that's it.  But that doesn't

 1    sound like something he wants to do.

 2          MR. A. FORD:  As Mr. Reynolds testified, that

 3    absolutely was not his understanding.

 4          THE COURT:  Okay.  All right.  That's fine.

 5          All right.  Did you want to sum it up?

 6          MR. CARVER:  Your Honor, may I make a request?  Since

 7    we're doing this on an expedited schedule, particularly given

 8    how important that electronic information is, I'd like to make a

 9    formal request that the parties preserve electronic evidence,

10    particularly including Mr. Reynolds' phone, because clearly

11    Mr. Reynolds' phone has a lot of information that needs to be

12    preserved.  I would hate for it to be lost.

13          THE COURT:  Any problem with that?

14          MR. A. FORD:  We have no problem with that.  It's a

15    mutual request obviously.

16          MR. CARVER:  Thank you.

17          THE COURT:  Any particular electronic records you're

18    referring to so they know what not to --

19          MR. A. FORD:  All of the electronic records from Axos

20    Clearing and COR Clearing related to Bio-Path and emails related

21    to Spartan and Reynolds, you know, from January 1st of this

22    year.

23          MR. BERKELEY:  The cell phones of Greg Garrabrants.

24          THE COURT:  Any problem with that?

25          MR. CARVER:  None, Your Honor.

Hearing on Motion to Dissolve Writs

150

1          THE COURT:  Okay.

2          MR. BERKELEY:  The cell phones of Eshel Bar-Adon, the

3   cell phone of Andrew Micheletti.  We would like all of the phone

4   records as well as text messages and emails on those as well.

5          THE COURT:  Well, confirm that in writing with each

6   other as to what you're wanting preserved, so we don't have some

7   misunderstanding down the road.

8          MR. CARVER:  Thank you, Your Honor.

9          THE COURT:  Okay.

10          MR. CRONTHALL:  Shall we check and see what the status

11   is of Mr. McComb?

12          THE COURT:  All right.

13      (There was a brief recess.)

14          THE COURT:  Counsel, in the TD Ameritrade account, do

15   you know what the character of the assets are in there; stocks,

16   or cash, or a combination of both?

17          MR. CRONTHALL:  Our understanding, based on the record,

18   is that a portion of it is liquid cash, perhaps around 4 or 4

19   and a half million, and the rest are in stocks that would need

20   to have positions liquidated in order to transfer cash.

21          MR. A. FORD:  Your Honor, I can correct that and

22   provide -- at this point, the TD Ameritrade account we believe

23   holds over $9 million in cash, and the rest are in expiring

24   options.  And what that means is Mr. Reynolds -- the way that he

25   trades, which is different than in Spartan, it just has to do

Hearing on Motion to Dissolve Writs

151

1   with options that expire, and so they are extremely liquid

2   positions because the options are only open for a week or two.

3           MR. REYNOLDS:  They expire every Friday.

4           MR. A. FORD:  Every Friday they expire and the account

5   has more cash and less options unless he purchase more options,

6   which he's been unable to do.  So at this point, the TD

7   Ameritrade account, we understand, has well in excess of $9

8   million in cash --

9           MR. REYNOLDS:  Ten.

10          MR. A. FORD:  More than 10 million in cash.

11          THE COURT:  10 million in cash and options that become

12  worthless over time?

13          MR. REYNOLDS:  Correct, they decay.  They decay in

14  time.

15          THE COURT:  Okay.

16          MR. CRONTHALL:  Your Honor, a couple of things, if I

17  may.

18          First of all, concerning Mr. McComb, he is available to

19  be here to testify on the afternoon of Monday, the 15th.

20          THE COURT:  Okay.

21          MR. CRONTHALL:  I think it's important, though, to

22  mention the following, and that is:  We have here a motion

23  that's directed at both the Writ of Garnishment and the Writ of

24  Attachment, and Your Honor mentioned the standard that applies

25  to the attachment, which has to do with one of these other acts

Hearing on Motion to Dissolve Writs

152

1   under the code, absconding, secreting, et cetera.

2          THE COURT:  Right.

3          MR. CRONTHALL:  But that doesn't apply with respect to

4   the garnishment.

5          THE COURT:  So you want to abandon your Writ of

6   Attachment?

7          MR. CRONTHALL:  I am not suggesting that we are

8   abandoning it.  I am just suggesting --

9          THE COURT:  Well, I'm telling you at this point, you're

10  not going to succeed without additional evidence on the

11  absconding.  Under the standard for attachment, you're going to

12  need additional evidence.

13         MR. CRONTHALL:  And I understand that.

14         THE COURT:  Unless you want to abandon it and just go

15  on the one and that was kind of going to the question of what's

16  in the account.

17         MR. CRONTHALL:  Right.  Yeah, it may be the case, Your

18  Honor, that the -- I mean, the garnishment is really the more

19  appropriate and significant writ --

20         THE COURT:  You tell me.

21         MR. CRONTHALL:  -- because it's the third-party TD

22  Ameritrade that holds it and I wanted to make sure that there

23  wasn't any confusion.

24         I mean, it looks like we could just go with the

25  garnishment because all that requires is a reasonable belief as

Hearing on Motion to Dissolve Writs

153

1   late as the time of this hearing on the part of Axos, which we

2   think has been shown.

3            THE COURT:  Okay.  Is that a statement?

4            MR. CRONTHALL:  Yes.  Based on that representation, we

5   think that the garnishment is really the key issue because of

6   the third party.

7            THE COURT:  When did you say that he would be

8   available?

9            MR. CRONTHALL:  The afternoon of this Monday.

10           THE COURT:  Okay.  That's not the 15th.  That would be

11  the 8th.

12           MR. CRONTHALL:  Oh, I'm sorry.

13           THE COURT:  But if what you're telling me now is that

14  you have abandoned your attachment, then there's no need for

15  him.  All right?

16           MR. CRONTHALL:  Yeah, I think it boils down to the

17  garnishment.

18           THE COURT:  Go ahead if you want to sum up then.

19           MR. CRONTHALL:  Well, in light of the garnishment, Your

20  Honor, I believe that -- I mean, we're happy to have Mr. McComb

21  testify.

22           THE COURT:  I don't think it's necessary.

23           MR. CRONTHALL:  It may not be necessary anymore because

24  I think, based on the record before Your Honor, there is a more

25  than sufficient basis for a reasonable belief, which is

Case 1:19-cv-20979-RAR   Document 65-4   Entered on FLSD Docket 05/27/2019   Page 155 of
179
Hearing on Motion to Dissolve Writs

154

 1  subjective, on the part of Axos that there was a danger that

 2  there would be some amount of those funds, those assets,

 3  unavailable at the time of execution on a judgment.  We've

 4  satisfied the standards.

 5      The agreement was entered into.  The settlement was

 6  signed.  Despite the testimony that there was some belief that

 7  maybe there would be a global resolution, that clearly isn't the

 8  case from the face of the Settlement Agreement.  The Settlement

 9  Agreement speaks for itself.

10      Florida law is very clear.  I mean, even if you're

11  unable to read the agreement, if you sign it, you have taken on

12  that obligation of a Settlement Agreement, and this agreement

13  has all of the appropriate language in it in terms of

14  integration and the recitals and the releases.  There's no doubt

15  that there's consideration for it.  The agreement is a solid

16  agreement.  There's no dispute over it being signed.  There's no

17  dispute over the money not having been paid, and in light of

18  that, there is more than a reasonable probability of Axos

19  prevailing on that claim.

20      So when you couple that with all of the activities that

21  led up to where we are today in terms of the nature of the

22  trades, the termination of Mr. Reynolds, the signing of the

23  request to transfer the funds, and then the immediate

24  cancellation of it, all of those things that occurred are more

25  than enough to create the reasonable suspicion, or reasonable

Hearing on Motion to Dissolve Writs

155

1    belief, I should say, that the funds might not be there in the

2    absence of a garnishment writ by this Court.

3           So Your Honor, we submit that we've more than met our

4    burden as the plaintiff and that the writ should stand, the Writ

5    of Garnishment should stand.

6           THE COURT:  Thank you.  Okay.

7           MR. CRONTHALL:  As well, I don't believe there has been

8    any testimony that there are other assets or other cash

9    available.

10          THE COURT:  Thank you.

11          MR. A. FORD:  Thank you, Your Honor.

12          As you're aware, the standards for -- well, let me stop

13   and first thank my colleagues for agreeing to abandon and agree

14   to a vacatur of the Writ of Attachment.  We appreciate that, but

15   we think that clearly, based on what was presented to with the

16   Writ of Attachment going, so too must the Writ of Garnishment,

17   and here's why:

18          Both of these writs, as Your Honor is well aware, are

19   highly disfavored under Florida law, and the reason why is

20   because the amount of damage that they inflict on the person who

21   they are subjected against.  As Mr. Reynolds testified, he is

22   being harmed greatly by these writs because they have

23   effectively taken away his only ability to earn a living at a

24   time having just been terminated by Spartan, and as he

25   testified, he trades these options in this account and now that

Case 1:19-cv-20979-RAR   Document 65-4   Entered on FLSD Docket 05/27/2019   Page 157 of
179
Hearing on Motion to Dissolve Writs
156

 1   he doesn't have any other employment and he was just terminated,

 2   he really needs access to these funds not so that he can run

 3   away with them, which has been established, but simply so that

 4   he can continue to trade and make a living.

 5         So, you know, the one element is a question of whether

 6   the garnishment has been sued out to injure the defendant or the

 7   garnishee.  You know, plaintiffs here can certainly say that it

 8   was not their intention to do so, although I think that fact has

 9   been disproven by the evidence regarding what happened on the

10   7th, but in any event, the practical effect is really to impose

11   severe hardship on Mr. Reynolds.

12         The question of other property, there is quite of bit

13   of evidence of other property in this record.  I believe there's

14   testimony or certainly a document showing another 1.5 million in

15   another account of Mr. Reynolds, and certainly he has a home

16   which is valued at $6.5 million.  Both of those, and then

17   including the TD Ameritrade account, suggest that there will

18   certainly be money at the end of this litigation should they

19   prevail.

20         There's certainly no credible testimony today that

21   Mr. Reynolds is a reckless trader; that Mr. Reynolds caused the

22   full amount of these losses.  All of the evidence were, in fact,

23   the opposite, that he could have stemmed the losses had be been

24   kept in control.

25         In terms of prong two, right, of obtaining this writ,

Hearing on Motion to Dissolve Writs

1    the question of whether there's a high probability of success, I

2    mean, you now have testimony that this Settlement Agreement was

3    not actually read by the signatory, and it wasn't read because

4    he had just gotten off the phone with the other party to it who

5    he understood to be the CEO of a $10 billion company, and he

6    wasn't expecting to get a document that didn't reflect what the

7    conversation was.  As soon as he realized what had happened, he

8    immediately took steps to try and fix the clear mutual mistake.

9         The other part of that document, and we didn't get into

10   it as much as we could, Your Honor, and certainly we will at

11   trial, which is -- I made the comment in our papers that it was

12   legally incomprehensible.  If you actually go through it, it

13   refers to, you know, certain subsections that don't exist.  It

14   refers to sort of defendants at certain times when it's

15   referring to a defendant.  It refers to an incident that in fact

16   does not exist and certainly is not clear.  The document does

17   not reflect a meeting of the minds.  So we think ultimately

18   there's a very low probably, if any, that they succeed on

19   demonstrating that this is a legally enforceable contract.

20        You know, I think if Your Honor is considering sort of

21   balancing the equities here, you know, if these writs are

22   sustained on this record, Mr. Reynolds is going to labor under

23   severe financial hardship.  The plaintiffs have already

24   abandoned their Writ of Attachment, agreeing that that was

25   inappropriately sought, or they sought it and couldn't produce

Hearing on Motion to Dissolve Writs

158

 1    the evidence for it; and the garnishment is really effectively

 2    the same, it's the same high standard, and I don't think

 3    plaintiffs have got that here.

 4         So we would really ask for Your Honor to vacate the

 5    remaining Writ of Garnishment.

 6         THE COURT:  Thank you.

 7         MR. CRONTHALL:  Very briefly respond, Your Honor?

 8         THE COURT:  Okay.

 9         MR. CRONTHALL:  The reference to other property really

10    is insufficient because the other property that was mentioned is

11    the residence that has a $6.5 million mortgage on it already,

12    not including the $3 million lien that Axos has on it pursuant

13    to the terms of the Settlement Agreement.  So that really

14    doesn't add anything to the equation.

15         With respect to the Settlement Agreement supposedly

16    being rushed, the discussions were occurring over the course of

17    two days with counsel involved for both sides.  So the fact that

18    it happened to be executed that day, which is not unreasonable

19    under the circumstances when you've got the existence of Spartan

20    as a business and you've got such a high amount of money being

21    involved on the part of the bank and its shareholders, acting

22    quickly was absolutely required.

23         Here the balance of the equities is clearly on the side

24    of Axos because of the fact that there were repeated promises by

25    Mr. Reynolds to pay either Spartan and then Axos and then pledge

Hearing on Motion to Dissolve Writs

159

 1   his assets, and then once the agreement was signed, the funds

 2   were supposed to come to Axos, he reneges on the deal.  So, I

 3   mean, this is a very clear case because of the definitiveness of

 4   the agreement, the definitiveness of the amount owed, the timing

 5   that it was to be paid, and the fact that the party,

 6   Mr. Reynolds, even started to take the action to transfer the

 7   funds and then stopped, stopped because he had an impression,

 8   supposedly, about the nature of the agreement being a global one

 9   when it clearly was not the case.  It just doesn't cut it, Your

10   Honor.

11          So there's enough on this record to support the

12   continuance of the garnishment.  Thank you.

13          THE COURT:  Thank you.

14          MR. A. FORD:  Your Honor, may I just briefly respond?

15          THE COURT:  Sure.

16          MR. A. FORD:  Your Honor, I think what's clear from the

17   arguments here is that we have a good old-fashioned contract

18   dispute between the parties and we're going to fight over this

19   maybe until September it appears, but under Florida law, when

20   there's a standard contract dispute between two parties, the

21   plaintiff is not permitted to just go and freeze the assets,

22   right, to freeze the assets of the defendant in the event that

23   they might win.  That's really the situation here, is we have a

24   dispute.

25          There's arguments on both sides, obviously, and we'll

Hearing on Motion to Dissolve Writs

160

1  have that fight and we're going to have this fight by September,

2  and now that I think about it, given the trial strategy, what

3  they really have to prove is that by September, which is in four

4  months, Mr. Reynolds is going to somehow, if given the rights to

5  his TD Ameritrade account to trade in, trading options, by the

6  way, that expire every week, that he is going to somehow lose in

7  excess of $8 million over the course of the next five months.

8          Mr. Reynolds has never done that before in his life on

9  trading these expired options, and so there simply can be no

10  reasonable belief -- and I would note, by the way, that this

11  account is really Mr. Reynolds', his money that he lives off of,

12  that he intends to live off of with his girlfriend who he

13  mentioned earlier.  And so the idea that he's going to trade

14  options in such a manner that results in him wiping out all of

15  the money that he has is simply not credible and certainly not

16  in the next four months.

17          So if we get to September and plaintiffs are able to

18  prove their case, they'll have a judgment for 7.5 million and

19  they'll be able to execute it, and for that, the Writ of

20  Garnishment really, under all the case law in the state, really

21  should be vacated.

22          THE COURT:  Well, they have put up a bond, as I recall,

23  in the amount of $15 million, and I suppose that's something

24  that, if they were not to prevail and you suffer damages in the

25  interim, that that's what that bond is there for.

Hearing on Motion to Dissolve Writs

161

1          Let me ask you:  Why could you not find some other

2   similar bond that would be an adequate substitute to satisfy

3   them that in the event -- if he so wants to get into his account

4   and make additional money or avoid losing more money, that in

5   the event that they prevail, that they would have this other

6   bond to go after?

7          MR. A. FORD:  Your Honor, let me -- my client wants to

8   speak with me about this.

9          THE COURT:  Okay.

10          MR. A. FORD:  Your Honor, to answer your question:  You

11   know, there are sort of a few issues, one of which is the easy

12   one, which is that, you know, ordinary defendants in contract

13   cases aren't obligated to post a bond while they litigate a

14   breach of contract case, and I don't think case is any different

15   such that Mr. Reynolds should be treated differently.

16          Second, the cost of these bonds is actually quite

17   expensive, particularly -- they are expensive, right, but

18   perhaps not for a bank which probably writes its own, but you're

19   actually asking my client to put up what would wind up being a

20   couple hundred thousand dollars, we believe, to post the type of

21   bond at issue, and that would be I think simply sort of

22   inappropriate given these circumstances.  And, you know, my

23   client is here, hasn't actually even been served yet.  We're

24   litigating the case.  We appeared.  He has an account which he

25   really is entitled to have access to.

Hearing on Motion to Dissolve Writs

162

1          THE COURT:  But it may be expensive, maybe it is a

2    couple hundred thousand dollars, but if he prevails, then he

3    goes after the bond, right?  He gets it all back.

4          MR. A. FORD:  If Your Honor is talking about maybe the

5    parties reaching an agreement where the account is unfrozen and

6    a bond is posted for 7.5 million, that's something I would

7    certainly discuss with my client.

8          THE COURT:  Okay.  There you go.

9          MR. CRONTHALL:  Your Honor, what Your Honor is

10   suggesting is certainly expressly permitted, if not encouraged

11   by the statutes, specifically Florida Statute 77.24, which talks

12   about a defendant whose property has been garnished may secure

13   its release by getting a bond with a surety to be approved by

14   the clerk in at least double the amount claimed in the Complaint

15   with interest and costs, which would be similar to exactly what

16   Axos did.  It didn't write its own bond; it paid for a $15

17   million bond, as Your Honor pointed out.

18          So that seems to be the most reasonable means of

19   protecting both sides if Mr. Reynolds really wants to have

20   access to that money while this matter is pending because, if

21   not, the risk to the bank is too great.  The amount of money is

22   so great that it could be absconded with, so the bond suggestion

23   is the one that's available to the party.

24          MR. A. FORD:  Your Honor, as I understood it, you were

25   talking about a $7.5 million bond?

Case 1:19-cv-20979-RAR   Document 65-4   Entered on FLSD Docket 05/27/2019   Page 164 of 179
Hearing on Motion to Dissolve Writs
163

 1          THE COURT:  Well, you know, I didn't have the benefit

 2   of the statute in front of me, and if you can agree to a lesser

 3   amount than what's provided for by the statute, you know, I'm

 4   not going to get in the middle of that, but I think that's

 5   something that needs to be worked out between you and opposing

 6   counsel.  But as I said, I realize that there's an expense

 7   associated with it, but it also seems to me that that is a

 8   recoverable expense in the event that you prevail.  Okay.

 9          We'll go ahead and take it under advisement, and I will

10   try and get you an order as quickly as I can.

11          Anything else?

12          Thank you.

13          MR. CRONTHALL:  Thank you very much, Your Honor.

14          MR. CARVER:  Thank you, Your Honor.

15          THE COURTROOM DEPUTY:  No hearing on Monday.

16          THE COURT:  No hearing on Monday.

17          Can you work out something in terms of disposing, a

18   joint motion to dispose of the one writ or do you want me to --

19          MR. CRONTHALL:  Yes.

20          MR. A. FORD:  Yes, sir.

21          THE COURT:  You'll get something to me?

22          MR. A. FORD:  Yes.

23          THE COURT:  Okay.  Thank you.

24          And you know under the rules, you're supposed to file

25   the exhibits --

1          MR. CARVER:  I know, Your Honor.

2          THE COURT:  -- online, okay, within 24 hours.

3          MR. CARVER:  Yes, Your Honor.  Thank you.

4          THE COURT SECURITY OFFICER:  All rise.

5      (The hearing concluded at 4:05 p.m.:)

6

7              C E R T I F I C A T E

8      I hereby certify that the foregoing is an accurate

9  transcription of proceedings in the above-entitled matter.

10

11  ___04-08-19_____      _____
        DATE                GILDA PASTOR-HERNANDEZ, RPR, FPR
12                          Official United States Court Reporter
                            Wilkie D. Ferguson Jr. U.S. Courthouse
13                          400 North Miami Avenue, Suite 13-3
                            Miami, Florida  33128    305.523.5118
14                          gphofficialreporter@gmail.com

15

16

17

18

19

20

21

22

23

24

25

**A**

**abandon** 152:5,14 155:13
**abandoned** 153:14 157:24
**abandoning** 152:8
**abide** 28:10,14
**ability** 12:11 13:23 14:10 30:17
72:6,8 73:25 77:14 81:21 85:5
140:16 148:4,12 155:23
**able** 35:5,6 46:1 55:3 58:25 59:5
60:19 72:10 82:12 85:12,18
93:18 94:9 98:18 109:5
123:17 141:8 142:14,15 148:4
160:17,19
**about** 11:23 13:5,7 15:1 16:11
16:12,15 18:7 19:17 20:9,14
25:23 27:5 31:8,9 34:16,20
35:7 41:25 43:18 44:12,22
45:6 47:11 51:14 52:8,22
53:21 55:18 59:12 60:2,6 61:5
61:10,20 62:2 63:1 67:18
70:11 71:20 72:3,6,8,17 75:20
78:14,19 88:4,14 90:12 92:1,2
92:24 93:2,5 94:12 96:23
106:18 108:2,8 111:7 112:17
114:19 115:25 116:8,11 117:6
119:8,14 120:18 121:10,13,14
121:15 124:2 125:15 128:4
129:12 130:21 131:11,17
132:7 133:21 135:3 139:16,20
146:3 159:8 160:2 161:8
162:4,12,25
**above** 47:9 74:5
**above-entitled** 164:9
**abrownsfan23@gmail.com**
109:19
**abrownsfan232@gmail.com**
109:15
**abscond** 24:4 44:15 69:8,15,23
71:4 114:16 115:18 143:19
**absconded** 162:22
**absconding** 142:16 152:1,11
**absence** 155:2
**absolutely** 51:4 75:6 79:23 96:6
105:23 120:8 138:8,11 149:3
158:22
**acceptable** 146:21
**accepted** 50:2
**access** 42:11 52:18 80:21 156:2
161:25 162:20
**accessible** 47:17
**accomplish** 17:7 107:5
**accordance** 12:24 38:15
**according** 18:24 22:12 105:6,20
**account** 10:5 22:11 23:9,13,17
23:18 24:4 27:3 29:13 35:16
35:19 36:17 37:22,22 38:13
40:16 41:5,7,8,11,14,17,17,20
42:2,4,7,10,1 1 44:5,10 47:15
52:13,22 53:2,23 54:3 55:4,12
55:13,16,17,20,2 3 56:9 59:1
63:1 64:21 69:9,12 70:9,16
72:7,9,11,18,23,2 5 73:16
74:24 75:13,15 76:5,5,13,22
77:1,9 78:8,24 80:2,8,19,21
80:22 81:12 86:17,17,20
87:11,22 92:2,3 93:10,17 94:2
94:3 98:9 102:11,24 104:1
107:23 108:5 114:17,19,24
115:5,12,19,2 2 116:12,21,24
119:12 121:24 127:8,9,13
128:1 134:9 138:3 139:5,15
139:16,18 140:1 143:21 148:5
148:24 150:14,22 151:4,7
152:16 155:25 156:15,17
160:5,11 161:3,24 162:5
**accounted** 15:18
**accounting** 115:10
**accounts** 23:3,4,6,6,8,9 37:19,25
37:25 41:15,18,22,23 42:6

47:15 52:17 59:14,15,19 74:1
75:20 98:18 121:24 130:10
**accuracy** 131:25
**accurate** 114:22 117:3 164:8
**acknowledge** 43:4 58:12
**acknowledged** 42:19,20,2 1 43:7
43:12,24 98:4
**acknowledging** 42:24
**acknowledgment** 49:23
**acquire** 77:14
**acquired** 49:2 74:7
**acted** 9:21
**acting** 33:9 158:21
**action** 16:9,25 18:1 85:24 159:6
**actions** 44:15
**activities** 154:20
**activity** 23:15 37:23 62:23 104:7
134:9
**acts** 151:25
**actual** 103:10 125:12 129:16
133:25
**actually** 8:19 11:21 41:16 44:25
54:4 65:15 94:14 98:16
101:11 104:16 115:13,20
120:22,24 123:23 129:19
132:17 137:17 143:11,19
145:3 157:3,12 161:16,19,23
**Adam** 1:22 5:15 23:25 69:6
117:17 141:3
**add** 106:24 158:14
**added** 34:17 46:19
**adding** 46:24 98:8,13
**addition** 89:2
**additional** 12:15 34:17 46:23
47:2 152:10,12 161:4
**address** 16:19 17:4 40:24 67:20
67:21,21,21 68:12 109:15,18
**addressed** 57:22 102:16
**adds** 10:5
**adequate** 161:2
**adjusted** 98:17 118:13
**adjustment** 117:22 118:16
**adjustments** 117:11
**admission** 89:24
**admit** 76:11
**admitted** 53:13 64:8,12 66:24
68:20 99:14 126:21 138:24
**advance** 50:23 128:9
**advanced** 51:3
**adverse** 94:24 95:17 100:7,9
**advice** 58:13 84:21 124:17 125:1
**advised** 58:16 92:22 93:25
**advisement** 163:9
**affect** 14:10 118:15
**affidavit** 11:10 12:6,9 18:5
20:16 22:6 25:12 26:1,16 37:1
43:19 44:22,25 45:7 53:5,21
63:5,10,19,20,2 4 64:2,24
65:18,25 66:21 67:1 87:24
88:1 90:16,23 92:7,17 93:25
98:25 99:11 103:22 105:14
106:6,18 107:7 108:11 111:2
111:11 112:6 113:15,16 117:1
126:9,19,24 129:23 131:9,18
133:4,10,17,19,2 3 134:15
135:17 136:19 141:25
**affidavits** 53:20 64:3,6
**affirmation** 141:2,6,11,14
**after** 19:6,17,23 29:16 30:4 33:2
45:11 46:1,17 56:22 81:20
90:25 94:3 100:1 108:19
120:3 124:2 134:1,4,8 161:6
162:3
**afternoon** 24:10 46:19 48:19
69:1 78:8 95:14 96:4 100:3,25
101:1 114:13 145:10 151:19
153:9
**again** 14:24 17:2 20:16 21:4
26:12 44:8 55:15 60:20 62:18

74:6 76:15 78:16 83:15,18
85:20 87:8,19 88:4 91:6 93:13
131:24 146:25 148:13
**against** 42:24 55:5 56:21 85:13
85:18,25 86:7 125:8 155:21
**aggregate** 15:18 47:4
**ago** 45:7 90:11
**agree** 28:6 41:3 71:1 73:21 85:4
87:5 104:9 148:3 155:13
163:2
**agreed** 27:18 36:22 55:1 56:16
102:8,11,14 106:25 113:10
139:25
**agreeing** 42:1 44:4,9 94:3
155:13 157:24
**agreement** 24:7 39:4,4,7,12,16
39:18 40:19 50:18 54:6,10,15
54:18,20,22,2 4 55:11,22,24
56:4,8,13 57:10,15,20,2 1 58:2
58:6,6,11,12,16,1 7 59:20 63:2
66:6,12,13,1 5 67:12 75:25
76:2 79:7,24 81:11,13 82:15
83:22 84:6,12,22,2 5 85:4,21
86:23 87:5,7,9,2 1 90:12 91:1
101:20 102:2,8,14,1 5 103:1,3
103:8,15 106:25 110:8,10,16
113:6,9,12,13,19,2 5 114:5,6
122:3,15,22 123:4,7,17,24
124:1,18,2 1 125:1,3,7,21
126:1,2 132:5,14 134:2 140:1
140:2,3 147:12 148:1,5,15
154:5,8,9,11,12,12,15,16
157:2 158:1,15 159:1,4,8
162:5
**agreements** 57:10,23 93:14
102:17
**ahead** 8:23 10:12 89:22 99:25
139:2 140:18 153:18 163:9
**Akerman** 1:19 5:11,13
**alerts** 120:24
**Alex** 5:21
**ALEXANDER** 2:1
**algorithm** 71:11,13 107:8,17,22
112:2
**algorithms** 107:17,21 111:4,14
**allow** 72:15 96:13
**allowed** 97:14
**allows** 10:6 38:19
**alone** 134:25 135:8,10
**alpha** 49:14 61:23
**already** 46:7,9 53:16 67:24
104:14 157:23 158:11
**alter** 82:9
**alterations** 117:7 118:19 119:2,9
119:14,18
**altering** 117:2 118:9
**although** 156:8
**always** 80:18 107:21 131:1
147:24
**Amanda** 69:24
**Ameritrade** 23:10,17 24:4 40:15
44:5,10 52:13,22 53:2,23 54:2
55:12,17,22 56:9 62:23 63:14
64:21 65:10,14 69:9,12,13,25
70:16 71:2 72:7,8,11,23,25
86:17,20,22 87:3 92:2 93:10
94:12 102:11,24,25 104:1
114:16,19 115:1,7,11,19,22
126:7,25 127:3 134:9 138:3
139:5 140:1 142:23 143:22
148:24 150:14,22 151:7
152:22 156:17 160:5
**Ameritrade's** 93:25
**among** 102:8 104:22 113:3
132:21
**Amongst** 122:9
**amount** 13:25 14:5 31:4 52:18
55:6 56:16 57:2 59:6 60:2,19
62:19 82:24 94:14 105:24

107:2 114:7 117:19 130:22
131:6 154:2 155:20 156:22
158:20 159:4 160:23 162:14
162:21 163:3
**amounts** 85:10
**analysis** 143:10
**Andre** 1:14 5:8
**Andrew** 150:3
**and/or** 101:6 111:3,13
**Angeles** 1:16
**announcement** 61:5,10,20
**announcements** 64:11
**another** 12:16 24:8 40:9 47:2
62:1 79:15 83:10 93:15,16
107:23 113:18 115:5 122:5
130:8 135:2 147:13 156:14,15
**answer** 21:3 75:1,14 78:6 103:10
103:10 108:21 114:4 132:24
161:10
**answered** 67:23
**answers** 11:23
**anticipate** 99:21 146:5,14
**anymore** 118:2 153:23
**anyone** 40:6,13,18 41:4 42:14
43:16 87:16 119:17,20,22
121:4 127:12 135:15
**anything** 9:24 16:4 19:20 38:16
45:23 46:12 53:20 59:7
106:18 158:14 163:11
**anyway** 47:18 145:9
**anywhere** 106:1 131:3
**apologize** 24:18 28:20 75:5
83:25 127:15 140:15
**apparent** 93:5 130:6
**appear** 18:16 20:21 54:18 66:17
104:10 136:21 137:21
**appearances** 1:13 5:7
**appeared** 18:20 19:4 161:24
**appearing** 5:9,16,20
**appears** 18:9 20:20 49:19 54:22
65:6 66:1 68:4,14 90:20 91:13
129:11,24 140:20 159:19
**applicable** 98:1
**applies** 151:24
**apply** 152:3
**appreciate** 15:13 155:14
**apprised** 129:15
**approach** 13:11 26:20 45:3 99:3
126:12 127:23
**appropriate** 152:19 154:13
**approvals** 12:15
**approved** 162:13
**approximate** 31:4
**approximately** 9:9 50:23 57:2
April 1:7 53:6 143:6,7
**area** 142:20
**argument** 144:1
**arguments** 159:17,25
**around** 32:1 34:18 101:13
114:21 120:12,14 121:11
129:22 130:20 134:12,17
135:24 150:18
**arrangement** 38:16,19
**arrangements** 83:19
**art** 107:10
**article** 61:12
**articles** 104:25
**aside** 90:3
**asked** 11:20 16:22,25 33:12
44:22 90:11 92:1 105:11
110:17
**asking** 21:14,24 22:14 45:6
76:17,18 111:8,8 161:19
**aspect** 43:10,15
**asserted** 12:6
**asserting** 88:18
**assessment** 33:7
**asset** 23:3,6 40:20
**assets** 23:4 44:5,10 59:2 82:11

93:9 94:3 134:5 142:16
150:15 154:2 155:8 159:1,21
159:22
**assigning** 141:9
**assist** 35:24
**assisting** 130:8
**associate** 23:16
**associated** 163:7
**assume** 57:9 72:1 85:3 91:14
99:24
**assumption** 142:1
**astronomical** 97:21
**attach** 53:23
**attached** 63:6 93:25 126:19
133:19 141:2,6
**attachment** 1:11 62:15 138:1
151:24,25 152:6,11 153:14
155:14,16 157:24
**attachments** 140:21
**attachment/garnishment** 93:17
**attempt** 44:15 70:22 71:4 78:20
115:18 147:18
**attempted** 18:9 68:11 94:2
114:15 129:24 147:14
**attempting** 35:6 51:8 62:25 69:8
69:15,22 143:11
**attempts** 24:3 54:2 70:8,24
143:13,15
**attend** 110:1,20
**attention** 26:24 94:5 108:13
130:7
**attesting** 102:2
**attorney** 84:11,23 132:18 133:1
**attorney/client** 25:19 51:12
79:10,13,15
**attractions** 145:15
**attributable** 33:3
**August** 147:1,4
**authority** 74:22,24 83:12,13,14
83:17 105:10 106:19
**authorization** 12:18 35:19
**authorize** 88:24
**automatically** 117:14
**availability** 77:23
**available** 29:22 77:25 78:13,15
78:18 142:11 144:17,21,23,24
146:19 151:18 153:8 155:9
162:23
**Avenue** 1:24 2:8 164:13
**average** 116:11,14,17,2 0 130:25
130:25
**avoid** 18:21 161:4
**aware** 23:3,6,8,12,12,17,2 0 24:3
24:5 28:23 39:12 42:23 44:14
44:17 45:14 46:12,15 51:17
52:12,17 54:6 69:11 70:22,24
72:5 73:15,21 74:14 76:11,23
86:19,22 87:1,2,16 104:17,21
107:19 109:12 112:15,17,18
116:23 118:8 119:1 129:5
144:16 147:9 155:12,18
**away** 62:20 155:23 156:3
**ax** 98:6
**Axos** 1:4 5:5,10 6:8 9:17,25 10:2
10:4,12 20:10,11,12 22:4,8 24:22
24:25 25:8 27:1,6,12,15 36:14
36:23,25 37:3,6,9,12 38:25
39:7,10,13,15 40:13,16,18,22
41:4,13,17 42:8,14,16,18
43:16,18,22 44:1 45:13 47:16
47:17 48:21,21,22,24 49:1,2,4
49:4,6,6,10,24 50:4,7,12,17
50:18,20,23 51:2,5,13,24
52:12,15,17,2 1 54:4,7,16,25
55:4,5 56:7,14 57:2,4 58:24
58:25 59:9 62:15 63:13 64:18
64:22 65:15 66:2,18,20 67:10
73:21,25 74:4,7,8 75:8,18,24
76:4,7,9,12,12,19 80:2,5,8,12

80:19 81:8,11,14,17,19 82:5
83:6,7 85:4,12,14,15,18,25
86:3,5,19,22 87:6,16 88:10
91:23 94:8 97:9,11 100:6
102:1,9,21,25 106:16 108:9
110:7 113:6 114:7 121:4
122:12,16,24 123:10,20 148:7
148:12,14,18 149:19 153:1
154:1,18 158:12,24,25 159:2
162:16
**A-d-o-n** 48:16
**a.m** 5:1 61:23 62:5 90:21 91:13
91:24 129:22 135:3,5 136:9

## B

**B** 22:6 63:8,10,18 91:9 141:15
**back** 17:22 28:9 30:11 41:9,25
59:10 63:14 78:6 95:21 99:6
100:1 116:10 117:23 124:1
126:5 128:17 131:17 136:3
143:9 144:11 147:18 148:7,8
148:8,12,13 162:3
**bad** 71:20 72:4 76:16 121:25
122:1 130:25
**balance** 93:23 109:3 158:23
**balancing** 157:21
**bank** 24:22,25 48:21 85:18
121:24 158:21 161:18 162:17
**Bar-Adon** 3:8 48:2,10,15,19
49:19 54:15 61:4 62:14 63:23
65:4 67:6 69:1,3,4,7 71:6
90:11 142:8,10,1 1 150:2
**base** 111:2,11
**based** 18:23 20:6 42:6 59:22
71:18 73:6 144:6 150:17
153:4,24 155:15
**basically** 59:1 61:24 73:13
**basis** 90:7 100:11 105:17 117:11
153:25
**basketball** 110:2,11
**Beach** 133:9 134:22
**bears** 62:18 133:11
**became** 74:14
**become** 50:11 52:17 73:15
151:11
**becomes** 76:7
**before** 1:11 11:23 21:16,19
39:18 45:25 60:12 65:4 66:7
87:17 90:16 92:8 95:16 97:11
98:25 104:17 105:1 109:1
116:3 118:7,10 120:11 121:1
123:24 131:18 136:3 140:15
146:6 153:24 160:8
**behalf** 5:16,18,19,2 1 8:1 9:23
10:17,22 30:18 31:14 33:9
80:9 86:19 103:16
**behavior** 93:14
**being** 13:13,25 14:1 16:6 20:6
24:13 31:4 34:13 36:18 55:23
58:11 66:13 73:25 81:12
88:14 92:3 94:5,9 106:19
109:12,21 111:4 112:16
119:22 125:18 131:4 142:14
142:15 154:16 155:22 158:16
158:20 159:8 161:19
**belief** 132:3 143:16,17 152:25
153:25 154:6 155:1 160:10
**believe** 11:21,22 13:2 16:20 23:2
24:16,22,23 25:1,22 31:9
34:21 39:9,14,17 40:9 45:2
47:16 51:24,25 52:16 55:2,6
57:13 60:15,23 61:1,13,13,22
63:7,9,10,23 64:5 65:23 67:22
70:10,10 71:13,15,17,21 72:3
74:9 76:2,4 77:2,8 78:19
79:10,11 80:25 81:18,25 82:4
82:9,12 83:10 84:9 87:6,7
88:12 90:15 93:13 98:1,5,25
112:22 113:24 116:4 120:6,9

120:21,22 126:20 129:4 132:9
132:13 133:7,25 135:24
141:25 144:5 146:16 150:22
153:20 155:7 156:13 161:20
**believed** 125:12 148:6
**believing** 131:23
**Bell** 88:5,6,7,9
**belonging** 23:4
**benefit** 36:19,23,2 5 37:9,13
47:17 163:1
**Berkeley** 2:1,2 5:17,18 8:16,18
19:2 100:8,11 108:20 111:15
111:19 132:10,16 149:23
150:2
**best** 45:21 46:6
**better** 90:8 147:3 148:22
**between** 24:8 38:25 39:7,12,15
45:12 49:4,10 50:16 54:7,16
57:21 64:18 66:1,16 69:24
83:10,19 85:3 87:6 102:15
128:25 159:18,20 163:5
**beyond** 45:14 47:8 84:18 139:13
**bill** 128:20
**billion** 157:5
**bills** 139:13
**bind** 83:12,13,17
**bio** 113:3
**bios** 112:13
**Bio-Path** 13:1,4 17:17 19:8,12
20:2 28:18,24,24 29:3 30:14
30:21 31:1,14 32:19 33:2
35:22 45:17 46:18 47:7 59:3
60:2,7,12,13,2 1 61:6,19 62:6
64:11 71:8,12,20 72:2,5 73:16
73:22 77:18,20 78:15 80:25
82:3 85:6 104:12,15,18,21
105:1,4,7,10 109:4 111:3,12
112:8,9,16,19,2 1 116:1 119:3
119:25 120:4,7,20 129:13,16
131:3 149:20
**bit** 60:22 90:13 92:5 94:12
117:21,23 131:17 141:1
143:21 156:12
**board** 110:18 136:4 147:18
**boils** 153:16
**bond** 160:22,25 161:2,6,13,21
162:3,6,13,16,17,22,25
**bonds** 56:20 161:16
**both** 14:1 22:20 24:14 31:6,20
45:15 58:1,12 59:2 64:3,5
125:17 141:15 142:23 145:14
147:16,25 150:16 151:23
155:18 156:16 158:17 159:25
162:19
**Boulevard** 1:19 2:3
**BPTH** 16:20
**BRASS** 18:11 117:2,7 118:9,20
119:2 129:18 130:1
**breach** 161:14
**break** 99:25
**brief** 47:24 52:6 89:19 140:19
142:3 143:1,3,3 145:2,2
146:20 147:2 150:13
**briefly** 50:22 54:22 126:6 158:7
159:14
**bring** 19:20 105:19
**bringing** 17:16,20 143:8
**broker** 7:14,19 15:17 70:12
**brought** 94:5 117:17 130:7
**Browns** 109:22
**building** 65:23
**bullet** 137:8
**burden** 155:4
**business** 7:5,7,16 9:16 73:13
89:9 97:16 107:10,14,19
130:7 158:20
**buy** 10:25 17:21,24
**buys** 46:21,22 98:6
**B-a-r** 48:16

## C

**C** 1:18,22 65:18 141:3 164:7,7
**California** 1:16
**call** 6:6,8 17:9 25:2,10,14 27:17
27:18,20 47:23 48:1,2 49:16
70:1,3 94:24,24 95:6,10,11,15
95:16 96:9 99:18 100:5 121:7
121:10,12,17,18,2,2 122:2,3,5
122:8,10 123:3,4 127:11
134:16,20 135:2,5,13,14,22,23
135:25 136:6,9,10,16 138:15
138:17,19 140:9 145:3,12
148:2
**called** 13:1 42:4 57:11 65:24
86:2 117:8,22
**calls** 25:19 79:12 100:6 103:11
122:9 128:21,25 129:11,12,15
135:15,20 136:5 137:23
142:18
**came** 61:23 72:4
**cancel** 110:16
**canceled** 104:4 129:21
**cancellation** 154:24
**cap** 21:21 77:23,24 109:9 112:13
113:3
**capital** 1:7 8:1,2 9:12 10:5 13:23
13:24 14:9,10,12 15:4,8,15,16
15:19,24 16:12,16 17:4,13
21:23 22:20 36:10,11 37:15
41:14,17 42:2,2,4 46:9 47:15
60:19 81:24 82:5 98:17
103:16 109:5
**Capital's** 82:2
**care** 95:16
**career** 137:10
**Carver** 1:18 5:11,11 140:25
141:5,10,14,17,2 1 145:1,8
149:6,16,25 150:8 163:14
164:1,3
**case** 1:3 9:24 17:17 67:16 69:6
80:18 107:16,16 108:2,7
113:14 126:10 138:2,5 142:13
142:22 145:14,16,20 146:5,15
147:17 152:17 154:8 159:3,9
160:18,20 161:14,14,24
**cases** 29:18 148:22 161:13
**cash** 40:15 59:2,5 115:11 150:16
150:18,20,2 3 151:5,8,10,11
155:8
**cause** 52:3 120:22
**caused** 44:1 46:4,13 71:11,13,18
156:21
**causes** 85:24
**Cavaliers** 109:24 110:1
**cease** 15:21,24 21:22
**cell** 128:21 129:9 149:23 150:2,3
**cents** 31:9
**CEO** 24:24 102:2 157:5
**certain** 14:5 19:21 22:1 39:17
55:12 56:19 60:19 62:18
104:9 107:16 157:13,14
**certainly** 13:10 14:25 26:4,23
29:15 30:16 40:8 42:23 96:10
111:10 118:25 119:8 140:17
145:16,25 147:24 148:18
156:7,14,15,18,2 0 157:10,16
160:15 162:7,10
**Certificate** 3:22
**certify** 164:8
**cetera** 114:1 120:24 152:1
**chain** 20:23 109:8
**change** 39:15 49:23 50:1,7 89:11
117:13
**changed** 46:11 50:7,14
**changes** 84:7 89:8
**character** 150:15
**characterize** 78:4
**charge** 32:14
**check** 150:10

**chief** 1:12 34:25 48:23 76:18 105:16,21
**Chris** 40:9
**Christopher** 1:18 5:11
**circumstance** 22:19
**circumstances** 73:12 76:20,21 83:4,15,18 158:19 161:22
**claim** 62:20 154:19
**claimed** 162:14
**claiming** 37:2
**claims** 86:7 125:8
**clarify** 100:8
**clarity** 36:2
**clause** 57:11,19 58:4 113:24
**clean** 141:8
**clear** 10:11 20:1 29:16 80:11 81:5,6 85:22 89:2 118:19 144:20 148:12,20 154:10 157:8,16 159:3,16
**clearing** 1:4 5:5,10 6:8 9:17,18 9:19,20,22 10:7 17:11 20:11 22:2,4,8,1 1 31:20,21,24 32:3 32:18 33:1,8 34:24 36:14,16 36:17,23,25 37:3,6,9 38:7,15 38:17,19,20,25,2 5 39:4,5,7,10 39:10,13,15,15,1 8 40:1,4,7,13 40:16,18,22 41:13,13 42:9,11 42:15,18 43:22 44:1 47:16,17 48:24 49:1,2,5,7,8,10,11,23 49:24 50:3,4,7,8,11,12,17,18 50:18 51:24 52:21 73:21,25 74:4,8,14,16,18,20,20,22,24 75:8,9,11,18,24,2 5 76:2,4,4,7 76:7,12,1 9 79:3 80:2,6,8,12 80:20 81:8,11,14,1 7 82:5 83:7 85:4 86:19,23 87:17 88:10,10 88:16 100:6 118:11,11 121:4 122:12,16,2 4 123:21 149:20 149:20
**Clearing's** 78:23
**clearly** 149:10 154:7 155:15 158:23 159:9
**clerk** 162:14
**Cleveland** 109:21,24 110:1
**client** 10:23 11:23 27:6 75:8 76:1 79:15 106:3 132:23 148:13 161:7,19,23 162:7
**clients** 75:22 107:25
**client's** 108:2 148:6,16
**clinical** 61:11,20 112:14,15
**close** 10:11 19:7,11,18 20:8 21:15 28:18,22 29:23,25 30:4 30:13 31:23,25 32:4,7,9,12,18 32:19,22 33:9,12,18 34:7,10 34:19,22 35:5,22 45:17,21 71:25 74:17 75:11,12 78:24 96:19 105:11 109:3 140:16
**closed** 19:22 29:2,3,11,14,17,19 30:6 32:6 34:11,13,14 35:1,2 35:8 46:6
**closing** 19:16 20:3,8 31:8 32:14 46:18 97:15 104:11 142:3
**code** 18:25 152:1
**collapse** 147:7
**colleagues** 155:13
**collect** 23:7 56:15
**collecting** 62:17 94:17
**combination** 43:21 150:16
**combined** 88:15
**combining** 89:4
**come** 30:11 71:20 122:3 125:11 126:5 143:2 144:11 159:2
**comes** 15:19 112:1
**coming** 48:4 88:3 104:16 145:15 147:9
**commencing** 147:4
**comment** 157:11
**comments** 115:21
**Commission** 22:21 27:4

**commit** 95:7
**committed** 87:11,15 92:23
**common** 113:3
**communicated** 43:16 87:2
**communicating** 40:22 52:21
**communication** 22:7 25:20 53:1 79:13
**communications** 34:20 43:21 51:12,14 52:1 69:24 98:12 124:11
**companies** 85:25 86:4,5 88:14 89:4
**company** 1:8 9:12,14 49:2,12 50:13 59:24 73:13 74:20,21 77:24,24 83:16 88:18 89:10 89:10 93:20 101:9,9,12,12 142:9 148:25 157:5
**compared** 18:18
**competent** 132:14
**complaint** 54:10 85:13 162:14
**complete** 20:23
**completed** 147:13
**completely** 75:13 117:4
**completeness** 20:25
**compliance** 7:4,10,11,1 3 13:24 14:11 15:16 32:25 33:25 34:1 34:2,25 38:10,12 105:16,21
**complicated** 145:15
**Composite** 67:25
**concealing** 142:16
**concentrate** 118:3
**concern** 53:21 59:4 62:15 64:11 92:2 93:8 94:8,15 142:13,15
**concerned** 58:22 72:17,20 92:21
**concerning** 11:10 12:6,10 13:18 52:2 53:1 58:1,10 61:20 92:1 104:6,23 105:1 109:4 111:3 112:9 132:14 134:5,9 151:18
**conclude** 19:1
**concluded** 18:24 164:5
**conclusion** 88:4 93:16
**conduct** 59:3 93:15
**conducted** 20:7
**conducting** 14:3
**conference** 24:11 42:14 60:18
**confirm** 44:14 46:16 66:6 98:24 113:21 124:9 150:5
**confirmed** 58:14,15
**confirming** 28:16 87:20 124:21
**confusion** 152:23
**conjecture** 19:22
**Connect** 9:12
**connection** 49:10 84:11,22 140:23
**consequence** 14:13 15:7 111:13
**consequential** 56:24
**consider** 112:10,12,5 113:21 145:19
**consideration** 56:7,12 57:3,6 154:15
**considering** 107:24 157:20
**consistent** 50:3 68:15,17 69:24 118:5
**constellation** 86:2,3
**constitutes** 85:25
**construction** 55:6
**consultation** 85:1
**consulted** 84:24
**contact** 109:12
**contacted** 74:16 125:17
**contain** 125:12
**contains** 57:20 102:15
**contemplated** 148:2
**contents** 3:1 127:3 128:11
**continuance** 145:3 159:12
**continuation** 59:11
**continue** 14:21 15:17 59:5,10 96:13,24 105:7 115:23 120:20 122:23 123:17,19 148:4 156:4

**continued** 96:25
**continues** 73:11
**continuing** 59:13,25
**contract** 82:25 83:4 114:2 157:19 159:17,20 161:12,14
**contractual** 51:1
**contradiction** 143:20
**contrary** 125:20
**contributing** 94:15
**contribution** 98:9
**contributions** 98:11
**control** 33:22 34:3,4 156:24
**controls** 82:1
**convenience** 11:15 53:9
**conversation** 24:15 25:2 43:18 52:6 69:18 87:4 124:7 126:24 127:2 134:18 135:10 137:12 157:7
**conversations** 39:21,22,2 4 44:3 45:14 79:6 96:15 116:7 126:7
**conveyed** 69:14
**cop** 121:25,25 122:1
**copies** 38:8 128:2,3
**copy** 11:16 26:16 53:9 82:18 127:18,2 5 128:7,20
**COR** 9:17,21,24 10:2 22:2,11 31:20,21,24 32:3,17 33:1,8 34:24 36:16,17 37:13 38:7,17 38:20,25 39:4,10,15 41:13 42:16 49:8,10,23 50:3,7,11 73:15 74:14,16,18,20,22,24 75:9,11 76:4,7,9 77:1,9 78:7 78:23 79:3 88:10,16 89:9 96:6 96:9,15,21,23 97:20,23 108:24 118:11,11 122:11,16 148:4 149:20
**Coral** 2:4
**core** 117:20,20
**corporate** 7:4 33:25 34:1 38:24 39:2 89:2,3,6
**corporation** 6:24 83:7,12,14
**correct** 9:4 10:5,15 11:1,9 12:15 12:19,24 17:18,19 19:21 22:5 22:5,9,25 24:12 26:15 27:8,23 27:24 28:19,24,25 29:4,20 30:14,19,20,22,2 3 31:2,18 32:10,25 33:4,13,14,16,19 37:23,24 38:1 39:5,6,8 41:11 41:18,19 42:3 44:2,6,11,16 45:13 47:19 57:11 63:11,21 63:24 69:16,19 70:20 72:19 72:21 73:6 74:2 75:16 77:7,11 78:9,21 80:6,12 81:17 82:16 83:7,12,17,18,2 3 84:2,8,12 85:9 86:8 87:6,13,25 88:3 91:7,15,19 96:17,22 97:3,8,13 99:11,19 101:3,6,7,10,24,25 102:3,9,10,13,1 8 103:16,20 104:4,8,12 105:3 106:7,17,23 107:2,13,20 108:9,16 109:6 109:10,13 110:8,9 114:1,7,8 114:25 115:15,16 116:5,6,22 117:15 118:13,17,18,20 119:9,10 120:1 121:13 122:6 122:24,25 123:15,18,22,24,25 124:3,13,14,15,16,2 4 125:1,2 125:22 126:4,25 127:9,10,14 128:22 129:6,13,14,20 130:11 131:4 132:8 133:24 134:2,6,9 136:23 139:6,7 140:3 142:20 150:21 151:13
**correction** 117:16
**correctly** 10:12 46:20 60:23 69:2 130:21
**COR's** 32:25 96:13,19,2 5 97:1 120:10
**cost** 139:17 161:16

**costs** 162:15
**counsel** 5:7,18 11:21 14:20 25:23 45:6 46:17 51:13 58:9 58:10,10,13,14,15,1 5 66:11 69:6 90:11 93:25 95:5,14 106:2 111:7,15 126:25 128:2 128:14,16 130:20 132:14 134:19 142:8,9 147:25 148:18 148:19 150:14 158:17 163:6
**couple** 127:16 142:2 151:16 154:20 161:20 162:2
**course** 10:10 158:16 160:7
**Court** 1:1 2:7 5:2,23 6:6 7:15,18 8:6,9,12,14,17,22 11:3,17,24 12:2 13:15 14:15,17,20 15:10 15:13 19:3 21:1 23:22 25:21 26:3,21 29:6 33:6 37:1 43:19 44:19 45:4 47:21,23,25 48:4,7 48:9 49:15 53:13,17,18,25 54:11,12 58:20 59:18 60:11 62:11 63:18 64:8,12,14 66:24 68:20,23 72:13 75:1,4 79:17 80:14 82:8 82:8 83:2 86:13 88:20 89:16,20,22,2 5 90:5,8 94:21 95:1,8,10,18,2 1 98:21 99:14 99:17,21,25 100:5,10,13 102:5 103:6,1 1 106:16 108:3 108:21 111:18 113:8 114:10 118:23 119:5 126:13,21 127:24 128:12,14 130:15 132:11,25 138:9,14,17,21,24 139:2,22 140:6,8,11,13,18,24 141:4,7,13,16,18,2 4 142:2,7 142:13,25 143:3,18 144:1,8 144:12,19,21,23,2 5 145:6,9,24 146:5,10,12,14,18,21,2 3 147:6 148:22 149:4,13,17,24 150:1 150:5,9,12,14 151:11,15,20 152:2,5,9,14,20 153:3,7,10,13 153:18,22 155:2,6,10 158:6,8 159:13,15 160:22 161:9 162:1 162:8 163:1,16,21,2 3 164:2 164:12
**Courthouse** 2:7 164:12
**Courtroom** 1:5 5:5 6:11,16 48:12 100:14,17,22 144:20 163:15
**cover** 10:6 17:8 21:18,22 35:25 36:11 42:9 46:22 50:24 74:17 74:18,22 75:9 77:14 78:18 79:4 96:6,7,10,22,24 97:3,5 97:20 108:25 109:1,8 111:25
**covered** 17:14 19:23 22:16 46:24 47:2 120:17
**covering** 34:15 42:5 46:2 76:10 120:11
**create** 112:23 154:25
**created** 80:1 107:21
**creating** 112:3
**credible** 156:20 160:15
**criminal** 124:15 132:20,21 143:6 146:1
**Cronthall** 1:14 3:5,7,9,11,14,16 3:18,21 5:3,8,9 6:4,7,18 7:24 8:24 11:4,14 12:4 13:17 14:22 15:6,20 19:5 21:2 23:21 25:19 26:2 29:5 33:5 44:21 45:3,5 47:20 48:2,18 49:13,16,18 53:11,15,19 54:5,9,14 58:21 60:5,24 61:3,18 62:1,4,13 63:19,21,23 64:1,10,17 65:3 66:20 67:2,4,8 68:3,18,22 72:12 79:12 80:13 81:16 82:7 83:1 88:19 89:21,23 90:10 94:19,23 95:9,12 98:23 99:3,5 99:8,9,13,16,19,2 3 100:6,24 102:7 103:5,7,14 106:4,5 108:6,19,22 112:5 113:11 114:9 118:22 119:4 128:7

130:16,18 132:12,19 133:3
138:10,13,16,2,2 139:24 140:5
140:12 142:6,8,25 143:4
144:4,16,22,24 145:22 146:8
146:11,13,16 147:1,3,20
150:10,17 151:16,21 152:3,7
152:13,17,21 153:4,9,12,16,19
153:23 155:7 158:7,9 162:9
163:13,19
cross 23:22 68:23 98:21 114:10
139:22
Cross-Examination 3:6,10,14
3:17,21 23:23 68:24 98:22
114:11 139:23
cross-examine 11:24 12:1 64:4,7
Cruz 2:2
currently 7:17 115:17
customers 74:5
cut 20:23 30:17 65:18 120:1
159:9
cutoff 21:16,19 109:1

**D**

D 2:7 3:4,12 6:9 65:6 67:25 96:1
103:23 164:12
daily 105:17,24 117:18
damage 46:7,9 155:20
damaged 57:2
damages 56:24,25 77:11 160:24
danger 154:1
Daniel 6:14
Daniels 2:2,2
data 62:7
date 27:1 49:25 65:11 67:10
90:20 164:11
dated 62:5 66:6,12
dates 129:2 133:25
Dave 120:11 125:17
David 3:4,12 6:8,9,14 25:13 26:1
43:23 44:25 87:12,25 91:18
92:16 96:1 113:14 122:8
day 10:10 11:8 12:11,13,17 13:4
13:13,19 15:2 17:5,11,23 18:2
18:3 19:14 25:9 28:22,25 29:1
29:3,10,20 30:1,15 31:13
34:14 35:7,24 42:17 45:25
46:5,8,14,21,22,2 3 47:5 71:23
71:25 76:8 78:1,3,4 93:19
104:14,16 105:22 106:20
108:24 110:6,6,16,17,19
111:24,25 112:21,22 115:2,8
116:11,13,2 1 117:15,16,25
118:4 120:24 129:6 148:8
158:18
days 78:3,5 111:20,22 112:4
134:1,4,8 146:17 158:17
day-to-day 117:11
De 2:3
deal 53:2 121:25 159:2
dealer 7:14,20 15:17
debt 58:25
decades 132:8
decay 151:13,13
decide 96:18
decided 71:24 118:2
decision 76:22 96:7,13,16,25
97:1
declaration 20:15 53:4 103:21
136:18
decline 28:10
decrease 131:24
deeper 56:17
defendant 5:25 24:1 67:16 68:9
156:6 157:15 159:22 162:12
defendants 1:9,22 4:18 5:16,18
5:19,21 69:6 81:9 126:22
141:15 157:14 161:12
defense 95:3,4 96:1 139:1
deficiencies 21:21 22:20

deficiency 15:24 80:2 81:10,15
82:6 142:19
deficit 40:24
define 32:20 80:15
defined 80:2
definitely 16:15 146:8
definitiveness 159:3,4
Delaware 49:20 88:14
delegations 83:20
deliver 25:15
demonstrate 71:3
demonstrated 59:3 64:5
demonstrating 157:19
denied 144:8
depend 77:15
depends 39:9 77:12,13,14 78:3
80:15,18 83:3,14,15,18
depositions 147:5
DEPUTY 5:5 6:11,16 48:12
100:14,17,22 144:20 163:15
describe 50:22 111:5
described 93:15 109:17 118:9
Description 4:3
designed 82:11
despite 46:3 105:4 154:6
detail 63:5 75:23
detailed 93:24
details 121:20
determination 78:11
determine 43:1 90:6 143:18
determined 86:11
Diego 76:23
different 16:11 40:10 41:17,20
41:22,23,24 116:13 130:20
150:25 161:14
differently 46:13 161:15
difficult 34:23 53:23 56:19
148:17
difficulty 139:13
digit 109:16
direct 3:5,9,13,16,2 0 6:17 26:24
47:11 48:17 81:13 96:2
100:23 139:3 142:17 148:13
directed 151:23
directing 31:21
direction 31:20 35:13 96:19
directly 16:4,7 22:2 33:3 37:12
40:23 42:8 47:15 56:16
disagree 33:7 81:21
disappointed 52:9
disclose 42:18 59:15,19
disclosed 50:18 127:2
disclosing 51:12
disclosure 59:14
discount 57:6
discovery 145:21 146:6,9 147:8
discuss 13:3,6,21 16:4,8 17:11
20:12 25:8 36:16 75:22 95:5
162:7
discussed 17:2,6,8,13 20:13
21:16 22:1 27:17 36:16,18,24
43:10,15 46:17 52:5 58:16
63:5 66:7 97:22 102:2 113:10
122:11 124:22 126:7 127:5,8
127:11 135:25 140:16
discusses 126:24
discussing 25:4,10 26:14 128:18
discussion 13:18 25:6 33:1,8
96:11 97:14 122:11 127:3
135:8 136:22 140:19 146:20
147:2
discussions 13:5,7,9 16:11,12,14
25:22 42:23 45:12 52:2 57:25
58:5 64:18 96:23 114:1
133:23 134:1,4,1 1 147:11,20
147:23 158:16
disfavored 155:19
dispose 163:18
disposing 163:17

dispositive 147:8
disproven 156:9
dispute 94:4 154:16,17 159:18
159:20,24
disregard 59:13,25
dissolve 1:10 8:20 106:15
dissolved 58:24 62:16 92:4 93:9
94:8,16 113:4
distinguish 107:22 138:12
DISTRICT 1:1,1,12
DIVISION 1:2
docket 53:6
document 11:14,14 12:5 20:16
20:24 24:7 25:12,18,2 5 26:8,9
44:23,24 45:9,11 49:20,22
53:6,10 54:11,23 57:15 58:19
60:25 62:2,5,14 64:25 65:4,17
66:3,20 67:24 68:4,5 79:7,9
79:14,22 81:7 82:9 90:6,7 91:10
92:10 99:10 101:21,23 103:25
125:11,18 126:2 128:8,12,24
131:14 136:3 141:2 156:14
157:6,9,16
documentary 143:12
documentation 27:25 28:3,5,14
38:20 40:8
documents 11:19,22 12:1 25:15
53:16 68:5 89:4,6 107:4,6
128:15 141:2
doing 6:2 18:1 44:7 89:9 96:11
107:14 149:7
dollar 47:10 51:9 130:22
dollars 20:9 47:13 50:23 55:1
57:3 116:15 130:21,23,24
131:3 161:20 162:2
done 19:21 23:15 27:20 32:1
46:7,13,21 97:16 104:23
109:4 117:14 118:7 119:22
120:13 148:19 160:8
door 67:23 68:13
double 131:21 162:14
doubt 154:14
down 5:23 47:21 71:23 74:24
94:21 95:2 99:17 138:14
140:8 150:7 153:16
draft 26:4,7 44:22 79:9,18,19
84:1
drafting 24:6 25:25 26:8 27:7
79:20,22
drafts 79:14
drawing 108:12 147:18
drop 71:22
drug 113:1
drugs 61:21 104:23
due 15:24 98:17 143:23
during 10:10 22:23 25:2 29:13
72:4 121:21
duties 7:11 83:20
D-a-n-i-e-l 6:15
D-a-v-i-d 6:14

**E**

E 2:1 164:7,7
each 107:21 129:15 139:19
147:17 150:5
earlier 25:9 27:21 36:5 37:17
58:23 62:22 69:14 72:17
73:18 78:19 81:1 83:6 84:10
88:13 90:14 91:12,19 93:2
94:12 97:17 99:1 104:6 109:7
110:6 112:3 116:3 123:23
126:7 129:4 131:10 160:13
early 6:21 10:17 12:7 42:13
43:20 60:20 91:6,8,24 135:3
144:18,18
earn 139:13 155:23
easier 90:4
East 1:19

Eastern 62:5 91:14 121:14
easy 105:25 106:21 161:11
ECF 140:22
edited 83:23
edits 83:25 129:18,21
effect 59:9 156:10
effectively 148:7 155:23 158:1
effectuate 87:3 89:4
effort 20:4
efforts 19:25 45:20 46:3,10 53:2
67:14,18 68:9 86:19
ego 82:9
eight 146:2
eight-week 143:6
either 10:7 17:10 24:17 31:7
39:3 53:3 158:25
Eldred 125:16
electronic 149:8,9,17,19
element 93:16 156:5
eliminated 98:14,15
eliminating 20:4
ellipses 137:10,12,21
elsewhere 73:1
email 22:9 28:8,9,15 58:14,16
66:1,18 84:23 90:20,25 91:3
102:1,4,6 109:15,18 116:9
124:20,25
emails 63:6,13 70:4,5,6,7 149:20
150:4
emergency 1:10 106:6,15,23
employed 6:22 48:20
employee 27:5
employees 22:10
employment 37:18 101:2 156:1
encouraged 162:10
end 17:9,23 18:1,3 19:13 20:3
28:25 29:1,10,20 30:1,15,18
30:25 31:6 35:7,24 46:22 59:6
71:25 76:8 93:19 108:24
123:16 133:10 143:24 156:18
ended 20:6 131:2,3
enforceable 157:19
engage 47:6 96:15 145:20
147:14
enough 15:16 29:22,22 88:23
89:1 154:25 159:11
ensure 7:13
ensuring 32:24
entail 17:20
enter 35:23 126:3
entered 5:25 18:15,21 53:6 54:6
54:16,20 59:20 63:2 145:13
154:5
entertain 142:4 143:1 145:18
entire 20:12 55:4 57:20 59:6
62:10 102:15 148:1
entirely 143:10
entirety 47:12
entities 39:2 86:3
entitled 5:25 24:7 25:12,25 51:2
68:5 79:7 84:6 161:25
entity 9:11 39:10 67:15 82:10
83:10
entries 92:23
equation 158:14
equities 157:21 158:23
erroneous 118:17
erroneously 143:14
Eshel 3:8 48:2,10,15 150:2
especially 60:4
Esq 1:14,18,18,22,2 3 2:1,1 66:8
essentially 56:20
established 156:3
et 114:1 120:24 152:1
Ethan 39:22,23,24 43:22 52:25
53:3,5 87:24 142:5
even 34:24 40:24 41:5 46:17
58:1 59:12 76:11,23 90:2
118:16 143:8,13 144:17

154:10 159:6 161:23
**evening** 110:2 120:1 134:18
135:1
**event** 55:2 92:3 94:9 156:10
159:22 161:3,5 163:8
**events** 11:11 12:7 18:6
**eventually** 148:9
**ever** 28:3,6 40:13 42:18 43:4
52:17 70:1,7 119:22 121:3
**every** 15:12 73:9,11 151:3,4
160:6
**everybody** 111:24
**everyone** 5:2 40:3
**everything** 89:24 108:19 118:15
142:1
**evidence** 4:2 6:1 53:12,14 64:1,9
64:10,16 67:7 68:19,21 78:10
99:13,15 108:2 126:19,22
138:22,25 140:18 142:14,17
143:12 149:9 152:10,12 156:9
156:13,22 158:1
**evidentiary** 8:21 140:14
**exacerbate** 45:23
**exacerbated** 120:6
**exact** 31:3 74:6
**exactly** 40:8 74:3 78:17 98:10
114:23 115:4 118:12 162:15
**exam** 47:11
**examination** 3:5,7,9,11,13,16,18
3:20 6:17 44:20 46:17 48:17
90:9 96:2 100:23 130:17,19
139:3
**examine** 66:23
**example** 13:11 46:25,25 117:12
**exceed** 12:16,22 13:12 74:12
**exceeded** 12:25 13:4,13 16:2
18:12 74:15 75:15 76:6 77:10
97:6,12 105:10,11 130:2
**exceeding** 13:19,23 14:3,8 15:1
15:22 105:24
**exceeds** 75:8 76:1
**exceptions** 108:25
**excess** 14:2,5 52:18 77:6,8 151:7
160:7
**exchange** 20:21 22:21 27:4 56:8
98:13 114:5
**excuse** 10:18 15:2 20:16 49:25
55:15 66:25 110:4 112:11
136:10
**excused** 47:22
**execute** 40:19 56:19 160:19
**executed** 64:20 65:15 66:15 89:5
108:8 133:4 158:18
**executing** 11:10 62:17 107:4
120:13
**execution** 90:12 94:10 102:3
154:3
**executive** 48:23
**exhibit** 4:5,6,7,8,9,10,11,12,13
4:14,15,16,17,18,1 9 20:15
21:5 22:6 49:14,16,17,19 50:1
53:11,14 54:9,10,13,15 55:10
61:1,2,4,16,17,1 9 62:1,3 63:8
63:10,18 64:2,9,15 65:1,2,6,7
65:18 66:21,25,25 67:2,5,7,25
68:1,2,19,21 90:15,19,22,23
91:9,10 92:6,15 93:24 99:6,10
99:13,15 101:18 103:21,23
105:18,20 108:12 113:18
126:20,20,22 131:9 132:5
133:4 137:6 138:23,25 141:4
141:6,21
**exhibits** 4:1,2 53:17 64:10 89:18
140:17 163:25
**exist** 11:22 157:13,16
**existence** 97:25 158:19
**exists** 39:7
**expect** 123:7,10
**expecting** 27:14,15 157:6

**expedited** 146:1 149:7
**expense** 163:6,8
**expensive** 161:17,17 162:1
**experience** 132:8,21,22
**expert** 60:9 71:6,18 70 15,17
147:5
**expire** 151:3,4 160:6
**expired** 160:9
**expiring** 150:23
**explain** 7:15 16:2 68:11 117:5
120:9 122:14 139:11
**explained** 96:16
**explains** 71:22
**explanation** 8:9 16:6
**exposed** 52:10
**exposure** 17:3 74:1,5
**expressly** 162:10
**extent** 53:15 139:11 142:20
**extra** 98:17
**extremely** 52:9 129:22 151:1
**E-s-h-e-l** 48:15

---

**F**

**F** 164:7
**face** 154:8
**FaceTime** 133:15
**fact** 12:22 13:3 19:21 19:7,11,25
22:14 27:11 29:24 30:4,25
36:22 37:21 38:7 41:22 42:21
52:9 65:13 69:21 70:19 71:1
74:4 78:11 80:5 81:14 85:8,23
87:5,24 101:15 102:23 105:5
105:9 107:4 110:21 112:15
113:2 124:25 129:8 143:19
156:8,22 157:15 158:17,24
159:5
**factor** 93:16 94:15
**factors** 77:16
**facts** 76:20
**failing** 59:15,19
**failure** 93:14
**fair** 12:13 32:4,5 34:1 46:3,7
47:18 68:13 76:14 87:10
88:23 89:1 105:12 115:10
116:20 118:11 120:19 127:5
**fake** 92:23
**fall** 34:2 98:9
**false** 37:3,10 104:13 130:5
**falsification** 93:6 130:6
**falsified** 104:9
**falsifying** 18:10,25 130:1
**familiar** 24:17 48:24 49:8 67:14
104:25
**families** 86:3
**family** 85:24 86:4,5
**fan** 109:21,24
**far** 10:24 14:2 57:4 105:24
**fast** 145:17
**favor** 58:23
**favorable** 112:1,13
**Fax** 1:17,21 2:5
**FBI** 22:23 51:17,21,22 92:24
93:3 109:12,14
**feel** 38:10
**fell** 111:23
**felt** 34:18,23,24
**Ferguson** 2:7 164:12
**few** 40:1,10 41:12 45:7 57:9
86:14 90:11 95:4,20,25 99:2
116:9 128:3 131:10 146:9,10
146:12 161:11
**fight** 159:18 160:1,1
**figure** 96:22
**file** 85:13,18 163:24
**filed** 25:9 26:13 27:3 53:16
54:11 67:24 68:4 81:19 89:10
93:22 140:22 142:1
**filing** 88:14,22,24 89:2 133:20
147:8

**filings** 88:16 89:14
**final** 57:20 58:6 102:15
**finalizing** 110:7
**finally** 60:1,22
**financial** 20:11 25:8 38:6 43:17
46:9 48:21 49:4,6 83:6 85:12
85:14,15,25 86:3,5 157:23
**financially** 139:8
**find** 99:2 161:1
**fine** 149:4
**fined** 59:15,15
**finish** 74:25 75:1
**finished** 140:13
**FINRA** 7:20 22:21 51:18,22
59:16,21 109:12
**firm** 8:1 9:19,20,21,22 10:8
17:12 21:21 23:16 40:2,4,7
42:11 98:6
**firm's** 8:2 107:24 129:20 130:7
**first** 6:6 55:9 56:15 61:10 63:20
73:15 82:15 100:21 134:4,16
142:5 151:18 155:13
**firsthand** 69:7,10,13
**five** 134:1,4,8 160:7
**five-minute** 145:2
**fix** 157:8
**flat** 17:9,11,16,20,24 18:2 19:20
108:24
**flatten** 20:1 105:12
**flattening** 19:16
**flattens** 117:22
**flight** 144:14
**flights** 144:16
**Floor** 1:15
**Florida** 1:1,6,8,20 2:4,8 114:16
133:9 154:10 155:19 159:19
162:11 164:13
**flowing** 57:3
**fluctuations** 111:3
**focus** 131:18
**follow** 72:5 107:4
**following** 5:1 25:13 55:2 100:4
113:1 117:16 151:22
**Ford** 1:22,23,23 3:6,10,13,17,20
5:4,15,15,19,1 9 7:17 8:5,8,11
8:13 11:2,18,25 12:3 13:14
14:14,16,18 15:5,9,11,14
20:22 23:24,25 25:24 26:6,20
26:22 29:8 30:9,10 33:11
38:22,23 44:18 47:24 48:3,5,8
53:24 58:18 59:17 60:9 62:9
63:16,20,22 64:3,13 66:22
68:25 69:6 72:16 75:5,7
79:14,21 80:17 81:23 82:14
83:5 86:12,14,15 88:23,25
89:15,17 90:2,6 95:4,19,25
96:3 98:19 102:4 103:9 106:2
108:1 113:7 114:12 118:24
119:7 125:23,24 126:12,15,18
126:23 127:15,17,23,25
128:10,13,16,1 9 130:14
132:23 138:7,18 139:4,21
140:7,10,15,20 141:3,19,22,25
143:5 144:5,10,14 145:23,25
146:22,24 147:18 149:2,14,19
150:21 151:4,10 155:11
159:14,16 161:7,10 162:4,24
163:20,22
**Ford's** 141:5,14
**foreclose** 147:23
**foregoing** 164:8
**formal** 149:9
**Fort** 1:20
**forth** 12:10 27:25 56:3 105:17
117:23
**Fortress** 1:7 24:1 81:24 82:2,5
86:20 103:16
**forward** 144:6
**forwarded** 102:1

**forwarding** 66:18
**found** 132:17
**four** 146:17 160:3,16
**FPR** 2:6 164:11
**frame** 64:19 134:12
**fraud** 27:5 92:23
**fraudulent** 119:8,18
**fraudulently** 115:18 117:2
**freeze** 86:16,20 87:3 93:17
121:24 127:6 139:9 159:21,22
**frequently** 42:17
**Friday** 63:14 151:3,4
**friend** 33:20 34:6,9
**friends** 52:10
**from** 11:20 12:18 18:9 24:4 27:2
27:12,13,16 28:9,16 39:16
40:13,18,23 41:4 42:12,14
44:5,10 47:3 49:20 50:1 51:3
51:9 52:15,16 54:2,25 55:11
56:15,22 57:3 60:14 62:22
63:1 64:21 66:18 69:8,12 70:9
70:11,14,16 72:25 73:25 74:5
78:20 79:3 81:2 82:11 84:23
86:23 87:23,25 88:3,11 90:21
91:3,6,13,18,1 8 94:2 101:2
102:24 104:1 106:15 111:21
112:3 114:16,16 115:7,18
116:9 117:14 119:23 121:4,7
123:11,14 127:12 128:1
129:25 133:11 136:2 137:3
143:21 144:2,17 145:5 147:25
148:6,16 149:19,21 154:8
159:16
**front** 32:25 44:24 63:11,24 91:3
92:15 163:2
**frozen** 139:5,16,18
**full** 6:12 20:24 28:17,23 29:25
57:20 100:18 102:15 156:22
**fully** 35:25 36:1 89:5 129:5,15
**functions** 7:20,22 34:2
**fund** 10:2 122:20
**funded** 9:25 10:13
**funds** 8:4 9:3 10:11 20:10,13
21:16,19,24,2 5 22:2,4,16 24:4
36:24 42:8,10 44:12 47:16
51:5 53:22 54:2 63:1 69:8,11
69:15,23 70:9,16,20,23 71:4
94:2 109:1 115:8,15 127:12
143:11 148:14 154:2,23 155:1
156:2 159:1,7
**further** 23:21 44:18 45:11,24
47:20 56:17 68:22 77:11 78:9
81:2 89:15 92:5 94:19 95:14
98:20 99:16 114:9 123:11,14
130:14 138:13 139:21 140:5,7
140:10

---

**G**

**Gables** 2:4
**Gainor** 66:2,8,10 101:23 102:1
124:12,15,17,2 0 132:7,7,13
**gambled** 62:20
**game** 110:2,11,12,21
**garnish** 53:23
**garnished** 162:12
**garnishee** 156:7
**garnishment** 1:11 62:16 138:2
151:23 152:4,18,25 153:5,17
153:19 155:2,5,16 156:6
158:1,5 159:12 160:20
**Garrabrants** 24:11,16 40:11
53:3 64:24 65:19 66:21 67:1
84:5 87:18 90:16,21,23 91:4
91:16 103:22 104:2 110:7,14
110:15,20 121:8,16,21 122:2
122:5,9,10 123:3 124:2,5
125:4 128:25 134:5,11,16,18
134:21 135:3,5,9,16 136:7,11
136:22,25 137:3,24 149:23

gave 53:21 121:3 124:25
general 7:11 51:13
generally 7:15
Gentile 110:23
Gentilly 110:23
George 31:16,17 120:5 130:12
gets 162:3
getting 34:15 70:11 86:16 118:3
    131:17 162:13
GILDA 2:6 164:11
girlfriend 135:20,22 136:1
    137:23 160:12
gist 91:21
give 8:6,9 19:15 35:21 36:14,22
    37:2,9 46:25 55:4 92:12 96:11
    141:11 147:6
given 12:5,11,14,17 15:3 16:6
    28:3 83:15 93:13 105:22,22
    106:19 114:4 121:3 128:8
    144:14 147:16 149:7 160:2,4
    161:22
giving 36:24 55:5
global 25:4 103:1,3 113:9,13,20
    113:21,23 122:11 140:2 154:7
    159:8
go 8:23 10:12 17:9 41:25 42:2
    56:17 68:11 71:18 78:6 79:16
    89:22 90:3 92:5 99:25 110:12
    139:2 140:18 146:2 147:18
    148:8,12 152:14,24 153:18
    157:12 159:21 161:6 162:8
    163:9
goes 137:11 139:19 162:3
going 19:16 26:24 27:20 29:21
    30:11 36:8,9,13,17,19 37:2,8
    56:22 63:14 82:5 95:8 96:21
    96:24 104:22 110:18 111:24
    117:25 122:18,18,19,20
    123:10,13 124:11 128:17
    145:16 147:7 148:15 152:10
    152:11,15 155:16 157:22
    159:18 160:1,4,6,13 163:4
gone 37:13 42:7,8 81:20 105:5
gonna 137:9
good 5:2,3,4,8,15,17 6:19,20
    23:25 24:2 46:25 48:19 69:1
    71:18 76:12,14,15 96:4
    100:25 101:1 114:13 121:25
    144:1,12 159:17
gotten 157:4
gphofficialreporter@gmail.com
    2:9 164:14
granted 58:23
granting 56:1
great 162:21,22
greater 23:18 106:19
greatly 155:22
Greg 24:11,15,19 25:3,3 26:12
    40:11 45:15 53:3 64:24 90:21
    91:15 121:7 128:25 136:2
    149:23
Gregory 67:1
Greg's 24:21
Group 6:23
guarantee 40:20
guess 13:8 42:25 106:24
guts 148:23
guy 110:23 130:12

H

hac 5:9,16,20
half 20:9 47:10,13 55:1 57:3
    99:23 121:13 150:19
Hampton 1:14 5:9
hand 48:9 53:9 67:2 99:5,6
    100:14 128:4,17 131:13
handed 61:4 99:10
handle 75:20
hands 59:5

happen 98:24
happened 46:11 68:16 148:11
    148:20 156:9 157:7 158:18
happening 60:21
happens 107:11
happenstance 111:25
happy 128:3,4,10 142:4,25
    144:11,12 153:20
hardship 156:11 157:23
harm 138:5,12 139:11
harmed 139:8 155:22
hate 149:12
having 15:3 16:8 17:8 32:17
    42:14 43:18 44:3 58:4 93:3,6
    107:19 132:20 139:13 154:17
    155:24
head 31:11 137:14,17
headquarters 76:23
hear 46:20 67:22 130:21 144:1
heard 91:18 104:6 110:24
    142:16 147:12,25
hearing 5:24,25 140:14 144:7,9
    153:1 163:15,16 164:5
hearsay 142:15
Heat 110:1
held 5:1 10:7 100:4
Hello 114:14
help 7:13 99:4
helpful 142:22,23
hereto 57:21 102:16
hey 121:25
he'll 138:19
Hibiscus 68:12
hide 119:22
high 111:21 157:1 158:2,20
higher 116:19
highly 155:19
him 9:7 11:24 12:2 16:8,22,25
    17:6 20:12 21:24 22:14 23:5
    25:2,3 28:16 36:24 42:24 48:6
    56:21,22 57:1 58:10,10 59:9,9
    59:24 63:24 64:5,7 67:19
    72:15,18 75:1 81:3,12 87 85:3
    91:23 95:15,16,20,21 98:13
    110:24,25 111:1 120:10
    121:12 122:3 123:5 124:8,21
    128:12 130:13 133:2 138:19
    144:13,17 145:6 148:9 153:15
    160:14
himself 65:23
hired 132:24
history 106:21
hit 118:15
hold 81:9,14 82:5
holders 37:22
holding 9:12,14,22 28:18,23
    30:14
Holdings 71:8,12 72:2
holds 150:23 152:22
home 55:6 133:7,8 134:24,25
    135:7 136:14 156:15
honor 5:3,4,8,15,17,22 6:4,7
    7:17 8:5,8,11,13,16,18 11:2
    11:15,18,25 12:3 13:14 14:14
    14:18 15:11 19:2 20:22 26:20
    30:9 38:22 44:18 45:3 47:24
    48:3,8 49:14 53:11,17,24
    58:18 59:17 60:9 62:9 63:16
    64:3,13 66:22 67:5 75:6 86:12
    89:17 90:4 94:20,23 95:4,20
    95:25 98:19,20 99:16,19
    100:8 103:9 106:2 108:1
    111:15 113:7,10 125:23
    126:12,18 127:15,23,25
    130:14,16 132:23 138:16
    138:18,22 139:21 140:7,10,12
    140:15,25 141:10 142:6 143:4
    143:5,23 144:5,10,24 145:1
    145:22,23 146:9 147:3,21,22

149:6,25 150:8,21 151:16,24
    152:18 153:20,24 155:3,11,18
    157:10,20 158:4,7 159:10,14
    159:16 161:7,10 162:4,9,9,17
    162:24 163:13,14 164:1,3
HONORABLE 1:11
Hope 1:15
horrific 97:23
hour 99:23
hours 29:13 121:13 164:2
house 65:22 122:17 135:11
huge 111:21
hundred 17:23,24 117:19,24
    161:20 162:2
hung 123:2
hyphen 48:16

I

ID 4:5,7,8,9,10,13,1 5 49:17
    54:13 61:2,17 62:3 65:2 68:2
idea 81:21 82:23 83:24 160:13
identified 44:22
identify 53:15 89:20 141:8
identity 107:22
ID/In 4:2
ignore 35:4 60:3
ignored 35:3
immediate 57:8 154:23
immediately 104:4 157:8
impact 14:8 15:3
important 109:8 149:8 151:21
impose 156:10
imposed 27:22 28:7 59:23 75:22
impossible 29:21 34:19
impression 8:20 159:7
improper 38:13 111:16 119:20
inaccurate 109:16 117:4
inappropriate 161:22
inappropriately 157:25
incident 80:3 157:15
include 12:20,21 123:7 125:4,8
included 108:18 132:4
includes 68:5
including 149:10 156:17 158:12
incomprehensible 157:12
incorporating 61:24
incorrect 30:7,8 33:20 78:10
increase 73:12 112:18,25
increased 47:3
incur 50:20
incurred 14:1 37:11 42:25 56:25
independent 88:18
indicated 60:18,20
indicating 28:10
indirectly 37:12
individual 1:7 12:23 24:19 79:14
    80:21
individually 25:16
industry 137:9
inflict 155:20
influenced 60:7
inform 31:24 70:7
information 38:6 52:15 53:20
    60:2,6 61:25 62:22 69:22 87:2
    87:25 88:4 136:3 149:8,11
informed 31:23 110:15,20
    142:10
injure 156:6
injury 44:1
inquiries 70:11,13
inside 67:22 68:12
insist 20:24
instead 104:11
instruct 31:17,19 33:15
instructed 32:3,9 34:24 35:2
instructing 25:17
instruction 35:3,4,21 78:23
    120:10
instructions 22:10 79:3

insufficient 78:10 143:15 158:10
insurance 56:19
integration 57:11 58:4 113:24
    154:14
intend 6:2
intended 40:14 79:16 109:9
    115:22 126:3
intending 26:9 110:13 127:12
intends 81:9 160:12
intention 95:11 99:18 113:5
    114:7 156:8
interday 98:4,6
interest 9:13 55:8 56:1 101:9
    162:15
interested 145:25
interim 160:25
internal 23:14 117:9,22 118:13
intimate 73:7
introduce 140:16
introduced 89:18
introducing 9:21 140:21
inventory 22:11
investigate 18:4
investigation 18:23 51:17
involve 8:3
involved 9:2 24:6 51:8 78:20,23
    79:3,18,20,22 86:16,18 87:4,8
    101:6 158:17,21
involvement 82:2,4
involves 148:17
involving 43:21 50:20 51:18
    63:13 91:12 122:11
irrelevant 143:10,17
Island 6:23 65:24
issue 6:1 25:5 115:17 126:5
    142:15 153:5 161:21
issued 60:13,16 78:15
issues 12:6 92:1 161:11
i.e 45:24

J

J 1:14 4:18 126:20,22
jail 121:23 136:4
Janet 40:9
January 49:3 74:7 149:21
Jaskot 133:11
joint 163:18
Jones 1:18 5:13,13
Jr 2:7 164:12
judge 1:12 117:5 140:20
judgment 62:17 94:10,17 154:3
    160:18
July 146:18,21,24 147:5
jurisdiction 10:20
jurisdictions 89:9
jury 143:6
just 8:7,10 14:7 15:11 19:4
    20:12 26:24 27:12 34:21 36:2
    36:15,24 41:13 44:14 45:7
    46:2,16,17,25 54:22 63:12
    64:13 67:10 77:18 78:11
    80:11 81:21 86:4,12,14 89:2
    89:10,24 94:7 95:20,25 96:5
    97:1 98:24 99:10 100:8 111:8
    111:25 112:23 117:17 118:8
    118:19 121:3,20 123:4 126:6
    127:15 128:1,3 129:10 130:24
    131:10 137:3 138:2,10,11,18
    138:19,23 140:21 141:7 146:2
    146:24 147:9,14,15 148:8,20
    150:25 152:8,14,24 155:24
    156:1 157:4 159:9,14,21
justify 6:1 142:21
justifying 131:22

K

K 1:11
Katherine 133:11
keep 40:23 96:17,18 117:20,24

kept 41:5 142:9 156:24
key 153:5
keyboard 136:25
kind 13:8 59:24 72:14 147:16
  152:15
kinds 120:24
knew 21:21 34:10,13 59:22
  97:11 125:7 133:1
knock 68:13
know 9:5,7 24:15 28:15 29:11,12
  29:21 39:2,3,10,16 40:1,9
  45:20 52:11 54:3 56:23 59:1,4
  59:11,22,22,2,4 60:3 61:24
  62:19 69:18,20 70:21 71:24
  72:6,8,22,24 73:2,4,24 74:6
  75:17,24 76:3,3,10,22 77:13
  77:16,17 78:6,16 81:6,19
  82:17,18 84:9,14,18,21,23
  85:1,16 86:9 87:19 88:5,13,16
  88:21 89:12,13,14,25 90:17
  93:21,22 105:18 109:14
  110:23,25 113:19 119:14
  120:10 124:20 129:19 133:10
  145:5,15,19 147:10,17 148:22
  148:25 149:18,21 150:15
  156:5,7 157:13,20,21 161:11
  161:12,22 163:1,3,24 164:1
knowing 18:21,22
knowledge 9:13 27:1 45:23
  50:10 61:10 69:7,10 70:25
  72:14 73:8 87:23 105:4
  136:11 142:18
known 9:17 118:20 125:3
knows 118:12

### L

L 2:1
labor 157:22
language 154:13
large 18:17 108:10 118:3 129:22
larger 34:15
largest 21:17
Las 1:19
last 6:21 24:17 26:24 48:15 62:2
  65:25 66:3,4,5 98:9 99:20
  131:14 147:10
lasting 99:22 146:6,15
late 88:17 146:24 147:5 153:1
later 73:19 109:13 117:25
  121:13 140:17 144:3
Lauderdale 1:20
law 142:14 143:15 154:10
  155:19 159:19 160:20
lawsuit 85:18 93:21
lawyer 25:17 66:18 88:10
  101:24 124:8,9,12,12,15
  132:8,20,21,24
lead 72:18 100:10
leading 118:22 119:4
learn 82:21
learning 18:9 129:25
least 18:24 99:23 107:19 134:4
  143:21 146:8 162:14
leave 48:6 97:2 115:20,22
  137:20 138:2,18
leaving 138:6
led 108:8,10 154:21
left 59:7 121:11 137:10,12,22
legal 43:23 76:18 81:18 83:11,13
  84:17
legally 157:12,19
lend 148:7
lengthy 121:18 136:21
lent 148:15
Leon 2:3
less 57:4 130:22 151:5
lesser 163:2
let 43:2 61:15 67:10 75:1 90:16
  96:6 97:20 99:2 105:17

113:19 155:12 161:1,7
letter 141:9,12,12,15
letterhead 65:14
let's 18:5 47:1 49:16 54:22 55:9
  62:1 95:21 99:25 103:21
  121:25 129:10 137:5 140:18
leukemia 61:21 104:23 112:1,16
  113:1
level 47:5
levels 131:24
liabilities 15:18
liability 1:8 27:2,13,16 57:7
  82:12 122:18,19,20 123:11,14
liable 76:7
licensed 84:23
lien 55:4 56:9 107:1,5 122:17
  158:12
life 122:1 160:8
light 153:19 154:17
like 6:8 7:22 18:12 20:15 34:23
  44:3 48:2 49:13 60:25 64:24
  65:17 67:24 89:25 90:19 91:9
  92:6 95:5 98:24 99:5 101:14
  101:18 108:11 111:5 113:18
  117:20,20 121:25 126:6,18
  130:2 131:9 144:3 149:1,8
  150:3 152:24
limit 12:13 14:2,4 17:1 98:5,7
  105:11,13,21
limitations 10:21,24,25 11:5,6
  11:11 12:10,11,2 14:6 18:12
  47:8,10 130:3
limited 1:8 77:24 120:21
limiting 111:15
limits 10:24 11:9,19,21 12:11,22
  13:3,12,13,19 14:8 15:2,23
  16:2,3 27:22 28:1,6,11 59:23
  74:1,5,8,9,10,12,1 5 75:8,15
  75:22 76:1,6,13 77:10 96:6,8
  97:7,13,24,2,5 98:3,6,13,15
  105:17 116:4,8,10
Lindner 31:16,17,18,19 33:12
  33:15 35:11,12,21,23 45:16
  45:20 46:3,6,12 120:5 130:12
Lindner's 35:9 120:6
line 4:3 8:19 62:10
liquid 150:18 151:1
liquidate 55:3,4
liquidated 150:20
listening 135:12 136:1,6
litigate 161:13
litigating 161:24
litigation 156:18
little 41:3 90:13 92:5 115:13
  117:21,23 120:14 131:17
  141:1 148:9
live 121:12 160:12
lives 160:11
living 155:23 156:4
LLC 1:4,7 49:8,10,11 81:24,25
  101:15 103:16,18,18
LLP 1:14,19 5:11,13
local 5:18
location 133:5
long 17:10,22 54:23,23 99:21
  104:10 107:11 117:10 145:6
  146:5,14
longer 97:15 109:4 146:16
look 12:9 18:4,5,12 20:15 22:6
  55:9 63:10 65:6,17,25 90:15
  90:19 91:9 92:6,10,18 103:21
  105:20 106:21 108:11 113:18
  126:16 128:6 130:2 133:25
  136:18,19 137:5
looked 85:16,20,23 132:5
looking 63:17 142:13
looks 99:12 152:24
Lopez 3:4,12 6:8,9,14,19,21
  8:25 11:20 12:5 14:23 18:13

23:25 24:3,6 25:13 26:1,23
  27:11,21 32:8,11 33:17,23
  38:24 40:13 43:2,23 44:14,22
  44:25 45:6 48:5 52:2,6,9,16
  81:1 87:12,25 88:3 91:13,18
  91:23 92:16 93:2,5 95:13,15
  96:1,4 98:24 99:11 104:6,9
  105:9,14,16,2 1 108:11,15,23
  113:15,16 116:8,23 117:1,6
  118:8,20 119:1,23 122:8,10
  125:17 129:5,8,11,15,19,23
  130:6 147:25
Lorne 2:1 5:17
Los 1:16
lose 72:19 160:6
loses 73:12
losing 59:6 161:4
loss 13:25 16:14 17:1,2,14 20:4,6
  20:9,11,12 22:18 27:2,13 31:4
  31:12,13 36:11 37:11 47:10
  47:12 50:20,22 51:9 60:1 73:9
  77:4,17 92:25 96:12 97:21
  97:23 100:5 131:6,7
losses 16:9 31:1,6 33:2 41:5 42:9
  42:12,19,22,2 5 43:5,14,25
  51:18 52:3,7 78:9,20 80:1
  85:6 93:18 120:7,21 121:5
  156:22,23
lost 149:12
lot 77:22 149:11
low 157:18
lower 47:4 116:19
lunch 99:25
luncheon 100:2
L-o-p-e-z 6:15

### M

M 5:19 79:14 89:17
made 14:17 18:10,16 36:1 45:20
  71:1 73:2 79:25 80:5,9,23
  83:25 84:7 87:21 89:3 96:7,12
  96:16 98:10 118:19 129:18,25
  143:9,13,14 148:5 157:11
maintain 7:13 13:24 14:10,12
  15:15,16 41:14
maintained 41:23 42:5
maintains 42:10
majority 120:13
make 8:12 10:13 18:11 19:25
  20:10 26:9 36:15 53:22 56:18
  78:11 88:22 96:9 104:10
  110:10 115:7,21 117:7,11
  118:16 119:15 121:25 130:2
  141:7 142:11 145:1 148:8,12
  149:6,8 152:22 156:4 161:4
making 7:21 9:25 45:16 61:5
  70:8 88:16 92:23 98:8 119:2
managed 38:2,3 110:10
management 18:11,15,25 43:22
  43:23 117:8,13,15 130:2
mangled 41:3
manner 121:19 160:14
many 9:9 16:11 39:21,22 101:12
  116:11 122:9 129:8
March 6:21 9:16 10:17 11:11,12
  12:7,22 15:22,22 16:1,1,10,22
  16:22,24 18:7 19:25 22:18,18
  23:1,2 24:10 28:18,22 29:20
  29:24 30:4,18,21 31:5,7,15
  32:1,2,3,7,13,1 7 33:3,13,18
  34:11,22 36:3,6,13 37:3 38:7
  39:17,21,25 40:11,12,14,18,22
  41:4 42:13 43:20 45:17 46:19
  50:2,6,12,14,16,2 0 51:14 52:3
  52:3 54:21 60:8,8,16 61:5,24
  62:5 63:14 64:19 65:8 66:2,7
  66:6,12 70:17,20 71:2,12,14
  71:15,20 73:19,22 74:8 77:1,3

77:21,22 78:6,8,24 79:4 81:2
  82:16 86:17,25 87:3,6,17,20
  88:17 90:20 91:6,13,24 92:20
  93:3 94:1 97:7,12,20 101:6,6
  101:10 104:7,14,17 105:2
  108:8 109:13 110:2 111:3,13
  111:13,25 112:7,19 114:15,20
  114:22 115:4 116:1 118:5
  119:1 120:1,4,7,20 121:7
  122:2,5 129:3,4,9 131:22
  133:24 134:12,12,17 135:3,5
  136:10 139:6,18
margin 10:6 41:14 42:5,11 80:1
mark 62:1 88:5,6,7,9
marked 49:13,17 54:9,13 60:25
  61:2,15,17 62:3 65:1,2 66:20
  67:25 68:1,2 99:6 101:18,20
  108:12 131:9 141:19
market 7:21 19:18,22,22 29:14
  60:13 120:16
markets 9:12 29:17
marks 137:16
math 31:11
matter 11:15 20:17 44:23 51:15
  53:6 55:18 58:23 62:17 64:25
  67:25 68:5 81:19 94:16
  101:21 106:10 107:7 111:12
  112:6 140:23 144:7 145:18
  162:20 164:9
matters 57:22 102:16 142:10
Matthew 1:23 5:19
maximum 15:2 98:5 105:21
may 11:15 14:16,21 15:11 18:20
  18:21 26:20 37:16 38:22 45:3
  47:21,24 51:13 53:11 58:25
  61:13 74:25 78:5,14 86:12
  89:9 94:21 99:3,17 124:11
  126:5,12 127:23 138:14 140:8
  143:5,9 144:16 145:1 149:6
  151:17 152:17 153:23 159:14
  162:1,12
maybe 13:8 90:6 92:15 116:15
  130:22 142:20 154:7 159:19
  162:1,4
McComb 39:22,23,2 5 43:22
  52:25 53:1,5,2 1 62:23 63:6,11
  63:19 64:2,4 69:14,19,21,25
  70:2,3,8 87:24 92:7,21 93:23
  134:8 142:5,6,9,9,2 3 143:2,8
  143:14,16,24 144:2 145:3
  150:11 151:18 153:20
mean 18:13 21:20 32:20,21 41:7
  47:3 72:9,10 78:12 83:9 84:16
  89:25 109:2 113:16 141:7
  143:16 145:2,2 146:10,12,17
  147:21 148:22 152:18,24
  153:20 154:10 157:2 159:3
meaning 17:8,9
means 75:17 83:24 100:10
  150:24 162:18
mechanism 74:3,6
mediate 147:11
medications 112:16
meet 22:23 93:14 109:5
meeting 157:17
member 81:25 101:8,15 103:19
memoranda 89:18
Memorandum 126:20
memorialize 40:19
memory 137:3
mention 19:7 106:18 151:22
mentioned 15:1 17:16 19:6
  45:16,25 46:16 56:1 61:11
  62:22 106:1 107:17 110:13
  132:3 133:19 134:11,15 135:2
  135:16 138:1 146:1 151:24
  158:10 160:13
merger 49:3,3
message 20:21,23 22:12 97:19

messages 20:23 91:12 150:4
met 14:9 15:8 51:22 111:1 155:3
Miami 1:2,6 2:8,8 10:20 107:2
110:1 133:9 134:22 164:13,13
Micah 125:16
MICHAEL 1:11
Micheletti 150:3
microphone 6:12 48:13 100:18
mid 147:5
middle 21:17 163:4
might 72:18 76:21 85:25 91:23
99:4 117:6 143:25 148:9
155:1 159:23
million 20:9,14 23:19 31:1 36:6
36:14,18,23 37:3,9 40:25 41:6
41:25 42:1 47:10,13,14 50:23
51:9 52:19 55:1,7,11 56:8,9
57:3 64:21 67:11 71:3 73:13
74:11 77:2,3,6,8,20 78:1,12
85:9 94:13 98:5,7 102:9,20,24
103:25 107:2 108:8 113:5
114:21 115:5,11 116:15,20
120:18,21 121:5 122:17,17,20
125:25 130:21,23,24,24 131:3
131:4,5 139:14,19 150:19,23
151:8,10,11 156:14,16 158:11
158:12 160:7,18,23 162:6,17
162:25
mind 8:25 14:23 86:2 134:13
mindful 95:12
minds 157:17
mine 121:24
minimize 16:9,14 17:1,2
minimum 14:9,12 15:2,3,7
minute 63:12
minutes 45:7 82:22,24 90:11
95:5 124:2 125:16 136:2
misapprehension 8:22
mischaracterizes 102:4
misconduct 59:24
misplaced 127:16
Misrepresents 58:18
missing 109:7,16
misspoke 67:4
misstatements 64:5
mistake 157:8
mistaken 39:18 40:10
misunderstanding 150:7
mitigate 16:16 51:8 78:20
moment 38:22 86:12 98:19
Monday 55:2 144:18,19,20,21
144:23,24 145:4 151:19 153:9
155:6
money 22:8 36:8,9 37:12 44:15
54:3 62:20 65:13 72:19,24
73:2 76:25 93:19,20 108:2,25
114:16,19 115:18,22 117:21
138:2 139:14,17 143:13,19
148:3,7,8,13,15,17 154:17
156:18 158:20 160:11,15
161:4,4 162:20,21
monies 9:22 36:17 37:5 76:10
107:25
monitoring 130:9
monitors 118:14
month 6:21 139:19
monthly 37:22
months 116:9 139:17,19 146:9
160:4,7,16
MOORE 1:11
more 13:8 53:23 71:3 86:14
115:13 117:23 131:20 134:8
141:1 145:15 151:5,5,10
152:18 153:24 154:18,24
155:3 161:4
morning 5:2,3,4,8,15,17 6:19,20
18:15 23:25 24:2 42:13 60:12
60:23 76:24 91:6,8 97:20 99:1
135:3 145:9

mortgage 55:5 56:9 158:11
most 12:12 28:8,12 29:18 109:8
133:20 146:17 162:18
mostly 21:7
motion 1:10 8:20 106:7,14,15,23
108:20 113:4 151:22 163:18
motions 147:9
move 53:11,16 64:1,10 68:19
89:17 99:13 103:5 108:19
111:21 113:3 126:18 138:22
146:3
moves 66:20
much 6:7 11:7 16:14 73:2 76:25
114:19 139:16 145:15,20
146:6 148:23 157:10 163:13
Mullin 1:14 5:9
multiple 105:23
must 143:18 155:16
mutual 149:15 157:8
myself 31:20 43:21 128:25 129:1

N
naked 72:22,25
name 6:12 13:2 24:17 39:15
48:14,15 49:23,25,25 50:7,7
89:8,11 100:18,20,21
named 24:9 31:16
names 40:3,6
nano 77:15 31
NASDAQ 98:7
nature 7:15 8:7 84:14,16 85:1
154:21 159:8
near 131:3
nearly 34:18
Nebraska 88:17 89:13 142:6
necessarily 37:11 77:12,17
necessary 10:6 89:4 153:22,23
need 17:14 53:15 105:18 111:24
127:8 138:12 141:10,11
142:21 145:20 146:6,8 150:19
152:12 153:14
needed 10:11 12:17 41:5 55:3
110:16 118:3
needs 95:4 149:11 156:2 163:5
negotiation 24:7
negotiations 57:23 102:17
147:15
neither 17:22 22:16
net 13:24 14:10 20:9,12 21:21,22
36:10,11 37:15 41:17 42:1,2
46:9 109:8
never 36:13,22,24 41:4 42:21
43:6,7,10,12,15,1 6 44:2,4,9
45:9 70:3 71:1 80:5,11 94:14
116:9,10 119:19 137:8 160:8
nevertheless 105:6
new 1:24,24 46:1 107:21 133:12
news 71:18,20 72:4 112:8,10,12
112:21,22 131:22 132:1
next 47:23 48:1 79:17 100:5
111:22 137:8 138:15 139:17
140:9 143:7 144:18,18 148:8
160:7,16
night 110:21
nobody 67:22 68:12
none 54:3 149:25
Non-Service 68:6
normal 107:14 112:12 117:19
139:13
normally 141:9
North 2:8 164:13
notarized 131:15 133:17
notary 130:10,11,15,16
notation 61:23
note 5:7 15:11 55:7 62:9 64:13
160:10
notes 136:25
nothing 30:22 94:19 99:16 114:9
119:8 138:13 140:7

notice 75:6
notification 19:15
number 1:3 4:5,6,7,8,9,10,11,13
4:14,15,16,17,1 9 9:8 10:9,10
10:24 11:14 13:7 31:3,11
41:15,23 42:23 49:17 53:6,14
54:13 55:10,13 61:2,17 62:3
64:9,25 65:2,17 67:7 68:2,4
68:21 77:16,24 79:25 93:23
99:15 138:25 141:4,9
numbers 4:12 41:20 64:15
numerical 49:14

O
oath 95:23 106:9,10 112:7
object 64:3,6 79:12 89:24
100:12 128:7
objection 7:17 8:5,7,7,10,12,14
8:17,18 11:2 13:14 14:14,17
15:5,9,12,1 2 19:2 20:22 25:19
26:2 29:5 33:5 53:13,24 58:18
59:17 60:9 62:10 64:13 66:22
72:12 80:13 81:16 82:7 83:1
88:19 90:7 102:4 108:1,20
113:7 118:22 119:4 132:10,16
132:23 138:7 140:20
objections 8:15
obligated 74:4 75:9,24 161:13
obligation 10:3 54:25 76:4
102:12,20 148:14 154:12
obligations 50:11,12 55:24
obtained 86:23 87:25 106:15
obtaining 51:9 156:25
obviously 149:15 159:25
occur 10:14 19:16 71:12,14
occurred 11:11 16:15 33:2 45:12
52:3 90:14 93:6 104:7 111:12
133:24 134:16,21 136:9
154:24
occurring 16:10 18:6 64:18
134:1 158:16
occurs 41:16
odd 31:9
off 20:24 30:17 65:18 111:22
117:25 120:1,23 140:19
146:20 147:2 157:4 160:11,12
office 10:20
officer 7:4,10,11 33:25 34:25
38:10,12 48:23 76:18 105:16
105:21 164:4
official 2:7 49:20 116:10 164:12
offset 85:10
oftentimes 89:13
Oh 67:2 70:24 75:3,5 92:16
106:17 109:20 124:10 127:20
128:16 153:12
okay 5:23 6:6,25 7:2 8:14,22,23
21:11,13 22:13 24:17 25:11
26:7,11 30:12 32:22 35:18
41:10 42:13 43:3,16 48:7
55:20 63:22 81:1,6,8 85:21
88:11 90:5 92:14,17 95:1
99:18 100:1 103:11,24 108:15
108:23 109:18,20 115:14
124:24 126:5,17 137:7 138:21
141:13,16 144:3,8,25 145:8
145:22 146:5,18 147:6 149:4
150:1,9 151:15,20 153:3,10
155:6 158:8 161:9 162:8
163:8,23 164:2
Olas 1:19
old-fashioned 159:17
Omaha 144:17
omnibus 89:24
once 159:1
one 16:7 21:7,9,10,11,1 7 22:9
23:9,11 28:16 30:9 31:3,13,1
39:14 40:2,9 41:13,14 44:25
45:1,14 47:15 51:25 61:20

62:1 68:18 73:6,24 77:25 78:1
78:3 85:16 86:12 87:1 88:21
90:3,4 91:13 96:18 97:4 98:19
114:23 115:4 122:9 125:23
127:15 137:8 145:10,11
146:17 147:13 151:25 152:15
156:5 159:8 161:11,12 162:23
163:18
ones 28:12 34:3
one-person 103:18
online 164:2
only 70:19 73:7 74:7 81:5 88:2
94:23 97:14 114:5 133:1,23
136:11 138:19 143:10,16
148:5 151:2 155:23
open 40:24 41:5 46:1 77:14 86:7
96:17,19 97:3 151:2
opened 60:13 97:12
opening 89:19 120:11,12,16,17
120:23 140:22
operate 109:5 123:19,20
operating 7:7
operations 15:17,22,25 21:22
122:21
opportunity 19:19 58:9,13 64:4
64:6 66:23 91:22 103:9
opposing 100:9 128:14,16 163:5
opposite 156:23
options 150:24 151:1,2,5,5,11
155:25 160:5,9,14
oral 57:24 87:7,9,21 88:2 102:18
order 5:24 15:16 16:18 17:1,7
18:1,11,15,2 1 20:11 36:11
50:24 57:8 82:10 95:16 107:5
117:8,13,15 130:1 145:13
147:7 150:20 163:10
ordered 35:4
ordering 33:8
orders 35:23 77:13 120:13
ordinary 82:24 161:12
organized 92:12
original 84:1
Originally 121:11
OSJ 10:20
other 7:21 9:11 21:14 23:17,18
28:16 46:12 52:17 56:16,24
58:22 67:16,21 69:18 73:24
77:16 78:3,5 85:16 87:1 88:21
94:24 96:18 102:8 103:4
104:22 115:1,7,8 117:18
119:11,14 120:24 121:24
132:21 135:15 136:5,6 138:16
147:25 150:6 151:25 155:8,8
156:1,12,13 157:4,9 158:9,10
161:1,5
others 70:25
otherwise 56:23
other's 147:17
ourselves 96:14 128:2
out 10:11 19:7,11,16 20:1,1,8
21:15 29:2,3,11,19,23,25 30:6
31:23,25 32:4,7,9,12,14,18,19
32:22 33:9,12,18 34:7,10,11
34:13,19,22 35:5,22 45:17,21
46:6,18 51:24 61:23 71:20,25
72:4 73:13 74:17 75:11,12
78:24 79:16 92:3 95:15 96:22
103:22 104:11 105:11,12
109:3,3 112:1,13 114:23
117:21,22 120:18 121:1
132:17 133:2 137:12,13,17,20
137:22 143:13 148:17 156:6
160:14 162:17 163:5,17
Outbound 65:13
outside 44:16
over 21:19 40:25 41:5 53:13
59:10 73:3 74:1 78:16,16
96:25 97:2 109:2 128:5
130:12 139:17 148:24 150:23

151:12 154:16,17 158:16
159:18 160:7
**overall** 74:9
**overheard** 135:20,23
**overrule** 8:14 19:3
**overruled** 7:18 8:6 11:3 13:15
14:15,17 15:10 21:1 25:21
26:3 29:6 33:6 53:25 58:20
59:18 60:11 64:8 72:13 80:14
82:8 83:2 88:20 100:13 102:5
108:3 111:18 113:8 118:23
119:5 132:11,25 138:9
**owed** 113:5 159:4
**own** 8:4 9:3 101:12 107:22,24
118:14 129:21 130:19 161:18
162:16
**owned** 93:20 107:2
**owner** 125:16
**ownership** 101:8
**owns** 67:15 82:1
**O'Brien** 1:23

**P**

**Pacific** 91:8
**page** 3:2 4:3 18:6 20:17,18,20
21:17 50:1 55:9 56:4 57:13
65:18 66:5 92:10,18 93:24
108:13 131:14 137:5
**pages** 65:6,25,25 66:3,4 127:16
**paid** 47:14 55:5 85:11 102:20
154:17 159:5 162:16
**paint** 140:25
**paper** 140:22
**papers** 140:22 157:11
**paragraph** 12:9 18:8,24 26:24
26:25 56:3 57:15 92:10,18,20
93:23 102:14 105:17,20
113:25 131:18 135:4 136:18
137:5,21
**paragraphs** 18:6
**parent** 9:14 49:6 83:6,8,9,12,13
83:15,19 101:9,16
**part** 19:23 24:10 37:17 46:22
51:5 55:22 57:6 60:20 64:18
67:11 79:6 93:8 94:7,16
101:11 102:20 103:1,3 106:22
125:25 131:19 140:2 148:25
153:1 154:1 157:9 158:21
**participate** 120:16
**participating** 135:12,15
**participation** 29:22
**particular** 11:7,8 13:7 17:10,16
17:17 22:1 57:19 60:4 90:25
92:20 108:7 133:17,23 134:20
135:14,22,25 149:17
**particularly** 43:23 149:7,10
161:17
**parties** 38:14 57:21 58:12
102:16 136:12 146:18 148:1
149:9 159:18,20 162:5
**partner** 9:15 135:11,12
**partners** 52:10
**parts** 82:25
**party** 24:8 26:4,7 44:6,11,13
45:13 51:13 82:24 83:3 103:4
123:8 136:5 153:6 157:4
159:5 162:23
**past** 73:3 75:4,5 76:13 118:1
**PASTOR-HERNANDEZ** 2:6
164:11
**pay** 55:1 56:8 59:10 102:9
122:16 148:3,7,14 158:25
**paying** 20:12 36:16 76:10 113:5
114:7 139:13
**payment** 41:25 54:25 57:8
**payments** 114:6
**pending** 94:3 162:20
**people** 40:1,10 51:25 67:22
68:12

**per** 12:13 16:3 98:4,16,17
113:10,14 116:15,16 117:18
120:10,11 125:18 130:21,23
**percent** 55:8 60:23 62:6 104:13
104:19 105:5 111:23 112:18
112:25
**percipient** 71:10
**perform** 10:17,22
**perhaps** 58:1 90:2 95:15 111:7
150:18 161:18
**period** 22:24 89:14 143:1
**periods** 147:8
**permission** 13:12
**permit** 74:4 123:20 143:2
**permitted** 35:18 72:24 120:20
159:21 162:10
**perpetration** 27:5
**person** 23:16 145:5 155:20
**personal** 37:19,25 38:6,11 70:25
87:23 109:15 115:5 128:21
142:18
**personally** 38:2,3 87:21 148:3
**perspective** 148:6,16
**pertaining** 107:6
**Phase** 60:15
**phone** 20:20 25:10,13 26:14
27:17,18,19 45:15 70:1,3
121:7,10,16,18,21 123:2,4
125:21 127:18,21 128:1,21,25
129:9,11,12 134:18,20 135:2
145:6 148:2 149:10,11 150:3
150:3 157:4
**phones** 149:23 150:2
**photo** 20:20
**photos** 65:19,22
**phrase** 44:8
**phraseology** 36:15
**physical** 133:16
**physically** 145:3
**picture** 21:7 140:25
**piece** 101:7
**pierce** 82:13
**place** 29:16,18 30:17,23 31:19
35:11,12,18 58:24 72:11,18
72:25 104:15 105:6 107:24
116:1 138:6
**placed** 29:13 30:21 31:14 36:4
74:1 77:13 80:11 81:12 107:1
120:3 128:21
**placements** 7:22
**places** 72:2
**placing** 80:15 116:12
**plaintiff** 1:5,14 5:10,12,14 6:1
155:4 159:21
**plaintiffs** 156:7 157:23 158:3
160:17
**Plaintiff's** 4:5,6,7,8,9,10,11,12
4:13,14,15,16,17,1 9 6:9 48:10
49:17 53:14 54:13 61:2,17
62:3 64:9,15 65:2 67:7 68:2
68:21 99:15 100:15 138:25
**plan** 104:15 105:6
**plane** 95:13
**plans** 110:17,17,20
**please** 5:2,7 6:8,11,12 9:1 14:24
21:18,18,18 26:25 41:1 48:9
48:12,13 55:15 84:19 92:18
100:17 106:11 108:25 109:1,1
111:9 136:19
**pledge** 40:14,15,2 0 86:23 87:5,7
87:9,11,21 88:2 91:1 94:3
102:11 134:5 135:6 139:25
158:25
**pledged** 55:12,20,23 56:8
**plus** 31:11 111:23
**pocket** 148:17
**podium** 106:3
**point** 15:21 16:1 19:17,19 21:17
22:3,5,19,23 29:7,9 34:16

52:12 64:20 75:25 77:10
100:12 137:8 144:7 147:22
150:22 151:6 152:9
**pointed** 162:17
**pointing** 103:22
**policies** 56:19 75:18,22 78:7
**policy** 76:12
**Ponce** 2:3
**Pope** 126:9,19,24 127:2,5
133:19
**Pope's** 141:5,11
**portion** 137:23 140:14 150:18
**position** 7:3,9 10:24 11:9 12:25
13:24,25 16:11,12,13,15,20
17:8,10,10,15,16,20,21,23
18:2,3,17,17,2,2 19:8,11,13,20
20:1,3,8 21:15 22:16 24:21
28:17,23 29:3,11,19,23 30:1,6
30:11,14,24 31:9,23,25 32:4,5
32:7,9,12,14,18,19,2 3 33:9,12
33:18,23 34:7,10,11,13,14,17
34:17,19,22,2 5 35:2,5,9,25
40:24 42:24 45:17,21 46:6,10
46:18,19 47:3,4,12 48:22 52:8
52:8 56:18 73:12 78:17 79:4
88:11 96:6,10,17,19,20,22,24
97:2,4,5,21 98:4,16,17 101:11
105:7,12 116:15,16 117:10,21
118:2,3,13,17 120:17 129:12
129:16,20,22 130:13,25 131:2
131:4,5,8,23
**positions** 9:22 15:17 18:16,18,20
35:22 36:4 42:6 45:24 46:1,23
55:3 60:8 71:25 74:17,18,23
75:9,12,12 98:5 104:10,11
105:23 107:12 118:12 119:23
121:1 129:5 130:23 150:20
151:2
**positive** 60:14,21 62:6
**possession** 38:9,16,21 69:22
**possibility** 95:6
**possible** 25:4 33:14 85:24
118:16 121:23 144:2 145:4
147:24
**possibly** 26:19 92:22
**post** 161:13,20
**posted** 162:6
**potentially** 10:19 17:3 18:22 37:6
89:8
**practical** 81:19 156:10
**practice** 76:12,14,16,16
**precipitated** 59:8,25
**precipitous** 71:22
**precise** 13:8
**precluded** 81:2
**prefer** 49:14 144:14
**premarket** 62:6 104:18 105:5
120:11,14,15,23
**prepared** 6:3,4 45:11 95:7
145:16
**presence** 133:16
**present** 60:18 134:19
**presentation** 94:22 95:3
**presented** 11:16 155:15
**presenting** 60:17
**preserve** 149:9
**preserved** 149:12 150:6
**president** 24:22,23,2,4 48:23
**press** 60:13,16 61:15,19,22
104:25 105:6 111:21,25
112:17,17,23
**pretrial** 145:13,21
**prevail** 156:19 160:24 161:5
163:8
**prevailing** 154:19
**prevails** 162:2
**prevent** 18:9 78:8 129:24
**prevents** 56:22
**preview** 145:14 147:17

**previous** 46:5
**previously** 46:24 59:15 68:4
96:1 131:21 139:1
**prexigebersen** 62:7
**price** 31:8 71:12,15,22 105:5
111:3 112:19,25 117:9,14
131:20,22,23
**primary** 7:20
**principals** 51:10
**print** 120:11,12
**prior** 12:18 13:13 21:13 26:13
27:4 46:8,14 57:22,25 58:2,5
58:11 60:16,19 66:17 78:6
84:3 93:24 98:15 102:3,17
104:14 111:20,24 112:3,19
114:1 117:15 131:24
**private** 7:22
**privilege** 55:20 79:10
**privileged** 79:13
**pro** 5:9,16,20
**probability** 154:18 157:1
**probably** 9:10 99:23 101:13
108:17 116:13 125:16 139:20
146:17 157:18 161:18
**problem** 16:19 46:13 62:16 94:9
94:17 95:18,19 106:4 149:13
149:14,24
**problems** 46:4 93:9
**procedurally** 8:19
**procedures** 12:24 23:14,15
28:15
**proceed** 6:3,5
**proceeding** 133:17
**proceedings** 1:10 5:1 100:4
106:7 164:9
**produce** 157:25
**produced** 11:19 112:16
**profession** 107:15
**profitable** 120:25 121:2
**profits** 139:14
**promised** 36:5
**promises** 20:10 158:24
**prong** 142:21 156:25
**pronouncing** 24:16 69:1
**property** 56:2,10 107:1 156:12
156:13 158:9,10 162:12
**proposed** 57:23 102:17
**proprietary** 7:21,25 9:2 29:13
35:15,19 41:8,11,15 42:6 98:9
116:12 119:12 130:9
**protect** 82:10,11
**protecting** 162:19
**prove** 105:25 106:21 160:3,18
**proven** 143:20
**provide** 23:7 37:18,21,22 38:13
38:16 56:7,9 64:20 124:17
128:3 150:22
**provided** 36:19 56:12 163:3
**provides** 58:12
**provision** 56:6
**provisions** 57:9
**proximate** 31:1
**public** 93:20,20 133:11
**publication** 61:5
**pull** 42:11
**pump-and-dump** 107:8,10
111:4,14 112:2
**punitive** 56:24
**purchase** 9:3 11:7 15:23 35:23
151:5
**purchases** 10:3,7 13:4 18:16
**purchasing** 8:3
**pure** 19:22
**purported** 88:2 136:21
**purpose** 55:23 122:22
**purposes** 10:1 38:17 41:15,24
42:5 145:17
**pursuant** 113:6 129:19 158:12
**pursuing** 62:19

purview 34:2
put 6:1 56:14,18 98:18 101:13
    105:24 113:12 114:22 115:4
    137:20 142:17 145:16 160:22
    161:19
puts 73:13 143:23
P.A 2:2
p.m 32:7,13,17,19 33:3,13 34:11
    73:19,22 77:3 83:6 87:17 89:7
    100:2,4 121:14 134:17,17
    136:10 164:5

**Q**

qualification 112:20
qualified 35:11
quantity 17:22
quarter 100:1
question 8:25 9:2 14:18,23 15:7
    15:12 21:4 28:20 32:11,12
    41:1,25 55:15 70:13 74:25
    79:17 80:19 103:10 111:9,16
    114:4 117:17 142:5 143:10,24
    148:8 147:10 152:15 156:5,12
    157:1 161:10
questioning 8:19
questions 11:23 23:21 44:18
    47:20 68:22 86:14 89:15
    95:15,20 98:20 111:7,8 128:4
    130:14 131:10 139:21 140:5
    142:2
quickly 96:5 144:13 146:4
    158:22 163:10
quite 41:2 60:22 90:22 156:12
    161:16
quotation 137:15
quotations 136:21
quote 137:5,18,19
quoting 81:9

**R**

R 3:15 90:21 100:15 139:1 164:7
raise 48:9 60:19 100:14
ran 120:15
rather 37:21 144:3
reached 51:24 125:21 133:2
    147:12
reaching 93:16 162:5
read 26:23,25 27:12 53:4 57:19
    94:7 102:2 114:2 123:23
    154:11 157:3,3
real 56:1,10 107:1
realize 34:7 163:6
realized 14:1 31:1,6,11 108:25
    125:11 126:1 157:7
really 31:12 71:19 143:23
    152:18 153:5 156:2,10 158:1
    158:4,9,13 159:23 160:3,11
    160:20,20 161:25 162:19
realtime 118:14
reason 33:17 93:8 125:25 127:6
    132:13 147:13 155:19
reasonable 152:25 153:25
    154:18,25,2 5 160:10 162:18
reasons 58:22 92:2
rebuttal 140:11
recall 11:10 13:16 16:4,6 24:10
    24:13,13 25:4,10,12,25 26:12
    26:15 27:7 28:9 31:3,4,7,7,12
    39:22,23 40:3,8,12,22 42:14
    42:20 43:18 44:3,12 45:10,18
    48:6 63:3 87:14,14 93:2,5
    94:5 96:5 98:8,10,12 106:9
    107:8 121:10,16 124:5,7,8
    127:2 133:20 135:25 137:3
    138:3 160:22
recaps 105:25
receive 52:15 103:4
received 4:2 11:20 28:15 53:14
    60:14 62:22 64:9,15 67:7,10

68:21 84:11,21 99:15 107:6
    121:7 124:2 125:19 126:22
    128:2 138:25
receiving 28:9
recent 12:12 28:8,12 133:20
recently 88:11
recess 100:2 150:13
recital 55:10,17 79:24 81:5,8
recitals 55:9,16 79:24 154:14
reckless 52:11 73:5,10,14 93:15
    156:21
recklessly 72:20
recklessness 52:8 59:4 62:19
recognize 12:5,8 20:18 22:6
    49:19 61:19 68:7 101:21
    131:14
recollection 26:18 27:19
reconcile 17:25
record 6:13 26:25 48:14 89:14
    100:19 137:23 138:11 140:19
    141:1,7,8,22 143:12 146:20
    147:2 150:17 153:24 156:13
    157:22 159:11
recorded 136:16
records 127:19 128:1 130:7
    143:21 149:17,19 150:4
recover 51:22 93:18 94:9
recoverable 163:8
recross 47:24
rectify 16:9 20:11 46:4,13
red 21:10
Redirect 3:7,11,18 44:19,20
    89:16 90:9 130:15,17 140:6
reduce 16:9 17:3
refer 18:6
reference 113:12,20 158:9
referenced 55:16 61:23 67:11
referencing 18:14 89:13
referred 25:3 55:20 66:12,13
    107:7 108:24 131:10 134:16
referring 6:25 60:6,6 61:8 80:24
    80:25 90:1 113:13 117:6
    149:18 157:15
refers 55:10 81:5 109:21 114:5
    157:13,14,15
reflect 21:6 128:4 140:4 157:6
    157:17
reflected 65:13 114:6 123:4
reflecting 68:9 128:20
reflects 107:11 128:24
refresh 26:17
regard 13:6,22 51:20 52:5 59:21
    92:6
regarding 22:7 25:5 60:13 61:20
    62:23 79:7 81:12 84:24 92:21
    112:21 124:17 156:9
regardless 129:18 143:24
Regards 66:7
registered 7:19
regular 53:1
regulations 11:6
regulators 22:19
regulatory 7:13
reimburse 10:4
reimbursed 51:5
reimbursement 51:9
related 23:18 149:20,20
relation 38:3
relationship 9:17 49:4 50:16
    51:1
relative 20:2
release 27:15 56:6,14,25 60:13
    60:17 61:15,19,22 86:9 103:4
    111:21 112:1,17,23 114:5
    122:18,19 123:10,14 125:4,8
    125:19 136:3 162:13
released 27:1,12 110:18 122:19
    125:18
releases 104:25 132:4 154:14

relevance 113:7
rely 142:14,15
remain 58:24 139:16
remaining 19:13 93:10 158:5
remarks 142:3
remember 25:17 26:14 40:6
    45:6 60:23 81:3 97:19,25
    121:8
remind 33:23
remove 54:2 69:11 70:16,20
    72:24 94:2 115:14 127:12
    143:11
render 18:1
renderings 65:22
reneges 159:2
repeat 27:11 28:20 38:18 111:9
repeated 70:8,15 143:14 158:24
repeatedly 142:17
rephrase 37:7 41:1 43:2 84:4,20
reply 89:19 126:20 140:22 141:6
reported 2:6 22:19,20 51:21,22
    69:19 70:24 94:7
Reporter 2:7 164:12
Reporter's 3:22
reporting 60:17
reports 92:20 93:24 104:18,21
    112:17
represent 23:25 40:18 79:25
representation 84:14,16,17
    153:4
representative 115:21 142:24
    144:2
represented 43:12 58:9,15
representing 132:22
request 32:25 38:8,20 40:23
    48:3,5 64:4,6,20 65:10,11,14
    66:22 94:12 102:23 103:25
    104:4 114:23 115:4 143:1
    149:6,9,15 154:23
requesting 124:8
requests 70:16,19 71:2 115:1,7
required 6:1 16:13 17:4,12
    22:21 23:7 32:18 37:18 51:23
    75:11 158:22
requirement 15:19 16:17 23:14
    36:11 42:2,12 59:14
requirements 7:14 10:6 13:23
    14:9,13 15:4,8 16:12,16 17:4
    17:13,14 36:10 37:15 42:5
    109:6
requires 152:25
residence 107:1 158:11
resigned 88:12
resolution 25:4 58:2 94:4 154:7
resolve 51:15 121:18 145:18
    147:19
respect 10:16,22 11:5 57:21
    58:17 59:3 60:6 62:15 102:12
    102:16 103:15 107:18 125:1
    131:2 136:9 141:11 143:23
    152:3 158:15
respectfully 11:25
respond 158:7 159:14
responded 68:13
response 108:15,23 111:16
    113:4 124:6
responsibilities 83:21
responsibility 36:2 42:19,20,21
    43:5,8,13,2 4 52:24
responsible 32:24 35:15 36:1,1
    52:7 76:9,9 81:9,15 82:6
    121:4 130:8,12
rest 150:19,23
restart 147:15
result 47:10 101:5 111:4 139:8
    148:20
resulted 43:13 47:12 56:24
    131:20
resulting 80:1

results 60:14 112:1,13 132:2
    160:14
resume 122:21
retract 26:13
retracting 27:4
return 68:5 106:2 126:6
returned 82:18 84:6
reverse 49:3 117:12
review 23:15 54:22 58:10 128:8
    128:18
reviewed 58:16 66:6 75:23 124:9
reviews 38:17,20
Reynolds 1:7 3:15,19 5:6 9:5,13
    10:16,19,21 11:5,7,10 12:7,10
    12:16 13:3,6,11,18,21 14:3
    16:1,8,18,25 17:6,17 18:1,8
    18:24 19:6,7,15 20:7,16 21:8
    21:9,14 22:3,7,12,14 23:4,7
    23:18 24:1,3,8,11,14 25:13,13
    25:15,18 26:17 27:22 28:3,6,7
    28:9 29:24 30:5,17,22 32:9
    33:9,21 34:6,9,10,15 35:4,12
    35:19,24 36:2,5,13,16,22
    37:2,8,18,25 38:2,6,13 40:14
    40:19,23 42:1,19,21 43:4,23
    43:24 44:4,9,15 45:12,25 46:4
    46:14,18 47:6,9,14 51:18 52:7
    52:10,12,18,2 2 53:21 54:1,7
    54:16,25 55:1,23 56:7,15 57:4
    58:1,9,14,14,17,2 5 59:2,8
    60:7 62:25 64:19,20 65:14,23
    66:2,11,16,1 7 67:15 69:8,11
    69:15,22 70:8,12,14,14,15,19
    70:22 71:1 72:6 73:2,5 79:6
    79:25 80:5,8,9,11,19 81:2,12
    81:14,20,25 82:10,11,11,16,18
    83:23 84:1,5,10,21,24 85:3,11
    85:13,19 86:1,7,16,23 87:6,16
    87:21 89:21,23 91:3 92:22
    93:13 94:1,13,25 95:6,10,11
    95:16 96:5 97:19 98:3,8,12
    99:18,20 100:6,15,20,25
    114:13,15 115:25 119:25
    120:19 125:3 127:18 128:1,10
    128:20 129:23,24 130:19
    138:18 139:1,5,25 141:19,24
    143:11,18,22 148:1,3 149:2
    149:10,11,21 150:24 151:3,9
    151:13 154:22 155:21 156:11
    156:15,21,21 157:22 158:25
    159:6 160:4,8,11 161:15
    162:19
re-ask 9:1 14:24
Richard 1:7 5:6 100:20
Richter 1:14 5:9
right 11:17,22 24:16 26:21 45:4
    48:9 49:16 53:18 54:12 56:20
    64:14 76:5 86:6 90:5,25 91:8
    93:3 95:7,21 96:21 97:4 100:5
    100:14 102:12 103:19 104:7
    105:7 107:25 110:11,21
    120:17 126:13 127:24 129:21
    141:4 142:2 143:12 146:23
    149:4,5 150:12 152:2,17
    153:15 156:25 159:22 161:17
    162:3
rights 50:10,11 83:20 160:4
rise 164:4
risen 60:22
risk 107:14,23,2 5 108:4 162:21
risks 16:16
road 150:7
Robin 144:19
Rodriguez 2:2
role 76:18
Ron 124:12,15
Ronald 66:7
room 73:18,20
routed 97:5

routines 117:18
RPR 2:6 164:11
rule 8:10 20:25
rules 11:6 59:13,25 163:24
run 69:13 156:2
runs 112:2
rushed 158:16
R-e-y-n-o-l-d-s 100:21
R-i-c-h-a-r-d 100:21

**S**

S 1:18
sale 43:14,25
sales 10:3,7 46:21
same 17:21 39:10 49:12 50:4,13
78:16 89:10 91:9 110:6
111:20 119:4 121:1 134:18
158:2,2
San 76:23
satisfied 37:14,15 154:4
satisfy 58:25 142:21 161:2
satisfying 55:24
saying 84:24 87:1 125:17 136:25
138:3
says 18:8 21:11 66:5 80:23 81:8
88:1 129:23 130:6 131:19
137:8 140:3
scenario 111:5
schedule 95:1 144:9 146:1,25
149:7
scheduling 145:13
scheme 107:8 111:4,14
Scott 1:7 3:15,19 5:5 22:10 24:1
25:4 28:9 29:24 32:9 33:20
36:16 37:8 40:14 42:18 45:15
47:6 72:6 79:6 80:8 81:11,14
82:15 83:22 84:1 90:21 91:23
98:12 100:6,15,20 127:25
139:1
screenshot 21:5
seat 14:20
seated 5:2 6:11 48:12 100:17
SEC 7:20 51:23,24
second 18:5 30:9 50:1 68:18
81:8 92:10,12,1 8 95:7 125:23
127:15 138:10 145:11 161:16
seconds 95:25
Secretary 88:17
secreting 152:1
secure 162:12
securities 6:23 7:19 8:3 9:3 10:7
10:19 22:21 27:2,4,12,22
28:18,23 29:2,16,22 32:21,22
33:2,4,24 35:9 36:6,10,20
38:4 40:15 49:2 59:2 71:6
73:16,22 85:5,8 97:16 104:15
107:12,18,25 116:5,13 117:10
119:11 123:8,11,13,18 125:17
131:23 132:18
security 11:7 12:14 13:8 15:3
23:3 56:1 91:1 105:22 106:19
164:4
see 57:10,17 62:8,21 63:13 65:19
66:3,5 90:21 91:1 92:25 99:2
99:4 102:19 105:16,18 113:20
113:23,24 114:2 117:9 118:15
129:10 132:1 136:22 145:4,7
148:19 150:10
seeing 62:19 131:19
Seeking 61:23
seem 127:16
seemed 27:19 59:13 60:1,2
seems 65:17 142:19 145:14
162:18 163:7
seen 53:4 65:4 70:4,5 84:23
91:12 105:14 118:10 126:9
147:17
sees 118:14
selection 143:7

sell 9:3 10:25 11:8 104:15
117:23,25
selling 8:3 17:17
sells 98:6
send 20:10 21:16,18,24,2 5 22:4
22:7 25:17 36:6,8,9 42:1
109:1
sending 20:13 22:22 25:12 84:3
97:19 123:3 124:6
sense 86:18 148:5
sent 22:9,17 26:17,17 28:7,8
54:4,4 82:15,17 83:22 84:1,5
97:22 102:6 104:1 115:1
124:1,20,21 125:4,7
separate 39:2
September 147:3,6 159:19 160:1
160:3,17
series 63:13 108:17
serious 93:22
serve 67:15,19 68:9
served 161:23
server 68:11
services 10:16
SESSION 100:3
set 5:23 12:10 56:3 90:3 105:16
116:10 144:7
sets 27:25 120:23
settlement 10:1 24:7 54:6,10,15
54:20 55:11 56:3 57:10 58:11
59:20 63:2 66:15 67:11 79:7
79:24 82:15 83:22 84:6,11,22
85:21 90:12 91:22,24 101:20
102:8 103:8,15 106:25 110:8
110:16 113:6,9,12,19,20,21,23
114:7 122:11,15,22 123:3,7
123:16,24 124:1,18 125:3,7
126:1,2 132:5,14 134:2 140:1
140:3 147:11,15,23 148:16
154:5,8,8,12 157:2 158:13,15
settling 9:22
seven 108:17
seven-page 54:23
several 52:4 94:2 137:20 139:17
severe 156:11 157:23
share 71:12,15 72:3,3 78:1
101:14 105:13 112:18 117:13
131:23
shared 38:6
shareholders 93:18,19,21
158:21
shares 10:3,25 17:22,23,24 31:8
47:1,2,3,7 77:20,23,24 78:1
78:12,13,15,16 84:6,11,16
105:10 112:8 117:19,20,24
118:1
shelf 92:15
Sheppard 1:14 5:9
short 17:10,18,21,22,2 4 18:3,17
18:17 19:13 20:7 31:8,9 34:14
34:17 43:13,25 45:24 46:19
46:23 47:1,2 57:19 104:11,15
104:16 105:7 107:11 111:24
112:3,23 117:10,20,21,24
120:22 131:23
shorts 46:21 72:22,25 112:3
shot 147:16
show 60:25 61:15 64:24 67:24
101:18 118:17 128:12,14
showed 26:16 98:25 132:1
showing 104:18 106:22 143:22
156:14
shown 138:23 153:2
shows 111:1 143:12
shut 74:24
sic 73:15
side 147:25 158:23
sides 145:14 147:16 158:17
159:25 162:19
sign 45:9 110:10 135:6 154:11

signatory 132:4 157:3
signature 54:18 101:21 131:15
signed 12:6 58:2,11 65:14 66:7
79:15 82:18 84:7 94:13
101:23 102:23 103:15 110:16
114:3 116:9,10 124:1 125:5,9
125:12,18 126:2 129:23 154:6
154:16 159:1
significance 62:14
significant 59:1 112:8,10,12,20
112:22 113:2 117:18 132:1,21
152:19
significantly 96:12 111:22
signing 84:22 110:7 123:24
154:22
similar 119:2 120:25 161:2
162:15
simply 82:10 128:11 156:3 160:9
160:15 161:21
since 50:14 114:15 118:6 139:6
142:11 149:6
single 81:25
sir 20:18 47:19 66:4 69:5 72:2
73:15 74:25 95:24 101:4,21
102:23 105:19 108:14 109:7
115:3 128:13 163:20
sit 147:24
sitting 73:18,20
situation 16:9 45:24 52:11 56:14
77:17 93:22 121:19 159:23
six 129:11
six-page 54:23
size 16:15 18:22 62:20 117:10
121:1 129:16,22 130:13 131:7
small 77:23,24 112:13 113:3
smaller 34:15
software 92:24
sold 17:23 111:22
sole 36:1 103:18
solely 36:24 39:4 73:6 79:19
solid 154:15
some 14:8 15:21 16:8 18:14
19:17 21:11,15 22:3,5,18,23
22:25 23:8 25:6,22 31:9 34:16
35:23 43:21 52:1,12 63:5
64:19 83:18 90:3 91:12 92:1
108:17 116:19,19 130:23,24
135:20,23 136:25 147:7 148:3
150:6 154:2,6 161:1
somebody 76:21
somehow 14:8 109:3 132:3
141:8 160:4,6
someone 12:18,20 37:1,8 43:19
52:21 73:18 79:16 136:5
something 15:1 59:12 60:18,21
62:21 82:12 107:14,18 145:17
145:19 148:19 149:1 160:23
162:6 163:5,17,21
sometime 146:18,21
sometimes 107:11 109:25
117:11,14
somewhere 101:13
soon 157:7
sooner 144:3
sorry 14:24 21:4 24:14,23 27:15
28:5 31:10 38:18 41:1 44:7
54:23 63:16 67:4 70:5,13
76:17 89:21 95:9 97:1 98:3
103:2 106:12 135:21 137:19
144:22 146:11 153:12
sort 57:6 118:17 137:1 148:5,16
157:14,20 161:11,21
sought 157:25,25
sound 149:1
source 88:2
South 1:15
SOUTHERN 1:1
Spartan 6:23,25 7:3,5,7,9,12,16
7:19 9:8,11,14,16,21,23 10:3

10:5,17,19,23 11:6 12:18,22
14:2,9,12,13 15:8,15,21 16:10
18:2,9 19:25 20:6 22:22,23,25
23:8,12 27:2,12,15,15,22,25
28:18,23 29:2,16,25 30:14,18
31:14,21 32:20,21,22 33:4,10
33:24 35:9,13 36:6,9,17,19
38:3 39:7,12 41:11 43:22
50:17,19,20,2 4 51:1,3,9,14,18
51:21 58:1 59:20 73:16,22
74:12,15,16 76:25 78:24 79:4
80:9,9 85:5,8 91:18 92:22,24
96:7,16,21 97:6,12 98:11,18
101:2,10,16 108:9 109:4,13
116:4,12 118:6 119:11,17
121:1 122:11,18,19,20,23
123:8,10,13,17,19,2 0 125:5,17
128:25 129:25 130:8 131:22
132:3,4 148:4,7,12,19 149:21
150:25 155:24 158:19,25
Spartan's 8:4 9:3 10:2 15:3 16:2
19:11 29:13 35:15,18 39:4
40:23 47:15 50:24 74:8,9,10
80:22 98:9 116:21,23 125:8
130:9
speak 14:16 40:11 48:13 100:18
148:18 161:8
speaking 6:12 8:15 87:16 98:16
110:7 134:8
speaks 86:9 154:9
specific 16:20 17:2 84:19 98:2
107:12
specifically 11:5 13:21 18:8
42:16 53:22 55:10 76:3
108:12 131:19 134:15 141:1
162:11
specter 59:11
speculation 71:17,24
speculators 71:24
spell 6:13 48:13 100:18
spend 136:4
spike 71:11,13 131:20,22
spiked 71:15
split 117:12
spoke 40:1,3,6 51:25 53:3 87:17
87:19
spoken 131:17
squeeze 95:20 112:3,24 120:22
SRR 1:7 24:1 67:15 81:24 82:2,5
86:20 103:16
stabilize 20:1
staff 22:25
stake 59:9
staking 59:9
stamp 133:10,11
stamped 90:20
stand 95:6 131:25 138:19 155:4
155:5
standard 121:14 151:24 152:11
158:2 159:20
standards 154:4 155:12
standing 15:11 62:9
start 104:17 105:1 112:19
started 32:1 118:6 120:11,13
159:6
starting 143:6 146:2
state 6:12 27:11,14 44:16 48:13
49:20 88:17 100:18 133:12
160:20
stated 117:1
statement 27:7,9 32:4,5 47:18
68:13 76:14 105:12 106:9,10
106:11,13,14 111:2,11 117:3
118:11 120:19 130:4 131:25
153:3
statements 26:9 27:5 37:23 38:8
38:14 59:8 86:22 143:9
states 1:1,12 2:7 76:3 79:25
87:24 113:25 164:12

stating 26:12
status 92:21 142:10 144:15
    150:10
statute 162:11 163:2,3
statutes 162:11
stay 144:11
stemmed 156:23
stemming 78:20
STENOGRAPHICALLY 2:6
step 41:9 47:21 48:4 94:21 99:17
    138:14 140:8
steps 16:18 17:3,6 143:19 157:8
still 7:5 18:3 19:13,19 44:24 47:4
    85:5,12 86:7 95:4,23 110:10
    132:1
stock 6:23 12:23 13:1,12,19 16:3
    17:17 28:24 59:3 60:22 71:17
    71:22 72:5 77:14,15,18,19,23
    78:17 111:20,22 112:2 117:12
    119:3,25 120:14,15,16 130:21
    130:23 131:20
stocks 113:3 130:20 150:15,19
stood 137:13,17
stop 73:25 155:12
stopped 159:7,7
story 132:1
strategy 160:2
street 1:15 18:18,18
stricken 103:10
strictly 46:2
strike 18:4 22:22 25:7 30:3,16
    33:22 34:7 35:11 38:11 67:9
    81:6,6,7 97:17 103:5 108:19
    108:20 118:25 123:1
string 66:1
strongly 64:6
structure 38:25 39:9 101:14
    117:13
studies 104:23 112:14
style 118:5,6
subject 106:7
subjected 155:21
subjective 29:10 42:25 143:16
    143:17 154:1
submit 37:1 155:3
submitted 43:19 70:14,15,19
    89:19 102:1 106:6,22 107:7
    111:12 112:6 126:10
submitting 106:10
subrogation 56:21
subsections 157:13
subsequent 52:1 121:12 144:7
subsequently 94:1
subset 21:7
subsidiary 9:11 83:11,13,17,19
substitute 161:2
succeed 152:10 157:18
success 157:1
successes 105:1,4
successful 20:4 104:23 112:15
    113:1
successfully 147:13
sue 85:5,8
sued 156:6
suffer 160:24
suffered 27:2 139:12
sufficient 153:25
suggest 119:17,20,2 2 127:12
    156:17
suggesting 152:7,8 162:10
suggestion 145:1 162:22
suggests 62:18
Suite 1:20 2:3,8 164:13
sum 59:2 149:5 153:18
summary 137:13,15,18
sums 51:2
supersede 58:5
supersedes 57:22 102:17 113:25
supervisor 28:15

supervisory 10:20
supplemental 53:4 63:24 64:2
    92:7,16
support 106:6,14,22 159:11
supporting 11:19
suppose 83:3 160:23
supposed 54:3 75:14,17 159:2
    163:24
supposedly 12:1,13 158:15
    159:8
sure 6:14 9:25 10:13 26:19 27:1
    28:21 36:15 39:3 40:2,9 57:20
    72:9 73:17 74:3 86:13 92:13
    99:7 100:20 101:11,14,17,19
    106:8 116:2 117:8 137:22
    144:13 152:22 159:15
surety 162:13
surprise 82:21
surrounding 12:7 134:2
suspend 75:13 76:5
suspicion 154:25
sustained 103:6 157:22
Suzanne 126:9,16
SWORN 6:9 48:10 96:1 100:15
    139:1
symbol 16:21
system 18:11,15,25 117:2,7,9,13
    117:15 118:9,14,20 119:2,9
    123:21 129:19,19 130:2
S-c-o-t-t 100:21

T

T 111:23 164:7,7
TABLE 3:1
take 10:6 12:9 16:8,18,25 17:1,6
    18:4,5 20:15 41:9 45:24 55:9
    79:6 90:19 91:9 92:6 96:25
    97:2,4 103:21 105:7 107:23
    108:4,11 113:18,19 114:4
    126:16 137:5 145:2 146:16
    159:6 163:9
taken 13:25 17:15 95:16 100:2
    104:11 148:9 154:11 155:23
takes 89:13
taking 17:3 24:10 60:8 104:10
    131:2 136:25
talk 115:25 129:8,10
talked 42:16 52:7 94:12
talking 44:12 55:18 92:24
    146:22 162:4,25
talks 117:6 162:11
tasked 45:16 52:21,24
tasks 10:16
TD 23:9,17 24:4 40:15 44:5,10
    52:13,22 53:2,22,22 54:2 55:12
    55:17,22 56:9 62:23 63:13
    64:21 65:10,14 69:8,12,13,25
    70:16 71:2 72:7,8,11,22,25
    86:17,20,22 87:2 92:1 93:10
    93:25 94:12 102:11,24,25
    104:1 114:16,19 115:1,7,11
    115:19,21 126:7,25 127:3
    134:9 138:3 139:5 140:1
    142:23 143:21 144:2 148:24
    150:14,22 151:6 152:21
    156:17 160:5
Technically 41:19
technique 118:8
telephone 24:11 25:2 42:14
    136:24
tell 40:13 44:7 50:1 72:6,10
    75:12 81:24 96:9 116:7 121:3
    128:24 152:20
telling 91:23 96:5 142:22 152:9
    153:13
Temporary 90:25
ten 73:3 151:9
ten-year 55:7,7
term 55:7 107:10

terminal 18:14
terminate 75:13,14,2 5 76:5,13
    78:24
terminated 76:22 77:9,9 78:8
    88:11 101:2 148:10 155:24
    156:1
terminating 148:11
termination 101:5 154:22
terms 30:5 43:6 90:13 111:23
    125:22 126:12 142:16 143:8
    146:3 154:13,21 156:25
    158:13 163:17
testified 26:14 27:21 34:21 36:5
    37:17 45:25 47:11,16 69:14
    72:17 73:18 78:19 81:1 83:6
    84:10 88:13 97:1,24 108:15
    116:3 123:23 129:4 130:19
    132:7 142:18 149:2 155:21,25
testify 73:9,11 76:17,18 128:11
    143:2,9,25 148:1 151:19
    153:21
testifying 29:12 81:3 89:23 93:2
    133:20
testimony 14:7 22:13 60:10 63:3
    70:15,17 89:3 93:5 97:17
    104:6 111:16 121:3 143:23
    144:6 154:6 155:8 156:14,20
    157:2
tests 112:16
text 20:21,23,23 21:9,17 22:12
    91:12,21 97:19 108:16,24
    109:7 150:4
texted 129:10
texts 21:7,14 65:19 108:17,24
thank 6:7,11,16 12:3 15:14
    39:20 47:21 48:8,12 67:6
    89:15 94:21 99:17 100:17,22
    105:19 111:19 126:14 130:16
    131:12 138:14 140:8 145:22
    145:23 149:16 150:8 155:6,10
    155:11,13 158:6 159:12,13
    163:12,13,14,2 3 164:3
their 56:20 60:22 71:25 78:17
    92:23 97:5 104:23 113:1
    118:14 128:11 156:8 157:24
    160:18
themselves 125:19
theories 81:18
theory 56:23
thereabouts 108:9
thereto 63:6 90:19
thing 26:23 109:8 117:9 145:10
    145:11
things 7:22 102:8 104:22 151:16
    154:24
think 26:16 32:5,20 59:11,12
    78:14 86:2 90:8 93:6 96:10
    112:2,23 116:3 117:25 120:25
    130:22 141:5,17 145:4 146:3
    151:21 153:2,5,16,22,24
    155:15 156:8 157:17,20 158:2
    159:16 160:2 161:14,21 163:4
thinly 77:15,18,19 78:1,5,7
third 38:14 44:5,11,13 55:17
    153:6
third-party 152:21
though 22:3 34:24 40:24 41:5
    95:12 101:15 106:11 151:21
thought 111:14 142:11 148:23
thousand 47:1 104:16 117:20,24
    161:20 162:2
threaten 121:21
threatened 121:23
threatening 121:19
three 111:20 118:1 146:13,14,17
throes 147:5
through 43:20 49:3 52:11 90:3
    101:12 107:4 114:2 122:23
    123:20 148:12 157:12

throughout 34:14 46:21,22 47:5
    129:6
ticket 95:13
time 16:1 18:15,23 19:17 22:1,3
    22:5,18,19,24 29:7,9 30:16
    31:12,22,24 34:7,16 35:21
    40:25 41:6 58:2 59:10,11,22
    60:3,20 62:6 63:1 64:19,20
    67:9 68:22 72:4 75:9 77:4,25
    79:4 82:18,24 89:14 90:3,3,20
    91:8,14 94:19 100:12 101:23
    110:10 112:7 113:19 114:15
    115:14 119:17 121:10,11,14
    121:23 125:11 127:11 129:10
    134:12 139:8 143:1 145:20
    146:6 147:7,8 151:12,14
    153:1 154:3 155:24
timed 112:23
times 78:15 94:2 118:1,12 129:8
    129:20 157:14
timing 90:12 159:4
tiny 101:11
title 61:11
titling 82:10
today 51:6 70:15 72:2 81:1 89:5
    91:12,19 93:2 97:17 104:6
    131:25 143:20 154:21 156:20
today's 106:7 144:6
told 29:24 30:5 32:17,22 35:5
    36:13 37:2 41:4 44:4,9 52:6
    74:16 91:23 96:21 121:23
    130:13 136:2 137:13 143:14
tomorrow 144:11,12,17 145:7,9
top 66:5 106:3
topic 129:12
tort 56:23
total 14:5 47:12 57:3 98:5
    130:22
town 144:10
track 145:17
trade 7:25 8:1 12:11 60:4 72:7,8
    72:15 73:6,7 105:24 115:23
    116:13 117:14,23 118:12
    122:23 127:9 130:20 156:4
    160:5,13
traded 77:15,18,19,2 0 78:2,5,7
    78:12,16 119:11
trader 9:8 10:19 12:16 32:14
    33:20 35:10 36:1 73:5,9,10,11
    111:1 130:8 156:21
traders 8:1 11:9 31:16 74:21
    119:11,14 120:24
trades 10:22 12:17 14:3 18:10
    20:7 25:5 29:12,16,18 30:17
    30:21,23 31:14,19,21 35:11
    35:12,18 45:16 46:14 50:24
    62:19 72:10,15,18,20 73:25
    76:8,10 77:12 78:1,18 80:1,5
    80:10,11,16,23,23,2 5 81:12
    82:3,4 93:6 101:5 104:10
    108:7 116:11 117:17 120:4
    130:1 150:25 154:22 155:25
trading 7:21 9:2 10:10 11:19,21
    12:13,23 13:12,19 15:2 16:3
    19:14 23:6,8,9 27:3,21 28:1
    28:10,22,25 29:1,10,13 30:5
    30:15 34:4 35:15,16,19 36:3
    36:17 37:19,21 38:13 40:24
    41:8,11,16,18 42:22 43:5,8,9
    43:11,13,14,15,25,2 5 46:4,8
    46:23 47:6,9,9 51:18 52:11,13
    59:6,10,12,23 71:6,8 72:2
    73:2,9,15,16,2 2 74:5,8,9,10
    74:12,15,21 75:8,13,14,15,20
    75:22,25 76:1,13,25 77:9,10
    77:10,22 78:21,25 80:1,8 81:2
    85:5 92:23,25 97:7,11,12,24
    97:25 98:3,9,13,18 104:7,14
    104:17,18 105:1,10,17,22

106:21 107:11,18,25 109:3
111:5,12,23 112:8,19 115:25
116:4,8,10,20,23 117:2,5,7,18
118:5,6,6 119:25 120:6,15,20
120:23 122:21 123:17 129:5
139:14 148:4,8 160:5,9
**transactions** 9:23,25 10:2,9,10
10:11,12,13 18:11,14,19,25
97:15 130:1,9
**transcription** 164:9
**transfer** 6:23 44:5,10 55:11 63:1
64:21 92:22 94:13 103:25
104:4 114:23 115:8 143:13
150:20 154:23 159:6
**transferred** 65:15 94:14 102:24
115:5
**transferring** 44:12
**transfers** 92:3 115:11 143:22
**transformations** 101:13
**Transhare** 6:24
**transpired** 110:18
**treated** 161:15
**tremendous** 60:2
**Trevor** 1:18 5:13
**trial** 113:1 143:6 145:17 146:1
146:22,25 147:1,4 157:11
160:2
**trials** 60:15
**triangular** 49:3
**tried** 67:22 115:14
**true** 39:24 50:6 69:12,21 71:9
75:10,11 77:12 99:11 105:23
108:7,10 112:9 130:4 139:25
**truly** 18:18
**trusted** 33:20 34:6,9
**truthful** 26:9 27:9
**try** 16:16 19:25 45:17 51:15
53:22 67:15,18 68:9 82:13
142:22 145:3,20 146:3 157:8
163:10
**trying** 35:24 69:11 95:1 147:11
147:18
**Tuesday** 144:18
**turn** 148:24
**turned** 121:1
**twice** 111:1
**two** 41:20,22 65:25 66:3,4 70:19
111:22 112:4 115:10 121:13
139:19 146:10 151:2 156:25
158:17 159:20
**type** 161:20
**types** 56:24 72:10 119:18 132:21
**typically** 57:9 130:20
**typing** 136:24
**typo** 109:20

---

**U**

**ultimate** 20:6 31:13 49:6 83:8,9
96:13
**ultimately** 47:18 60:1 66:15
96:24 157:17
**unable** 46:4 50:24 151:6 154:11
**unauthorized** 18:10 43:8,8,10
43:13,15,25 47:6,9 129:25
**unavailable** 154:3
**uncertain** 30:5
**under** 8:20,22 10:3,22 11:6
11:6 20:24 31:20 34:2 35:12
54:24 55:6,24 73:12 75:24
76:2,20 78:7 95:23 106:9,10
112:7 141:20 143:15 148:13
152:1,11 155:19 157:22
158:19 159:19 160:20 163:9
163:24
**understand** 5:24 10:12 14:7
38:12 41:2 45:12 54:24 57:25
65:21,22 66:10 71:17 77:25
77:4,20 82:25 83:11,16 85:12
91:16 95:13 100:9 123:2,13

151:7 152:13
**understanding** 25:7 38:15,19,24
50:3,10 51:2,20,21 58:8 66:14
67:18 68:17 74:16 87:8,15
97:6,11 120:3 125:20 149:3
150:17
**understandings** 68:15 114:1
**understood** 28:17 30:13 54:1
87:9,12 109:2 113:14 122:14
122:23 123:16 157:5 162:24
**undertaking** 38:21
**underwritings** 7:22
**Unfortunately** 140:4
**unfrozen** 127:8 162:5
**United** 1:1,12 2:7 164:12
**unknown** 19:21
**unless** 151:5 152:14
**unrealized** 14:1 31:6
**unreasonable** 158:18
**unresponsive** 103:5
**unsigned** 45:1,7 113:16
**unsuccessful** 67:20 147:16
**until** 55:5 76:23 145:5 159:19
**untrue** 143:21
**unusual** 131:19
**unwise** 60:4
**update** 61:11,20
**use** 9:3 107:17
**used** 36:9
**U.S** 164:12

---

**V**

**vacate** 158:4
**vacated** 115:17 144:6 160:21
**vacatur** 155:14
**valid** 132:1
**valuable** 57:1
**valuation** 42:4,7
**value** 116:14
**valued** 156:16
**varies** 107:16 130:24 131:1
**variety** 81:18,20
**various** 43:20 89:9 142:10
**Venetian** 65:23
**Verizon** 127:18 128:1,20
**versus** 5:5
**very** 6:7 34:23 56:18,25 57:19
60:22 96:5 120:14 144:18
154:10 157:18 158:7 159:3
163:13
**via** 28:8
**vice** 5:10,16,20 48:23
**violated** 59:22
**virtue** 46:8 51:1
**visited** 93:3
**voicemail** 121:11
**volume** 120:13,15
**vs** 1:6

---

**W**

**waiving** 56:20
**want** 26:12 33:18 46:16 49:15
78:4 90:13 92:5 115:25
117:24 118:2 128:3,12,14
131:10,18 142:3 144:1 145:18
145:19 146:3 147:10,23 149:5
152:5,14 153:18 163:18
**wanted** 12:16 32:5 58:4 59:9,12
62:21 96:16 121:18 152:22
**wanting** 150:6
**wants** 149:1 161:3,7 162:19
**warning** 19:15
**wasn't** 17:2 18:17 55:3 106:1,22
129:22 131:6 132:13 152:23
157:3,6
**wasting** 90:2
**Watch** 48:4
**watching** 130:12
**way** 19:4 28:16 39:3 73:24 85:16

87:1,20 88:21 96:18 121:2
124:12 135:12 145:18 150:24
146:17 151:2 160:6
**ways** 81:20
**week** 116:11 143:4,7 144:18,18
146:17 151:2 160:6
**weekend** 136:4
**weeks** 146:2
**well** 5:14,23 7:21 9:15 11:25
12:21 15:18 17:3,12 19:6
23:14 29:9 30:16 31:20 32:1
34:20 35:10 39:9,14,18,21
52:1 53:17 55:5 56:14 68:19
74:20 79:12 80:18 85:10 95:8
97:17 99:23 100:11 106:9,14
107:19,21 111:7 113:14 128:7
128:11 131:2,7 132:20 137:15
137:18 138:5 139:18 140:24
146:8 147:8 148:22 150:4,4,5
151:7 152:9 153:19 155:7,12
155:18 160:22 163:1
**went** 42:24 101:12 111:21
**were** 5:1 6:21 8:19,22 10:13,25
11:21 13:4,23 14:2 16:10 17:4
18:14,16 21:13,24 22:14,16
22:20 23:3,8 24:6 26:7,8,8,11
27:14,15 28:7,22,22 30:21 31:1,7
32:18,24,24 37:1,25 38:8,10
41:5 44:22 45:11 46:1,21,23
47:1 51:3,8,13,17 52:18 53:1
54:6 56:25 58:22,23,24 59:5
61:8 64:15,18 67:20 68:12
70:1,11,24 72:17,24 73:18
76:21,23 77:10,13 78:12,12
78:19,23 79:2,3,22 83:25,25
86:16,19,22 90:11 92:1 96:23
96:23 97:14,25 98:1,4,15,17
100:4 101:2,6 104:10,17,21
104:21,22,25 106:15 109:12
110:6,13 112:15,17 115:1,17
117:1 118:20 119:1,11,18,20
119:22 120:19 121:4 122:15
122:17 125:18 127:12 128:21
129:12,18,21 132:20 133:4,6
134:1,20,23,25,2,5 135:4,6,8
136:5,11,14,24,2,4 139:16
140:21 147:15,16 148:2
156:22 158:16,24 159:2
160:24 162:24
**weren't** 45:13 133:16
**we'll** 60:25 61:15 64:25 138:18
144:24 147:4,6 159:25 163:9
**we're** 6:4 8:20 20:24 93:20,20
126:8 128:4 144:10,16 145:25
147:7,24 148:18 149:7 153:20
159:18 160:1 161:23
**we've** 11:19,20 55:17 64:5 91:12
91:18 116:10 154:3 155:3
**whatsoever** 38:4 100:12
**whichever** 42:16
**while** 75:1 128:18 136:24 148:9
161:13 162:20
**whole** 26:23 101:14 111:5 118:3
120:17
**wholesaler** 96:12 97:22
**wholesalers** 97:5
**Wildman** 2:1 5:21,21
**Wilkie** 2:7 164:12
**willing** 135:6 147:24 148:18,24
**win** 159:23
**wind** 161:19
**wiping** 160:14
**wire** 21:16,19 42:6 65:10,11,13
70:15,19 109:1 114:23 115:1
115:10 125:25
**wired** 37:5,6 47:14
**wiring** 22:10
**wish** 138:17
**withdraw** 62:25 70:9,22 71:2

**witness** 6:6,9,10,14 7:19 11:16
11:16 13:16 15:15 19:4 25:22
26:4 29:7 33:7 47:22,23 48:1
48:10,11,15 53:9 54:1 59:19
60:12 62:12 63:25 66:23,25
67:3 71:10,10 72:14 79:18
80:15 81:17 82:9 83:3 88:21
88:24 90:3 94:25 95:17,24
96:1 99:4,5,7,20 100:5,7,9,15
100:16,20 102:6 103:13 108:4
111:16,17,20 113:9 119:6
126:12,14 127:23 128:17
132:17 133:1 138:8,11,15,20
138:23 139:1 140:9 142:12,17
**witnesses** 94:22,24 138:16,17
140:10
**wondering** 147:14
**word** 75:17
**words** 46:12
**work** 137:9 163:17
**worked** 163:5
**working** 10:21
**works** 88:10 147:6
**worry** 35:7
**worse** 96:12
**worst** 47:4
**worth** 12:17 131:21 147:18
**worthless** 151:12
**wound** 148:11
**wrap** 142:3
**wreck** 122:1
**Wright** 69:25 70:1,3,7 143:8,14
143:24
**writ** 6:2 8:21 14:19 142:21
151:23,23 152:5,19 155:2,4,4
155:14,16,1 6 156:25 157:24
158:5 160:19 163:18
**write** 124:25 162:16
**writes** 161:18
**writing** 40:20 150:5
**writs** 1:11 58:23 62:15 92:3 93:9
94:8,16 106:15 113:4 115:17
138:6 144:6 155:18,22 157:21
**written** 28:14,14 57:23 75:18
76:12 102:18
**wrong** 78:14 120:9

---

**X**

**X** 9:12

---

**Y**

**yeah** 44:9 46:15 49:6 75:1 90:8
99:4 106:11 128:16 141:19
152:17 153:16
**year** 60:20 149:22
**years** 9:8,9,10 73:3 107:20
**year-to-date** 139:15
**yesterday** 126:10 133:20
**yo** 8:22
**York** 1:24,24 133:12

---

**Z**

**zero** 17:25

---

**S**

**$1** 122:20 139:14,18
**$1.4** 77:2,3,8
**$1.5** 77:6
**$10** 74:11 157:5
**$100,000** 98:16
**$11** 115:11
**$12** 31:8
**$14** 40:25 41:6
**$15** 160:23 162:16
**$16.5** 85:8 121:4 131:4,5
**$16.6** 73:12 108:8
**$19** 72:3
**$2** 20:14 23:19 36:6,14,18,22

37:3,9 41:25 42:1 47:14 52:19
71:3
**$2.2** 31:1
**$20** 72:3,3
**$25** 116:20
**$3** 55:6 56:9 107:2 120:18,21
122:17 130:23 158:12
**$375,000** 98:8,13
**$38** 71:23
**$50,000** 101:13 130:24
**$500,000** 12:14,17 14:2 98:4,16
105:11,13,2,2 106:19
**$6.5** 156:16 158:11
**$600,000** 114:23
**$7.5** 55:11 56:8 64:21 67:11
94:13 102:9,20,2,4 103:25
113:5 162:25
**$74** 71:15
**$8** 160:7
**$9** 150:23 151:7
**$9.13** 31:10
**$9.14** 31:10

---

**1**

**1** 4:5,6 49:16,17,19 53:11,14
54:11 79:25
**1st** 39:17 50:2,6,12,14,1 6 60:16
149:21
**1-2** 57:15
**1.5** 115:4 156:14
**1:00** 32:2
**1:40** 100:2
**10** 4:19 18:6 98:7 131:9 133:4
136:18 137:6 138:23,25
141:21,22,2,3 151:10,11
**10:45** 129:22
**10:55** 5:1
**100** 3:15,16 104:13
**10017** 1:24
**11** 18:6,8,24
**11th** 143:7
**114** 3:17
**12** 20:17 108:13 135:4
**126** 4:18
**13** 4:7 114:21 133:24
**13-1** 1:5
**13-3** 2:8 164:13
**130** 3:18
**138** 4:19
**139** 3:19,20,21
**14** 4:6 9:10 107:19
**15** 4:12,17 9:10 107:19
**15c3-1** 15:16
**15th** 143:6 151:19 153:10
**16** 20:9 47:10,13 57:2,16 102:14
113:25
**16.5** 51:8
**16.6** 50:23
**1600** 1:20
**164** 3:22
**17** 4:5,9 113:25
**18th** 88:17
**19-20979-CIV-MOORE** 1:3

---

**2**

**2** 4:7,8,12,13,1 5 54:9,13,15 56:4
60:15 64:11,15 93:24 100:1
101:18 105:20 111:23 113:18
132:5
**2nd** 53:6
**2:00** 32:1,3,7,13 33:3,13 73:19
73:22 77:3
**2:15** 100:4
**20** 125:16
**2009** 101:14
**2013** 39:19
**2016** 10:17
**2019** 1:7 6:21 9:16 10:18 11:12
12:7,22 18:7 43:20 50:2,6,14

---

50:16,20 51:14 53:7 61:5
65:12 66:6,13 88:17 92:21
94:1 101:10 104:7 109:13
110:2 131:22 133:24 135:4
**21** 4:16
**212-858-0040** 1:25
**213-620-1398** 1:17
**213-620-1780** 1:16
**22** 4:18
**23** 3:6 109:20
**24** 65:6 164:2
**24-14** 44:23
**24-2** 141:2
**25** 4:19 65:6 116:13 130:20
**26** 65:6

---

**3**

**3** 4:8,10,12 55:10 61:1,2,4 64:11
64:15 98:5
**3:00** 32:17,19 34:11
**3:15** 34:16
**3:30** 34:16,18
**3:45** 34:18
**30** 66:1,17
**305-374-5095** 1:21
**305-448-7978** 2:5
**305-448-7988** 2:4
**305-982-5572** 1:21
**305.523.5118** 2:8 164:13
**31** 66:1,17
**31-1** 11:14 20:16
**31-2** 53:6
**31-3** 64:25
**31-4** 68:4
**33128** 2:8 164:13
**33146** 2:4
**333** 1:15
**33301** 1:20
**350** 1:19
**350,000** 118:1

---

**4**

**4** 1:7 4:9,12 56:3 61:16,17,19
64:11,15 111:21 150:18,18
**4:00** 34:19
**4:04** 82:16
**4:05** 164:5
**4:14** 135:24
**400** 2:8 164:13
**4000** 2:3
**43rd** 1:15
**44** 3:7
**46** 82:21,24
**48** 3:8,9
**49** 4:5

---

**5**

**5** 4:10,12 55:7 57:14,15 62:1,3
64:11,15 92:11,18 93:23
131:18 137:5
**5th** 1:24
**5:25** 90:20
**50** 47:2 111:23 124:2
**500,000** 139:20
**53** 4:6
**54** 4:7 60:23 62:6 104:18 105:5
112:18,25
**575** 1:24

---

**6**

**6** 3:4,5 4:11 51:8 57:15 64:2,9
66:21,25 92:6,15 93:24 101:6
101:10 104:7,14,17 105:2
108:8 112:19 131:22
**6th** 9:16 11:11 12:22 15:22 16:1
16:10,22,24 17:15 18:7 19:9
19:10,14,14 20:13 22:18
28:19,22 29:20,24 30:4,13,15

---

30:18,25 31:5,7 32:1,2,3,8,13
32:17 33:3,13,18 34:11,22
35:23,24 36:6,13 37:3,16 38:7
39:21,25 40:11,12,14,18,23
41:4 46:1,10,11,19,23 52:3
60:8,12 61:5,24 62:5 70:17,20
71:2,12,14 73:19,23 77:1,3,21
77:22 78:7,8,24 81:2 111:3,13
111:25 112:7 114:15,20,22
116:1 118:1,5 119:1 120:1
129:3,4,9
**6:30** 121:11 134:17
**61** 4:8,9
**62** 4:10
**64** 4:11,12
**65** 4:13
**650,000** 31:8
**67** 4:14
**68** 3:10 4:15,16

---

**7**

**7** 4:13,14,1 4 12:9 55:1 64:19
65:1,2 67:1,2,5,7 90:15 91:10
101:6,10 103:21 105:17
109:13 134:12 147:4
**7th** 11:12 15:22 16:2,2,22 19:25
20:3,8,13 22:18 23:1,2 24:10
24:13 30:21,24 31:15 35:25
36:3,4 42:13 43:20 45:17,21
46:10 51:14 52:3 60:8 70:17
70:20 71:2,12,14,16,20 76:24
79:4 86:17,25 87:3,6,17,20
93:3 94:1 97:7,12,20 111:4,13
115:4 116:1 120:4,7,20 121:7
122:2 129:3 134:17 135:20
136:10 139:6,18 147:1 156:10
**7.5** 122:16 125:25 160:18 162:6
**7:30** 135:3,5
**74** 77:20 78:1,12,12
**77.24** 162:11

---

**8**

**8** 4:15,16 20:17 64:19 68:1,2,19
68:21 108:13 110:2 134:12
135:4,5 137:6
**8th** 51:14 54:21 63:14 65:12
66:6,12 82:16 90:20 91:6,13
91:24 92:20 122:5 129:3
135:21,21,2,2 153:11
**8-K** 25:8,10 26:13 27:3 93:22
**8.55** 111:22
**8:00** 61:23
**8:00ish** 120:14
**8:40** 62:5
**800** 2:3 47:2,3
**850** 47:3

---

**9**

**9** 4:11,17 99:6,10,13,1 5 108:12
**9:00** 87:17 134:17 136:9,10
**9:30** 120:12 121:14
**9:52** 91:13,24
**90** 3:11 136:2
**90071** 1:16
**96** 3:12,13
**98** 3:14
**99** 4:17