**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 19-CIV-20979-RAR**

**AXOS CLEARING, LLC**,

       Plaintiff,

v.

**SCOTT REYNOLDS, an individual;**
**and SRR FORTRESS CAPITAL, LLC,**
**a Florida limited liability company**,

       Defendants.

_____/

## ORDER GRANTING DEFENDANTS' MOTION TO COMPEL ARBITRATION

**THIS CAUSE** comes before the Court on Defendants Scott Reynolds' and SRR Fortress

Capital's Motion to Compel Arbitration or Dismiss the Complaint ("Motion to Compel

Arbitration") [ECF No. 65], filed on May 27, 2019.  At issue is whether the allegations in

Plaintiff's Amended Complaint [ECF No. 53] ("Amended Complaint") are subject to mandatory

arbitration with the Financial Industry Regulatory Authority ("FINRA") or should otherwise be

dismissed.  Having reviewed the parties' written submissions, the record, and applicable case law,

it is hereby

**ORDERED AND ADJUDGED** that Defendants' Motion to Compel Arbitration [ECF No.

65] is **GRANTED** as set forth herein.

## BACKGROUND[1]

Plaintiff Axos Clearing LLC ("Axos") is a clearing firm serving brokers and dealers

engaged in securities transactions.  Axos performed services, including executing and settling

---

[1]  For purposes of the instant Motion, the Court accepts as true the well-pled allegations in Plaintiff's
Amended Complaint.

securities transactions for non-party Spartan Securities Group, Ltd. ("Spartan") pursuant to a Fully Disclosed Clearing Agreement ("Clearing Agreement") [ECF No. 65-1]. Axos and Spartan were also parties to an Inventory Lending Agreement ("Loan Agreement"), which allowed Spartan to make authorized trades in its proprietary trading account ("Spartan Inventory Account") held at Axos. Am. Compl. ¶ 21. Defendant Scott Richard Reynolds ("Mr. Reynolds") worked for Spartan as a principal trader on the Spartan Inventory Account. *Id.* at ¶ 18. Spartan imposed limits on the amount of trading Mr. Reynolds was authorized to conduct within the Spartan Inventory Account at Axos. *Id.* at ¶ 27. Mr. Reynolds was limited to a maximum intra-day position of $500,000 per ticker symbol, never to exceed at any single time $500,000, and a total aggregate intra-day basket of all positions held at any time not to exceed $3,000,000. *Id.* at ¶ 28. To ensure these limits were not exceeded by individual brokers, Spartan utilized BRASS, an integrated trade compliance application that tracked the trades made each day. *Id.*at ¶ 34. Axos had the right to reject any trades that went beyond the limits agreed to by the parties. *Id.* at ¶ 30.

According to Plaintiff, between March 6 and March 7, 2019, Mr. Reynolds engaged in a series of unauthorized securities trades that exceeded Mr. Reynolds' trading limits and resulted in an injury of more than $16,000,000 to Axos. Specifically, on March 6, 2019, Mr. Reynolds took a short position on 824,436 shares of Bio-Paths Holdings, Inc. ("BPTH"), which had an average price of $9.32 per share, or an aggregate $7,683,744 in short value. *Id.* at ¶¶ 35-38. This position far exceeded the limit placed on Mr. Reynolds' trading capacity and was not authorized by Spartan. *Id.* at ¶ 37. Plaintiff alleges that in order to circumvent detection, Mr. Reynolds falsified transactions in the BRASS system to create the impression that he had not exceeded his trading limits. *Id.* at ¶ 39. Specifically, Plaintiff claims Mr. Reynolds fabricated certain purchases to net

against the BPTH short position and make it appear that he was short a smaller number of BPTH shares than he actually was. *Id.* at ¶ 40.

On March 6, 2019, when Axos learned of the real magnitude of Mr. Reynolds short position, Axos demanded that Spartan cover the entirety of the loss. *Id.*at ¶ 44. Mr. Reynolds acknowledged his responsibility for the unauthorized trading losses and represented that he would close out the BPTH short position by the end of that trading day; in reality, Mr. Reynolds only partially closed his position in BPTH, leaving Axos with financial exposure. *Id.* at ¶¶ 46-49. The following day, Mr. Reynolds requested that Axos keep Spartan's trading position open to address the deficit in the Spartan Inventory Account. *Id.* at ¶ 53. In addition, Mr. Reynolds offered to pay Axos $2,000,000 that afternoon by wire transfer. *Id.* He also agreed to pay the entire deficiency in Spartan's account by pledging cash and securities in a TD Ameritrade account ("Pledged Account") held by Mr. Reynolds and his limited liability corporation, Defendant SRR Fortress Capital, LLC. *Id.* at ¶¶ 53-55. Mr. Reynolds did not pay the $2,000,000 on March 7, 2019. *Id.* at ¶ 53. Moreover, by the following day, after Mr. Reynolds' remaining position in BPTH was closed, the net loss to Axos was approximately $16,600,000. *Id.* at ¶¶ 60-71.

On March 8, 2019, Axos and the Defendants entered into a settlement agreement, which required Defendants to pay $10,500,000 to Axos, comprised of an initial payment of $7.5 million and an additional $3,000,000 to be paid over time ("Settlement Agreement") [ECF No. 53-1]. According to Plaintiff, Defendants failed to make the initial payment of $7.5 million payment as required by the Settlement Agreement, and to date, have failed to perform all of their obligations therein. *Id.* at ¶¶ 81-83.

On March 13, 2019, Plaintiff filed a two-count Complaint against Defendants, alleging breach of contract and fraudulent inducement [ECF No. 1]. On May 5, 2019, Plaintiff filed an

Amended Complaint, which contains eight counts: Breach of Settlement Agreement (Count I); Fraudulent Inducement (Settlement Agreement) (Count II); Fraudulent Misrepresentation (Count III); Negligent Misrepresentation (Count IV); Fraudulent Failure to Disclosure (Count V); Tortious Interference With Contractual Relations (Count VI); Breach of Pledge Agreement (Count VII); and Unjust Enrichment (Count VIII) [ECF No. 53]. Counts II-VIII are brought in the alternative to the Breach of Contract claim in Count I.

On May 27, 2019, Defendants filed a Motion to Compel Arbitration or Dismiss the Complaint [ECF No. 65], arguing that Plaintiff's grievances are subject to mandatory FINRA arbitration given that both Axos and Spartan are Members of FINRA and the Clearing Agreement contains a mandatory arbitration clause. In the alternative, Defendants argue that Plaintiff's claims must be dismissed for a number of reasons, including failure to join an indispensable party and lack of specificity. Plaintiff responds that its claims are not subject to FINRA arbitration, and alternatively, that Defendants waived their right to pursue arbitration.

## LEGAL STANDARD

While federal law establishes the enforceability of arbitration agreements, state law governs the interpretation and formation of the same. *Employers Ins. of Wausau v. Bright Metal Specialties, Inc.*, 251 F.3d 1316, 1322 (11th Cir. 2001). The Federal Arbitration Act requires that a court stay or dismiss a lawsuit and compel arbitration where: "(a) the plaintiff entered into a written arbitration agreement that is enforceable under ordinary state-law contract principles and (b) the claims before the court fall within the scope of that agreement." *Lambert v. Austin Ind.*, 544 F.3d 1192, 1195 (11th Cir. 2008) (internal quotations and citations omitted). Generally, when deciding whether the parties agreed to arbitrate certain matters, "courts should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v.*

*Kaplan*, 514 U.S. 938, 939 (1995). "Under both federal statutory provisions and Florida's arbitration code, there are three elements for courts to consider in ruling on a motion to compel arbitration of a given dispute: (1) whether a valid written agreement to arbitrate exists; (2) whether an arbitrable issue exists; and (3) whether the right to arbitration was waived." *Seifert v. U.S. Home Corp., et al.*, 750 So.2d 633, 636 (Fla. 1999) (internal citations omitted). "The party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Financial Corp. v. Randolph*, 531 U.S. 79, 92 (2000). Moreover, "federal law counsels that questions of arbitrability, when in doubt, should be resolved in favor of arbitration." *Employers Ins.* 251 F.3d at 1322 (citations omitted).

## ANALYSIS

### A.  The Parties

FINRA Rule 13200 requires arbitration when "the dispute arises out of the business activities of a member or an associated person and is between or among: members, members and associated persons, or associated persons." There is no dispute that Axos and Spartan are FINRA members. The issue before the Court is whether Defendant Reynolds[2] constitutes an "associated person" such that Plaintiff's claims must be resolved in FINRA arbitration. FINRA Rule 13100(a) defines an "associated person" as a "person associated with a member," a term defined by FINRA Rule 13000(u)(2) to include, as relevant here, "a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member." In

---

[2]  For purposes of this Motion, the Court accepts Plaintiff's contention in the Amended Complaint that Defendant SRR is the "alter ego of Reynolds" given that "SRR is not only influenced and governed by Reynolds," but also that "there is such unity of interest and ownership that the individuality or separateness of Reynolds and SRR has ceased." [ECF No. 53 ¶ 22]. Accordingly, the Court's analysis with respect to Defendant Reynolds is equally applicable to Defendant SRR.

addition, Rule 13000(u) notes that "a person formerly associated with a member is a person associated with a member."

Under this broad definition of associated person, there is no question that Mr. Reynolds is an "associated person" within the meaning of the FINRA Rules.  Mr. Reynolds was formerly employed by Spartan and was certainly controlled by Spartan during the time of his employment when the alleged unauthorized transactions occurred.  In fact, Plaintiff does not dispute that Mr. Reynolds is an "associated person" of Spartan.  Rather, Plaintiff contends that because Mr. Reynolds is not an "associated person" of a party *in this lawsuit*, compelling FINRA arbitration would be improper.

Plaintiff cites no authority to support its argument and the Court is unaware of any such legal proposition.  The law does not require Mr. Reynolds to be an "associated person" of a party to this lawsuit; the law requires that there be a dispute arising out of the business activities of a member or an associated person.  *See* FINRA Rule 13200.  Indeed, FINRA's own rules contemplate mandatory arbitration "between or among associated persons."  *Id.*  This means the actual members of FINRA need not be a party to a dispute among associated persons to compel arbitration.  In addition, FINRA Rule 13200 requires arbitration in disputes "between or among members and associated persons" where such disputes arise out of the business activities of a member or an associated person.  Here, Mr. Reynolds is an associated person of FINRA-member, Spartan.  Axos is a member of FINRA.  Accordingly, this is a dispute between a member of FINRA and an associated person as required by Rule 13200.

### B.  The Claims

Having determined that the parties are subject to the arbitration provision of FINRA, the Court turns to consider whether the dispute is arbitrable.  Resisting arbitration, Plaintiff argues that

its claims are not subject to FINRA arbitration because "the core" of the Amended Complaint "is a simple breach of contract claim *arising out of* the parties' Settlement Agreement," not the business activities of an associated person [ECF No. 77 at 5-6] (emphasis in original).  While it is true that Plaintiff's Amended Complaint includes a breach of contract claim, it also advances seven separate claims brought in the alternative, ranging from fraudulent misrepresentation and inducement to tortious interference and unjust enrichment.  Many of the issues raised in Plaintiff's Amended Complaint have little to do with Plaintiff's breach of contract claim, and indeed all relate to the underlying business activities that gave rise to the Settlement Agreement.  The issue before the Court is thus whether Plaintiff's claims arise out of the "business activities of" an associated person such that Rule 13200 requires arbitration.

The Eleventh Circuit, in interpreting FINRA Rule 12200—the customer dispute counterpart to the industry dispute section at issue here—explained:

> Because a person's status as an associated person depends entirely on his or her relationship or role with the FINRA member, we understand the FINRA Arbitration Code to require an associated person to arbitrate a dispute before FINRA only if the dispute has some connection to the associated person's relationship with the FINRA member.

*Pictet Overseas Inc. v. Helvetia Tr.*, 905 F.3d 1183, 1189 (11th Cir. 2018).  In doing so, the Court noted that it was persuade by the reasoning in *Valentine Capital Asset Mgmt., Inc. v. Agahi*, 174 Cal. App. 4th 606, 616 (Cal. Ct. App. 2009), which held that in the context of FINRA Rule 13200, a Court "must require arbitration of disputes only if they arise out of the business activities of an individual *as* an associated person of a FINRA member." (emphasis in original). *Pictet*, 905 F.3d 1191 n.8.  In surveying the relevant legal landscape, the *Valentine* Court noted that in cases where FINRA arbitration has been compelled, there is generally "a nexus between the alleged wrongdoing and the actions of a party *as* a member or associated person."  *Valentine*, 174 Cal.

App. 4th at 540.  Other courts have followed suit in explaining that whether a dispute "arises out of the business activities" of a member or an associated person "has been defined to mean any dispute that the parties could reasonably expect to be appropriate for arbitration in FINRA." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Middleton*, No. 3:17-CV-1259-J-20JRK, 2018 WL 3625784, at *5 (M.D. Fla. Feb. 7, 2018).

Against this backdrop, the Court turns to Plaintiff's claims.  In Count I, Plaintiff posits that the parties entered into a Settlement Agreement, whereby Defendants agreed to pay Plaintiff $10.5 million, which Defendants failed to do.  The Settlement Agreement was born out of, and two days after, Mr. Reynolds' allegedly executed unauthorized trades on Spartan's Inventory Account, resulting in over $16 million in losses to Plaintiff.  However, Plaintiff argues that the Breach of Contract claim is "several steps removed" from the business activities regulated by FINRA because Mr. Reynolds was acting in his personal capacity when he executed the Settlement Agreement. Plaintiff contends that in executing the unauthorized transactions, Mr. Reynolds exceeded the scope of his employment thereby giving rise to an independent cause of action that does not arise from his business activities, nor those of a FINRA member.  This Court disagrees.

The Breach of Contract claim at issue in Count I is intimately related to the business activities of Axos, Spartan, and Mr. Reynolds.  The underlying Settlement Agreement, which Plaintiff contends was breached, was executed two days after Mr. Reynolds placed the unauthorized trades for which Plaintiff now seeks to recover.  Mr. Reynolds effectuated these trades while acting as principal trader of the Spartan Inventory Account on behalf of Spartan. When the alleged scheme unraveled, Mr. Reynolds spoke with his employer, Spartan, and acknowledged his responsibility for the unauthorized trading.  He then sought to remedy the situation first by requesting that Axos keep Spartan's trading position open to address the deficit

in the Spartan Inventory Account, then by orally pledging his assets to cover the entire loss, and finally by executing the Settlement Agreement. Plaintiff's breach of contract claim cannot be separated from the underlying business activities that gave rise to the signing of the Settlement Agreement just two days prior.

As such, the breach of contract arises out of the business activities of Mr. Reynolds as an associated person of a FINRA Member (Spartan) and is between a FINRA member (Axos) and an associated person (Mr. Reynolds). Moreover, there is a clear nexus between the breach of contract and the actions of Mr. Reynolds as an associated person. The underlying wrongdoing that forms the basis for the Settlement Agreement, and thus the breach of contract, is clearly connected to Mr. Reynolds' work as Spartan's employee. Mr. Reynolds' unauthorized trades triggered, almost immediately, the creation and breach of the Settlement Agreement on which Plaintiff's breach of contract claim is based. Given the interconnectedness between the unauthorized trades and the signing of the Settlement Agreement, this is a dispute that the parties could reasonably expect to be appropriate for arbitration.

In support of its position, Plaintiff cites, without analysis, to *Valentine* for the proposition that Count I does not arise from Defendants' business activities as associated members of a FINRA member. In *Valentine*, the defendants were former employees who worked for the plaintiff investment firm. Plaintiff was affiliated with an outside investment firm to provide FINRA-regulated services. When defendants left plaintiff's investment firm, plaintiff sued the former employees for, among other things, slander and unfair competition. The former employees moved to compel arbitration under FINRA, which the Court denied, finding that the claims were outside the scope of the FINRA relationship. In doing so, the Court noted that "none of the purported

wrongdoings occurred in the course of the parties' duties as associated persons with a FINRA-member firm." *Valentine*, 174 Cal. App. 4th at 535.

      *Valentine* is inapposite here.  In this case, Mr. Reynolds's work for FINRA-member Spartan led to the signing and breach of the Settlement Agreement during the course of his employment.  This is not a case, as in *Valentine*, where the underlying dispute is so tangentially related to the FINRA affiliation that compelling arbitration would subject parties to arbitrate disputes beyond the scope of those reasonably anticipated by the parties involved.  To be clear, *Valentine* involved a situation in which an associated person sued another associated person due to activities unrelated to a member firm or unrelated to business regulated by FINRA.  That circumstance is not analogous to the facts of this case.  Here, we have a FINRA-member (Axos) suing a FINRA associated person (Mr. Reynolds) for a breach of contract claim that directly arises from the business activity regulated by FINRA.  Plaintiff's argument that Mr. Reynolds exceeded the scope of his employment in executing the trades at issue does not change the relevant analysis, which only requires that the dispute arises out of the business activities of an associated person, as this dispute does.  Moreover, to the extent any ambiguity exists with respect to the scope of arbitrable claims, the Court resolves such doubt in favor of arbitration.  *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 (1983).

      Similarly, the Court find that Plaintiff's remaining claims— Fraudulent Inducement (Count II), Fraudulent Misrepresentation (Count III), Negligent Misrepresentation (Count IV), Fraudulent Failure to Disclose (Count V), Tortious Interference with Contractual Relations (Count VI), Breach of Pledge Agreement (Count VII), and Unjust Enrichment (Count VIII)—are subject to FINRA arbitration.  Like the breach of contract claim, these remaining claims concern disputes that arise out of the business activities of an associated person.  The genesis of these claims is that

Mr. Reynolds engaged in unauthorized trading positions and/or fraudulent misrepresentations, as a Spartan employee, which resulted in significant harm to the Plaintiff. There is thus a clear nexus between the alleged wrongdoing in all of these claims and the actions of Mr. Reynolds as an associated person. Perhaps in recognition of this truth, Plaintiff's Opposition does not specifically contest the enforceability of FINRA's mandatory arbitration provision with respect to Counts II through VIII of the Amended Complaint, as it does with respect to Count I. Rather, Plaintiff contends that Defendants have waived their right to compel arbitration generally, an argument considered and rejected below.

In sum, Plaintiff's claims arise out of the business activities of Mr. Reynolds as an associated person of a FINRA member. As such, absent a finding of waiver, Plaintiff's claims must be submitted to FINRA for mandatory arbitration.

### C.  Waiver of Arbitration

Plaintiff argues that even if the parties and the claims at issue are subject to arbitration, Defendants waived their right to arbitrate by filing four motions, appearing before the Court, participating in scheduling conferences, agreeing to mediate, and filing a notice of appeal. Plaintiff advances that in the collective these actions amount to a waiver of the right to arbitrate.

Notwithstanding a strong federal policy in favor of arbitration, a party, by its conduct, may waive its right to arbitrate. *S & H Contractors, Inc. v. A.J. Taft Coal Co., Inc.,* 906 F.2d 1507, 1514 (11th Cir. 1990). To establish that an arbitration right has been waived by participation in prior litigation, the moving party must demonstrate that the party seeking to arbitrate "substantially participate[d] in litigation to a point inconsistent with an intent to arbitrate and [that] this participation result[ed] in prejudice to the [moving] party." *Morewitz v. West of Eng. Ship Owners Mut. Prot. & Indem. Ass'n,* 62 F.3d 1356, 1366 (11th Cir. 1995) (citation omitted). "Because

federal law favors arbitration, any party arguing waiver of arbitration bears a heavy burden of proof." *Home Quality Mgmt., Inc. v. Ace Am. Ins. Co.,* 381 F. Supp. 2d 1363, 1367 (S.D. Fla. 2005) (quoting *Belke v. Merrill Lynch, Pierce, Fenner & Smith,* 693 F.2d 1023, 1025 (11th Cir. 1982)).  Therefore, any doubts concerning whether a waiver of the right to arbitrate has occurred should be resolved in favor of arbitration.  *Morewitz,* 62 F.3d at 1366.

Plaintiff filed the instant action on March 13, 2019.  On May 5, 2019, Plaintiff filed an Amended Complaint.  Less than one week after Plaintiff filed the Amended Complaint, Defendants filed a Motion to Stay [ECF No. 53], which was denied, and a Renewed Motion to Stay [ECF No. 58], which was granted in part.  In both of these motions, Defendants sought relief from the Scheduling Order pending the filing of Defendants' response to Plaintiff's Amended Complaint. While it is true that neither Motion to Stay specifically mentioned arbitration, Defendants did promptly request relief from the scheduling order "pending the filing of the[ir] Motion to Dismiss." *See* Renewed Mot. Stay at 4.  Such relief is consistent with Plaintiff's response to the Amended Complaint, which sought to compel arbitration. Similarly, the Court finds that Defendants' Emergency Motion to Dissolve Pre-Judgment Writs of Attachment and Garnishment [ECF No. 24] and Defendants' Motion to Expedite Discharge Lis Pendens [ECF No. 47], both of which narrowly sought to vacate preliminary orders, and at least one of which was requested *ex parte* before Defendants had been served, do not constitute substantial participation in the litigation to a point inconsistent with an intent to arbitrate.

The Court is also unpersuaded by Plaintiff's argument that Defendants waived their right to arbitrate by appearing at Court-ordered hearings, complying with Court orders such as the scheduling of mediation, and appealing an unfavorable ruling.  None of these actions amount to substantial participation in the litigation such that a finding of waiver is appropriate.

Finally, even if waiver could be inferred from Defendants' delay in seeking arbitration, the Court finds that Plaintiff has not met its heavy burden to demonstrate resultant prejudice to Plaintiff.  In support of its position, Plaintiff states, in a conclusory fashion, that compelling arbitration will make it more difficult for Plaintiff to collect on any judgment.  Plaintiff does not explain, nor expand on this calculation, and Plaintiff's reference to its Opposition to Defendants' Motion to Stay [ECF No. 64] fares no better.  Defendants filed the instant Motion to Compel Arbitration three weeks after Plaintiff filed the Amended Complaint.  While the parties have been conducting discovery in compliance with this Court's Scheduling Order, no specified prejudice has been articulated by Plaintiff.

In sum, the Court finds that Plaintiff has not met its heavy burden to establish that Defendants substantially participated in the litigation to a point inconsistent with an intent to arbitrate and that such participation resulted in undue prejudice to Plaintiff.

## CONCLUSION

Having found that all of Plaintiff's claims are subject to arbitration under FINRA, and that Defendants did not waive the right to arbitrate, the Court need not reach Defendants' remaining grounds for dismissal.  Accordingly, it is

**ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion to Compel Arbitration or Dismiss the Complaint **[ECF No. 65]** is **GRANTED**.  The parties must arbitrate all of their claims.

2. All pending motions are **DENIED as moot**.

3. The Clerk of Court shall **CLOSE** this case.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 30th day of August, 2019.

_____

**RODOLFO RUIZ**
**UNITED STATES DISTRICT JUDGE**